IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STEVEN G. MILLETT, MELODY J. )
MILLETT, On Behalf of )
Themselves and All Others )
Similarly Situated, )  Case No. 05-599-SLR
 )
       Plaintiffs, )
 )
vs. )
 )
TRUELINK, INC., A Trans Union )
Company, )
 )
       Defendants. )
 )
_____)

VIDEOTAPED DEPOSITION OF KATE ANDERSON
San Luis Obispo, California
Tuesday, June 26, 2007
9:30 a.m. - 4:40 p.m.

Reported by:  Lora L. Shoffstall, RPR, CSR 9271

```
 1   reports for the TU credit monitoring unlimited, is the
 2   consumer only purchasing TransUnion credit reports?
 3       A.   Yes.
 4       Q.   And with TransUnion credit monitoring
 5   unlimited, is the consumer accessing TransUnion credit
 6   scores?
 7       A.   TransUnion credit scores?
 8       Q.   Uh-huh.
 9       A.   Could you elaborate on that question?
10       Q.   Does your company actually provide the credit
11   scores for the data?
12       A.   We do not have a credit scoring algorithm, no.
13   The -- we offer different credit scores on our
14   TrueCredit.  We -- we provide the TransUnion TransRisk
15   credit score.
16       Q.   And you mentioned that you provide credit
17   alerts.  What is a credit alert?
18       A.   When certain triggers occur, certain things
19   that are critical to a credit report occur, we send an
20   e-mail to the consumer, and then they can log -- that
21   advises them that there has been a critical change in
22   their credit report, and they can log into their
23   account, their TrueCredit account, and see that
24   information.
25       Q.   And why would a consumer want to see critical
```

1        MS. FRIEDMAN:  Objection.  Calls for
2   speculation.  Go ahead.
3        THE WITNESS:  We receive credit alerts from
4   the three credit bureaus, so if it went -- for example,
5   we were discussing TransUnion credit monitoring.  If
6   that item went through TransUnion and they recorded
7   that information, it -- we -- we would receive it.
8   BY MS. YEAGER:
9       Q.   Does TransUnion always determine when a credit
10  alert should be sent?
11       MS. FRIEDMAN:  Are you talking about in the
12  context of a TransUnion credit monitoring?
13       MS. YEAGER:  Yes.
14       THE WITNESS:  They determine what -- they
15  determine the triggers and -- and furnish the credit
16  alerts to us.  So yes, they determine when the credit
17  alert -- when a transaction is a -- an alert.
18  BY MS. YEAGER:
19      Q.   Are there implications to an individual who
20  has been assigned a Social Security number when someone
21  else is using their Social Security number?
22       MS. FRIEDMAN:  Objection. Calls for
23  speculation.  Vague.  What implications do you mean?
24  Implications to what?
25       THE WITNESS:  May or may not.

1     A.    Generally monthly.
2     Q.    Do you know how long after a reporting entity
3  provides credit information to TransUnion it is posted
4  to a credit record?
5     A.    No, I do not.
6     Q.    How can consuming -- excuse me.  How can
7  purchasing the TransUnion credit monitoring unlimited
8  improve a consumer's credit?
9     A.    Improve a consumer's credit?
10    Q.    Yes.
11    A.    By -- by knowledge of what is in the report.
12 For example, if there are inaccuracies that may be
13 harming their credit, they would have the information
14 to be able to dispute that information.
15    Q.    Are all inaccuracies -- strike that.  Who
16 determines -- strike that.  I think you already asked
17 and answered that one.
18          Who generates the credit report pages that the
19 consumer actually sees if they are purchasing the
20 credit-monitoring product?
21    A.    Who generates those?
22    Q.    Yes.
23    A.    The display of the information?
24    Q.    Yes.
25    A.    We do.

```
 1      Q.    Do you obtain the data from TransUnion?
 2      A.    Yes.
 3      Q.    Does the credit report that you display to a
 4   consumer have the same appearance as a credit report
 5   that would be purchased directly from TransUnion?
 6            MS. FRIEDMAN:  Objection.  Lack of foundation.
 7            THE WITNESS:  A consumer?
 8            MS. YEAGER:  Could you read that back?  Sorry.
 9            (Record read.)
10            THE WITNESS:  It appears slightly different.
11   BY MS. YEAGER:
12      Q.    In what way?
13      A.    Just the -- the -- the way that it's
14   formatted.  You know, we have our own display and our
15   own -- you know, we have formatted the credit report
16   ourselves.
17      Q.    Does TransUnion provide free advertising for
18   TrueLink products?
19      A.    Free advertising?
20      Q.    Yes.
21            MS. FRIEDMAN:  Object to the form of the
22   question.
23            THE WITNESS:  Explain "advertising."
24   BY MS. YEAGER:
25      Q.    Are -- are there advertisements available to
```

1   personal information and they -- they send that
2   information over to the credit bureaus that the
3   consumer is requesting data from.
4           MS. FRIEDMAN:  Pass that over.
5           MS. YEAGER:  Let's mark Exhibit 46, please.
6   Almost got it.
7           (Plaintiffs' Exhibit 46 was marked for
8           identification and is attached hereto.)
9           THE WITNESS:  Okay.
10  BY MS. YEAGER:
11      Q.   Is this a TrueLink training document?
12      A.   It appears to be, yes.
13      Q.   Does it appear to be dated February 17th,
14  2005?
15      A.   Yes.
16      Q.   This indicates that compliance has identified
17  a need to improve our customer record matching.  Were
18  you part of the decision to improve customer record
19  matching?
20      A.   It was my decision.
21      Q.   And why was this necessary?
22      A.   We were getting too many no-hits from the
23  credit bureaus.  We were sending name, address and
24  Social Security number, and in some cases that was not
25  enough to obtain a credit report, particularly with one

1  page 1, so it looks like it's a complication of several
2  reports.
3         THE WITNESS:  Right.
4  BY MS. YEAGER:
5      Q.  Very good.  Let's just take the first one,
6  then.  Are you familiar with the first page, a request
7  watch set?
8      A.  No, I'm not.
9      Q.  Do you know what the watch set is?
10     A.  "Watch" is the name that TransUnion uses for
11 credit monitoring, their credit-monitoring service.
12 Regretfully, we chose to use that name in one of our
13 products as well, so it gets somewhat confusing.  But
14 this references TransUnion's watch product, and a
15 request would be if someone enrolls in our
16 credit-monitoring service, we send data, their
17 indicative data, name, address, Social Security number,
18 to TransUnion to request that they send us alerts.
19     Q.  Is that when the watch is set?  Is that what
20 this document indicates, that function?
21     A.  It's our request to receive credit-monitoring
22 alerts for this consumer.
23     Q.  What do the numbers 112846583 reflect?
24     A.  I'm not certain.  I don't know.
25     Q.  Do you know what the letters FFI --

1    contact -- the creditor to contact the consumer to
2    ensure that it is a valid transaction that they
3    initiated.
4        Q.   So it would be up to the consumer to take any
5    actions to try to correct their credit information.
6        A.   To correct their credit information?  Yes.
7    Only the consumer can correct their -- can take action
8    to correct their --
9        Q.   Does an individual who learns of identity
10   theft from the credit reporting -- pardon me.  Let me
11   do that again.
12            Does an individual who discovers an instance
13   of identity theft because they are utilizing your
14   product learn of the identity theft after it has
15   occurred?
16            MS. FRIEDMAN:  Objection.  Lack of foundation.
17            THE WITNESS:  Yes.  We can only send an alert
18   on something that has happened.
19   BY MS. YEAGER:
20       Q.   Who determines what alerts will be sent?
21           MS. FRIEDMAN:  Objection.  I believe that's
22   been asked and answered.  Go ahead.
23           THE WITNESS:  The credit bureaus.
24   BY MS. YEAGER:
25       Q.   Does TrueCredit -- I'm sorry.  Does TransUnion

1    you.  Is that correct?
2        A.   Right.
3        Q.   And the only way that TransUnion would know
4    about a new account is if the creditor were to report
5    it to TransUnion?
6        A.   Correct.
7        Q.   And some of the -- some of the transactions
8    that consumers do are not reported to credit reporting
9    agencies.  Is that correct?
10       A.   Correct.
11       Q.   And some of those would include, for example,
12   someone who was doing a rental for a place to live as
13   opposed to a mortgage?
14       A.   Um, rental screening is a valid, permissible
15   purpose.  So some do.  Many don't.  But some do, so
16   that -- that could be something they receive.
17       Q.   What about the use of utilities?  Is that
18   something that would appear on a credit report?
19       A.   We're seeing it more and more, mostly
20   derogatory information, but I believe some are actually
21   reporting now.
22       Q.   There's no requirement that a utility would
23   report.  Is that correct?
24       A.   Correct.
25       Q.   Is there any requirement that a creditor would

1    your identity?
2        A.   If someone used your identity, the information
3    would be reported through a credit alert.
4        Q.   But that's only if the identity theft is
5    reported to you.  Is that correct?
6        A.   Correct.
7        Q.   And that's only reported to you if in fact the
8    name, address and Social Security number are each used
9    together?
10       A.   I'm not certain how many.  It would take more
11   than one.  I do not know if -- if it is all three.  I
12   don't know what the matching is at TransUnion.
13       Q.   Do you tell your customers that use of their
14   Social Security number by another individual will not
15   trigger an alert?
16       A.   No.
17       Q.   Why?
18       A.   It won't be in their credit report.
19       Q.   How does credit monitoring give you peace of
20   mind?
21       A.   By knowing that we will notify you of critical
22   changes in your credit report.
23       Q.   Where on this ad do you tell the consumer what
24   will and will not be monitored?
25            MS. FRIEDMAN:  Objection.  I don't know if

1  that, and maybe we'll come back to it if we have time.
2       I need just quickly for my own clarification
3  to be certain that I understand the actual steps and
4  understand succinctly so I can describe it the steps
5  that are employed for enrolling in the product. So I
6  just want to run through this and have you stop me if
7  at any point my understanding is incorrect or you feel
8  it needs to be clarified in some way. Okay?
9       A customer first enters your web site and they
10 request to enroll in credit monitoring. Is that
11 correct?
12    A.   Uh-huh.
13    Q.   And then they fill out a form, and the
14 information on that form is sent to TransUnion.
15    A.   Yes.
16    Q.   And then --
17    A.   Some.
18    Q.   Some of that information. TransUnion only
19 requires you to send name, address, and Social Security
20 number?
21    A.   That's the minimum, yes.
22    Q.   And then TransUnion sends back to you a credit
23 report.
24    A.   Correct.
25    Q.   And then your computer determines whether or

1  not -- or your programming determines whether or not
2  that credit report that's sent matches the criteria on
3  your enrollment sheet?
4      A.  Correct.
5      Q.  If that criteria does not adequately match,
6  according to the software, the transaction is stopped.
7  No charge is made, and the person who's trying to
8  enroll is notified that the transaction is incomplete.
9      A.  No.  That's not correct.
10     Q.  Okay.  Tell me about --
11     A.  Okay.  The -- the first page of the order --
12 there are a couple of pages of the order form.  Right
13 now we do have a version that is single page.  But the
14 customer accepts the user agreement.  The next screen,
15 they enter the credit card information.  We will
16 authorize the credit card for the amount of the
17 purchase.  The customer sees on the screen how much the
18 purchase is going to be.  If the credit card
19 authorizes, then we -- we check to determine if a
20 credit report is -- if we can get a credit report.  If
21 we get -- that's when we pull the -- the credit report.
22 If we have a valid credit report that matches, then we
23 charge the credit card.  Then the authentication system
24 starts.
25     Q.  Okay.  And then if the credit report is

1  determined to be an adequate match, the consumer can
2  view that credit report?
3      A.   After they pass authentication.
4      Q.   Okay.  And then at that point a watch alert is
5  set or requested to be set at TransUnion.
6      A.   Correct.
7      Q.   Then that at some point becomes effective at
8  TransUnion, and they send back the FFR that says the
9  watch is set.  I understand now that that's all
10 asynchronous, but at one time that was --
11     A.   It's synchronous now.
12     Q.   I'm sorry.  Synchronous.  Now you've got me
13 doing it.  At one time it was not synchronous.
14     A.   Right.
15     Q.   And now it is synchronous.
16     A.   Is synchronous, yes.
17     Q.   Okay.  And then TransUnion monitors their data
18 for these critical changes.  If a critical change
19 occurs, an alert is sent to your database, your web
20 site.
21     A.   Uh-huh.
22     Q.   An alert goes to the consumer.
23     A.   E-mail.
24     Q.   An e-mail goes to the consumer.  They post
25 onto your site, log onto your site to view the alert.

```
 1      A.   Yes.
 2      Q.   Then they -- if they -- in 2004, for example,
 3  if they had quarterly reporting, they hadn't yet seen
 4  their quarterly report, they could view that at no
 5  cost.
 6      A.   Yes.
 7      Q.   If they had already reviewed their quarterly
 8  report, they paid for an additional cost for a credit
 9  report.
10      A.   No.  That's --
11      Q.   Tell me what's wrong about that.
12      A.   They would have to go to a separate page.  I
13  mean, when -- are they -- they going in to view their
14  credit alerts?
15      Q.   Okay.  They viewed their credit alert.
16      A.   Yeah.
17      Q.   And they see something that causes them to
18  want to look at their entire credit report.
19      A.   Okay.  If the credit -- if a credit report
20  that is part of the product is there, they would view
21  that.  It may not be -- as you said, if -- if the new
22  one is available, it will pull the new one.  If they --
23  if they are not eligible for a new credit report, then
24  they would have to go into a new order process to
25  purchase another one.
```

1  Q.  Okay. If they're eligible for a new credit
2  report, does that credit report -- is that credit
3  report accessed at your site or is it accessed through
4  the TransUnion site?
5  A.  As soon as the customer logs in to get the
6  credit report, we -- we electronically contact
7  TransUnion and obtain the credit report.
8  Q.  And then the consumer is not looking at
9  TransUnion's database. They're looking at your
10 database. They're looking at data --
11 A.  It's TransUnion data that we are displaying in
12 our format.
13 Q.  And on your web site?
14 A.  Yes.
15 Q.  There have been -- we've talked about a number
16 of the different versions of the credit-monitoring
17 process -- or excuse me -- the credit-monitoring
18 product.
19 A.  Uh-huh.
20 Q.  And I know that from looking at the documents
21 that different versions were rolled out over time. But
22 is it fair to say that it was basically the same
23 procedural process that was employed for the entire
24 time credit monitoring was offered?
25 A.  Not from my perspective. It always -- we

1  always sent e-mails when we obtained -- we have always
2  obtained e-mail alerts from the credit -- from
3  TransUnion. We always e-mailed the customer that they
4  had an alert. They always logged in. Behind the
5  scenes a lot of different things have been -- you
6  know, there's a lot of different things going on.
7      Q.  Was that -- those things that are going on
8  behind the scenes, is it fair to characterize those as
9  changes in software?
10     A.  Yeah.
11     Q.  Okay.
12     A.  Yeah. Definitely.
13     Q.  That process that we just discussed, where I
14 tried to abbreviate to clarify my own understanding,
15 that was the same basic process the entire time,
16 though?
17     A.  I'm sorry. What?
18     Q.  Was that the same basic process for the entire
19 time period that credit monitoring was --
20     A.  Which process?
21     Q.  The one that we -- when I tried to do the
22 really quick run-through that we just did.
23     A.  Yeah, when we ordered and went to the order
24 page and did the credit card and -- yes.
25     Q.  So that basic process has always been the

1    same?
2        A.    Yes.
3        Q.    Okay.  And what has changed would have been
4    the way in which that functionality was accomplished.
5        A.    Yes.
6        Q.    Software changes --
7        A.    Yes.
8        Q.    -- if you will.
9        A.    Yes.
10       Q.    A person can do scoring, to order credit
11   scoring from you -- is that correct? -- from your
12   company.
13       A.    Credit scores, yes.
14       Q.    And when a person wants to order credit scores
15   from your company, are the identifiers required in
16   order to obtain scores, the same identifiers?
17       A.    Yes.  We have to have a credit report.  A
18   customer has to have a credit report in order -- in
19   order for us to score it.  Credit scores don't really
20   live.  They are generated whenever it's requested, so
21   if a customer wants a credit score, it has to come with
22   the credit report.
23             MS. YEAGER:  Let's go off the record for about
24   five minutes.  Let me check my notes and see if I got
25   everything.