Federal Trade Commission

For these reasons, requiring several points of matching, as suggested by section 318(a)(2)(A) of the FACT Act, appears premature at this time.

## V.  Same Credit Report

### A.  Introduction

Section 318(A)(2)(C) of the FACT Act requires the FTC to study the effects of:

> requiring that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action, including – (i) the extent to which providing such reports to consumers would increase the ability of consumers to identify errors in their credit reports; and (ii) the extent to which providing such reports to consumers would increase the ability of consumers to remove fraudulent information from their credit reports.

The proposed requirement is meant to address the situation where a report provided to a consumer subsequent to an adverse action notice does not disclose the same information that was provided to the creditor. Consumers cannot exercise their rights to identify and correct any inaccuracies if they do not see the information that is inaccurate. By requiring that the consumer receive the same report used by the creditor, the proposal seeks to ensure that the consumer can spot and dispute inaccurate information that would otherwise go undetected.[162]

To understand the implications of the proposed requirements, Commission staff relied on discussions with representatives of consumers, CRAs, and creditors who use consumer reports. The Commission also issued a *Federal Register* Notice that requested input from interested parties on a number of specific questions. The notice yielded 63 responses from consumers and industry representatives, and these responses were helpful in preparing the study.

Based on this information, the study first discusses the circumstances under which a "same report" requirement would be useful to consumers, and then describes the costs and benefits of the requirement for consumers and industry. These costs and benefits could vary substantially, depending on how the requirement is implemented. As a basis for analysis, this report considers two possible approaches.

- Under the first approach, the CRA that provided the report to the creditor would provide the "same report" to the consumer. In this case, the requirement would essentially amend consumers' existing right to receive a copy of their reports following an adverse action. Under this arrangement the "same report" would be sent only when a report is explicitly requested by a consumer who has experienced an adverse action.

---

162. As specified in the FACT Act, this study is limited to situations when a consumer obtains a credit report following an adverse action taken by a creditor. Section 603(k)(1)(A) of the FCRA states: "The term 'adverse action' has the same meaning as in Section 701(d)(6) of the Equal Credit Opportunity Act" ("ECOA"). 15 U.S.C. § 1681a(k)(1)(A). Under the ECOA and its implementing Regulation B, "adverse action" is defined to include denials of credit and, in some instances, charging a higher price or less favorable terms (for example, if the creditor makes a counteroffer that is not accepted by the consumer, or if the creditor makes an unfavorable change in the terms of a particular consumer's account). *See* 12 C.F.R. § 202.2(c)(1).

Federal Trade Commission

- Under the second approach, the creditor who took the adverse action would provide the "same report" to the consumer. This approach would be similar to the current requirement regarding employers who take adverse actions.[163] In this case, the consumer would receive a copy of his or her report along with the adverse action notice, without having to request it explicitly.

These approaches are not the only ways that the proposal could be implemented, and different choices could lead to different costs and benefits. Where appropriate, this report discusses how alternative policy choices would affect the costs and benefits of the measure.

## B. Background

### 1. How consumers and creditors might see different reports

Currently, the CRAs add information to consumer files when it arrives from furnishers. At any given time, the information contained in a particular consumer file is the same whether a request to access the file comes from a consumer or a subscriber. If a consumer and a user see consumer reports derived from the same file at the same time, the consumer will see all the information that a creditor sees.[164] This leaves two possible ways that a consumer might not see information that the creditor sees:

(1) the two reports were generated at different times, and

(2) the consumer's disclosure request does not identify and supply the same file, or all of the files, that were provided to the creditor.

Differences based on timing are probably quite common. Information is constantly being added to consumer files or updated as it is received from furnishers, and deleted from files when it becomes obsolete. For example, if a user requests a report on April 1 and then rejects a consumer's application, the consumer would not receive his or her free disclosure until a later date, perhaps April 20. Any information that has changed between April 1 and April 20 would appear on the consumer's disclosure, but not the earlier report received by the user.

If the consumer were to receive the historical document that the creditor had relied on, it might sometimes help alleviate any confusion about why a credit decision was made. For example, suppose a creditor receives a consumer report showing high credit card balances. These balances might be lower by the time the consumer receives a disclosure. Seeing the "same report" would give the consumer a clearer picture of what had caused the creditor's decision. On the other hand, informing the consumer of historical information might be less likely to further

---

163. Section 604(b)(3)(A)(i) of the FCRA requires employers, before taking any adverse action based in whole or in part on a consumer report, to provide the employee or job applicant with a copy of the report. 15 U.S.C. § 1681b(b)(3)(A)(i).

164. The FCRA prohibits CRAs from including certain information in reports to users. For example, inquiries that were not initiated by the consumer (e.g., inquiries associated with prescreening) are prohibited by Section 604(c)(3), and furnishing medical information is restricted to certain circumstances by Section 604(g). 15 U.S.C. §§ 1681b(c)(3) and (g), respectively. Such information appears in consumer disclosures.

the primary aim of the proposal, which is to help consumers identify errors and fraud. For this purpose, the most recent information is most relevant.

Receiving the "same report" could be much more valuable when a creditor receives a consumer report based on a totally different file than the report that would otherwise be disclosed to the consumer. There are two situations in which this could occur. First, the creditor could receive a report consisting of a single file pertaining to the wrong consumer. Second, the creditor could receive multiple reports, while the consumer receives only one of these reports.

Either result can be caused by problems in the identifying information provided by the creditor. For instance, suppose Jane A. Smith applies for credit, and that there is another consumer with similar identifying information (Jane B. Smith). If the creditor provides incorrect or incomplete identifying information to the CRA, it might receive a report on Jane B. Smith only, or two consumer reports pertaining respectively to Jane A. and Jane B. In either case, it is possible that information pertaining to Jane B. will adversely affect Jane A.

If Jane A. requests a copy of her own consumer report, it is less likely that she will see Jane B.'s file. CRAs generally require consumers who seek file disclosure to provide more complete identifying information than subscribers who make an inquiry; thus, a consumer request is more likely than a user inquiry to screen out files belonging to someone else.[165] Even if the consumer's request does initially match another consumer's file, the requesting consumer might still not get to see it because when a consumer's request matches more than one file, the CRA generally requests additional information from the consumer in an attempt to determine whether the additional file or files belong to him or her.[166] Any files found not to belong to the consumer will be excluded from the report that is provided. Although the consumer may end up with the correct report, he or she will not have access to the incorrect report used by the creditor, making it more difficult for the consumer to determine what went wrong and to correct it.

Some consumers, however, currently do see the same report that the creditor sees as part of the credit granting process. Particularly in mortgage lending, some creditors discuss the reports directly with the applicants. Also, resellers of "merged" credit reports – typically used by mortgage lenders – will retain these merged reports and provide them to consumers when they request a disclosure.[167]

---

165. One reason for this is that, in providing reports to consumers, the CRAs must establish that the requesting consumer is indeed who he or she claims to be, in order to prevent fraudulent access to consumer information by others. Requiring sufficient information for authentication purposes means this information is also available for matching. When a creditor requests a file, the creditor is in a better position than the CRA to verify the consumer's identity – for example, the creditor may request a copy of a driver's license or other identification. In responding to creditor inquiries, the CRA requires information only for matching, and not for authentication.

166. FTC staff communication with CRA representatives.

167. Even if they have provided two separate reports relating to a particular consumer (e.g., because of requests from two different mortgage lenders), industry sources indicate that these resellers can and do ask follow-up questions to ensure that the report sent to the consumer is the one that was sent to the mortgage lender that took the adverse action.

Federal Trade Commission ─────────────────────────────────────────

## 2.  How often do creditors see files that consumers do not see?

As noted above, a consumer and a creditor could see different reports if (1) the creditor received a single report based on the wrong consumer's file, or (2) the creditor received multiple reports and consumer received only one.  As described in section III, the first scenario appears to be uncommon, and generally involves incorrect identifying information being entered in the request.[168]  This situation could occur if two people share some identifying information, and the creditor makes an error entering information that is not common to both.  It is also possible if a creditor requests a report relating to a consumer who is new to the credit system, and therefore does not have a file or has a file with only limited information, that the CRA will supply a report on an existing file that is the "closest match."

As to the second scenario, two of the three major CRAs report that they currently do not send multiple reports to their subscribers.  The other CRA states that, depending on the subscriber's preference, it sometimes supplies reports containing more than one file.[169]  In these cases, the CRA presents each file as a separate report and scores each report separately.

It appears that in many instances when multiple files are identified in response to a single inquiry, one file contains the bulk of the consumer's credit history, and one or more "secondary" files contain relatively little data, perhaps a single account.[170]  These secondary files contain information that the CRA has not been able to assign to this consumer, or any other, with what it considers a sufficient degree of certainty to cause it to merge the information.  Yet, the CRA may still consider the information likely to pertain to the same consumer.

A sample of recent reports obtained by the FTC independently indicates that, for the CRA that does provide multiple reports, about four percent of inquiries match to more than one file.[171]  However, this CRA has stated that many of its subscribers choose not to receive multiple files and request to receive only the single file that best matches their request.  The CRA states that it supplies multiple files in response to fewer than one percent of subscriber requests.[172]

─────────────────────────────

168.  As discussed in section III, the CRAs report that they receive a small number of complaints from subscribers about receiving a single wrong report.  *See* discussion *supra* page 15.

169.  In order to comply with Section 607(a) of the FCRA, a CRA that furnishes multiple files (including fragmentary files) in response to an inquiry on a single individual must have reasonable procedures to assure that the information it furnishes pertains only to that consumer.  In other words, a CRA cannot furnish multiple files unless it has reasonable procedures to ensure that each file contains information pertaining to the same consumer.

170.  FTC staff communication with CRA representatives.

171.  Data provided to the FTC by Fiserv/Chase Credit Research.

172.  The CRA also states that, over time, it continues to refine the accuracy of its matching software and to reduce the incidence of reports containing multiple files.

This CRA also has stated that most of the multiple files it sends out apply to the correct consumer.[173]  On the other hand, the fact that the CRA has not merged the files suggests that it believes there is a non-trivial probability that the files belong to different people.  If so, and if the creditor does not recognize the error, then the creditor may evaluate the consumer's application based on information that does not pertain to him or her, but the consumer may have no way to discover the problem by requesting his or her report from the CRA.

### 3.    What do creditors do when they receive multiple reports?

As noted above, many users of consumer reports choose not to receive multiple reports, and ask to receive only the report based on the "best match."  When a creditor chooses to receive multiple reports, the creditor is likely to recognize that multiple reports signal greater than normal uncertainty about whether all the reports in fact apply to the consumer in question.  The effect of any "secondary" reports on the consumer depends on what the creditor does in this circumstance.

There is evidence that some creditors take steps to verify whether multiple reports indeed apply to the consumer in question, particularly in the mortgage industry.  A creditor may attempt to verify the applicability of a report either directly or by using a reseller.  One service a reseller provides is to investigate whether the file or files furnished actually pertain to the applicant.  Creditors can also resolve questions by manually reviewing the files or by taking the additional step of contacting the consumer.  The benefit to the creditor of verifying the applicability of the file is that the creditor could avoid rejecting a loan that would, in fact, meet its standards.  The greater the potential revenue associated with making a loan, the more likely a creditor would be to bear the costs associated with such steps.

According to the Mortgage Bankers Association, the general practice in the mortgage industry is to discuss any significant derogatory credit item with the consumer before a final credit decision is made.  Mortgage lenders make this effort because mortgage loans typically involve greater revenue and because compensation for loan officers and mortgage brokers typically depends on the loan closing.

Similarly, a credit union officer stated that credit unions generally follow this practice, not only for mortgage loans, but for all loans.[174]  Moreover, Boeing Employees' Credit Union indicated that the first step for any creditor is to determine if there is an obvious reason why there are multiple "in-files," such as a generation issue (Junior and Senior), married/maiden/ hyphenated name issue, or some other logical issue.  Boeing also pointed out that in processing

---

173.  As a basis for this claim, the CRA cites two sources of information.  One source is feedback from creditors.  As discussed below, there are a number of creditors who, when they receive a report containing multiple files, attempt to verify the applicability of the files to the consumer by contacting the consumer and obtaining more information.  Such creditors might be expected to inform the CRA if they found that most "secondary" files pertain to the wrong person.  Another source is research that the CRA has done on the accuracy of its matching procedures, the details of which were not disclosed by the CRA.

174.  Telephone conversation with Beverly Rutherford, Vice President/Compliance, Virginia Credit Union, Inc. (Sept. 16, 2004).

loan applications, multiple "in-files" are screened out of automated decision and require manual review by an underwriter, who can ask for additional information from the consumer.[175]

When creditors take steps to verify the applicability of any files they receive, the "credit report that the creditor relied on" is the report or reports that the creditor determined in fact pertains to the consumer, rather than all the reports that the CRA sent.  However, it is not clear whether this practice is common among creditors as a general matter.  For example, for creditors who use automated loan approval systems, it is costly to subject files to additional manual review.  When such creditors choose to receive multiple reports, it is unclear how often they perform any "check" on the applicability of the files they receive.

## C.  Benefits and Costs of a "Same Report" Requirement

As noted above, this study addresses two ways to implement the proposed requirement: (1) requiring CRAs to provide a copy of the same report that they furnished to a creditor when the consumer subsequently requests a consumer disclosure, and (2) requiring creditors themselves to provide a copy of the report they used in making a decision.  The discussion below focuses first on the benefits and costs to consumers, regardless of who provides the report, and then on the benefits and costs that are specific to how the requirement is implemented.

### 1.  Benefits to Consumers

The proposed "same report" requirement is intended to ensure that consumers always know what information was used by creditors in taking an adverse action.  Consumer groups have argued that this is important both so that consumers can "discover and correct any inaccuracies that may be contained in credit reports received by creditors," and so that when consumers dispute information with creditors, both parties "refer to the same information to ensure that they are reviewing and discussing the same report or information . . . ."[176]

The proposal would provide these benefits in situations in which a report provided to a consumer following an adverse action does not include information that was contained in the report furnished to the creditor.  To assess the likely benefits of the proposal, it is important to know how often this situation arises and to what extent the proposal would help consumers address it.

At present, it is unclear how often creditors base decisions on information from a report that is not disclosed to the consumer, or how often these cases result in adverse actions.  In order to estimate the extent of these errors, one would need a random sample of consumer files relied on by creditors in taking an adverse action, the correct consumer files at the time of the adverse actions, and input from the creditors or some other means of evaluating whether the adverse

---

175. Comment of Boeing Employees' Credit Union, at 2.  Comments received in response to the FTC's Request for Public Comments on the "same report" proposal are available at:  http://www.ftc.gov/os/comments/factaadverseactstudy/index.htm.

176. Comment of The National Consumer Law Center, the Consumer Federation of America, Consumer's Union, The Electronic Privacy Information Center, The Identity Theft Resource Center, Privacy Rights Clearinghouse, Privacy Times, and U.S. Public Interest Research Group, at 3.

actions would have been reversed if the correct file had been used. This information could not be obtained within the time frame of the study, and it is unclear whether it could be obtained even with a longer time frame.

The problem could occur in particular when a creditor receives multiple consumer reports and takes an adverse action based on negative information contained in a report that does not belong to a consumer. Multiple reports are sent in less than one percent of cases by one of the three nationwide CRAs, but this could still translate into a significant number of reports each year. Even in these cases, however, the benefits of the proposed "same report" requirement are unclear.

The CRA that sends multiple reports argues that in most cases, the "secondary files" that are sent do pertain to the correct consumer.[177] In these cases, the CRA says that the consumer will see the same information the creditor sees. Sometimes, a consumer's disclosure request will provide enough information for the CRA to merge the files, and so the consumer will receive all the information in the form of a single file. If the CRA is not confident enough to merge the files, but cannot confirm that the "secondary" files belong to another consumer, then the CRA says it will send the multiple files to the consumer as well.

If the secondary file in fact contains negative information that pertains to a different consumer, the problem is potentially more serious. When this occurs, the harm to consumers – and the benefits of the proposed requirement in addressing this harm – depend on how the creditor processes the reports it receives. For example, receipt of multiple reports should act as a signal that the creditor should take care to check that the information in fact applies to the applicant. For mortgage transactions, where stakes are arguably the highest, further review in the case of multiple reports appears common. Other creditors, particularly those who use automated systems for credit approval, may not take extra steps to evaluate multiple reports.

The benefits of the proposal would also depend on the actions taken by consumers in response to the information shown in the "same report" and the likely outcome of such actions. For example, if a secondary file had been created as the result of identity theft, the "same report" requirement could bring the fraudulent activity to the victim's attention. Learning about the file would enable the consumer to file an identity theft report and dispute the fraudulent information.[178]

When the CRA has sent a secondary file that is not created by identity theft, but in fact belongs to a different consumer, fixing the problem could be more difficult. Even if the CRA learns that a particular file does not belong to a consumer, it may be difficult to guarantee that a future inquiry will not match that same file. The CRA cannot delete the information because it presumably pertains to some legitimate consumer. Further, it may be costly for the CRA to redesign its matching procedures to prevent any possibility of this occurring.

There are other steps that a consumer could take, apart from informing the CRA, after discovering that the CRA had sent a creditor the wrong consumer's file. The consumer could make sure to provide more complete identifying information when applying for credit. He or she

---

177. *See supra* note 173.

178. However, as discussed below, there is also some risk that the "same report" proposal could make it easier for identity thieves to operate and thus increase the incidence of fraud.

can also warn creditors that there is the possibility they will receive a file belonging to the wrong consumer. The effectiveness of such steps depends on how the creditor responds. For example, if a creditor uses automated systems, it may have limited ability to act on a consumer's warning that the wrong file might be supplied by the CRA.

## 2.    Costs to consumers

Many of the costs of implementing the same report requirement would fall on industry, and these costs depend substantially on whether CRAs or creditors provide the reports. Consumers would also bear some costs, regardless of who provided the report.

One cost to consumers results from receiving a report that may be several months old. By the time a creditor processes the consumer's application, informs the consumer of a decision and the consumer's right to obtain disclosure from the CRA, and the consumer requests a report, the data in the consumer's file are likely to have changed. If the data in question are out of date, or have been corrected, the consumer might waste time and effort disputing data that are no longer inaccurate. The consumer might also fail to uncover inaccuracies that currently exist, but are not reflected in the historical document.[179]

Second, if the same report proposal were to require that reports be sent even to consumers who had not affirmatively requested one, the proposal might increase the incidence of identity theft.[180] Many parties noted that identity thieves might exploit the requirement as a means to gain access to another party's consumer report.[181] An increased volume of reports in the mail and trash could also enable identity thieves to gain increased access to consumer reports.[182] These

---

179. As noted by MasterCard International: "[p]roviding consumers with an outdated consumer report can therefore provide consumers with a false sense of concern if negative or erroneous information is no longer in the consumer's file, or a false sense of security if the consumer's file has been damaged more recently than would be reflected in the historical consumer report." Comment of MasterCard International, at 3.

180. A related issue is that the requirement could raise privacy concerns. If the creditor mistakenly relied on a consumer report that actually pertained to a different person, the "same report" requirement could mean that a consumer would receive another person's consumer report.

181. This point was made in numerous comments. For example, the American Financial Services Association noted:

> lenders could inadvertently send credit reports or similar information to identity thieves if lenders were required to provide declined applicants with such information ... To require a creditor to send a credit report with the adverse action notice could provide perpetrators of identity theft with additional information about the consumer that may enable the perpetrator to be more successful on the next application for credit in the victim's name.

Comment of American Financial Services Assoc., at 2. *See also* Comment of the American Bankers Association, at 2, Comment of MasterCard International, at 4, and Comment of Background Investigations, Inc., at 6.

182. For example, the Boeing Employees Credit Union noted that a requirement to provide a copy of the consumer report whenever an adverse action notice is given

> potentially exposes more consumers to fraud or identity theft risk by forcing creditors or CRAs to provide a large volume of credit reports to consumers. That volume will travel through channels that ultimately put the consumer at risk. If fraudsters are able to use a monthly credit card statement to do significant damage to consumers, what will they be able to do with an entire credit report?

concerns would be substantially reduced if the "same report" were sent only when a consumer explicitly requested one.

### 3.   Costs if the CRA provides the report

The three nationwide CRAs would incur substantial costs from the proposed requirements due to the need to design, build, and maintain systems to store historical data.  These systems would be required to store consumer files regardless of whether an adverse action is taken.  A CRA would not know in advance which data requests would result in adverse actions, so they would need to assume that any report provided might need to be disclosed to a consumer at a future date.

As an estimate of this effect, one of the three nationwide CRAs noted that the "same report" requirement could eventually swell its database from its current 210 million credit files to 5 billion records because of the multiple reports retained for consumers.  It further stated that the increased costs of data retrieval and error correction in such a system "would be passed on in higher report prices to creditors."[183]  The other two nationwide CRAs each estimate the cost of additional equipment and staff necessary for such a system to be in the in tens of millions of dollars.[184]

Given current law, an unintended consequence of the proposal would be to substantially increase the quantity of information that a CRA would provide as part of a consumer disclosure.  Section 609 of the FCRA requires CRAs to disclose *all* information in the consumer's file at the time of the consumer's request.  Because all information in the consumer's file would consist of every historical document that is being saved, the consumer could receive much more information than is needed after requesting a copy of the file.[185]  One CRA noted that under the

---

. . . Our members do not like us mailing their confidential information unless they specifically requested it, as mail is not secure.  This proposal takes that consumer right away.  Additionally many consumers just throw this type of information in the unsecured trash can.  We believe this is putting those individuals at risk for dumpster divers and identity theft and fraud.

Comment of Boeing Employees Credit Union, at 5-6.  The American Bankers Association made a similar point, noting that

Unlike the case where the consumer has specifically ordered a report and is expecting it, consumers denied loan applications will not be expecting or necessarily wanting a credit report.  Accordingly, they will be less likely to dispose of it properly, either because they overlook it or are not interested.

Comment of American Bankers Assoc., at 2.  *See also* Comment of Mortgage Bankers Association, at 3.

183.  *See* Comment of Equifax Information Services LLC, at 4.

184.  *See* Comment of Experian, at 2; Comment of TransUnion LLC, at 4.

185.  There may also be other unintended costs associated with the proposed requirement.  For example, the Independent Community Bankers of America noted that

if consumer loan applicants were required to receive the same credit report on which an adverse action was based, the need to streamline operations and reduce costs might force creditors to use a single credit report.  This would reduce the amount of information available for underwriting decisions, potentially affecting borderline loan applicants particularly, since the reduced information might increase the number of loan denials.

Comment of Independent Community Bankers of America, at 3.

Federal Trade Commission ────────────────────────────────

proposal, consumers would be likely to receive "an enormous disclosure package of multiple credit reports issued over a long period of time in addition to the current disclosure copy of their credit file."[186]

An alternative policy that would avoid the costs associated with the CRAs' storage of historical data would be to simply require CRAs to mail consumers a copy of their consumer report at the same time that the creditor is sent a copy of the consumer's report. This would result in all consumers who apply for credit being sent a copy of their consumer report regardless of whether an adverse action was taken. However, it is far from clear how consumers would react to such a policy. In any given year, some people may apply several times for credit. For consumers who are not denied credit, the benefit of receiving all these reports appears limited, and it seems likely that they would object to it both as a nuisance and as something that increased the risk of identity theft. Moreover, as discussed below, CRAs often provide creditors only a credit score or other form of summarized data that would not be readily understood by consumers.

This alternative approach would also increase the number of files sent to consumers in a year from the tens of millions to the billions.[187] The associated costs could increase the cost of credit substantially and potentially eliminate the use of consumer reports for certain lending decisions.

## 4.  Costs if the creditor provides the report

An alternative way to implement a "same report" requirement would be to require creditors to provide each consumer with a copy of the consumer report that the creditor used to evaluate the consumer's application. The creditor could provide this information at the same time it provides the triggering adverse action notice to the consumer, obviating the need for the consumer to go through the extra step of requesting a disclosure from the CRA.[188] The consumer would receive the report directly from the creditor and would thus benefit from the timeliness of receipt of the report and the ability to immediately interact with the creditor. This approach has several drawbacks that could offset consumer benefits, however.

One drawback of this approach is that the information the creditor receives may be considerably less detailed than the information in the CRA's files. Another concern is that sending consumers an unsolicited report might raise privacy concerns and increase the risk of identity theft.

In order to comply with such a requirement, creditors at a minimum would have to build systems to create a consumer-friendly version of the file that they access and employ personnel to respond to inquiries from consumers about their consumer reports. Many creditors use

---

186. Comment of Equifax Information Services LLC, at 14.

187. The CDIA estimates that two billion credit reports are sold each year, and that there are fewer than 20 million consumer disclosures each year. *See* Statement of Stuart Pratt, *supra* note 2.

188. Alternatively, the consumer might be required to request a copy of the report from the creditor during a short period after he or she receives the adverse action notice. This would mitigate some of the costs below, but would require creditors to retain files containing consumer reports for a longer period of time.

automated systems and do not receive or keep paper reports. As noted by the American Financial Services Association,

> [l]enders receive raw data that they cannot typically print out in consumer-friendly format. The data feeds from credit bureaus are designed for computers to communicate with each other. Today's systems will not allow the typical lender to generate a readable credit report from their files.[189]

Requiring creditors to provide the "same report" could also result in consumers receiving less information than they receive if they seek file disclosure from the CRA under the current system. For example, it is common for a creditor to use a credit score or another form of summarized data from the CRA in lieu of a complete consumer report. Consumer groups have pointed out that the report is only effective if it includes "the specific information that forms the basis for the adverse action."[190] If the creditor provided only summarized information to the consumer, the consumer could not observe the underlying data that generated the report. In this case, the notice might not serve its fundamental purpose, because the summary data might not inform the consumer about the specific negative information that led to the adverse action.

However, consumers might not always need to see all of the specific information. For example, if a report contained two scores and it was obvious to the consumer from the identifiers that one score belonged to someone else and was the reason for the denial, the scores would be sufficient to inform the consumer of what had happened. Even if a consumer did not receive the same report, the adverse action notice supplied pursuant to the Equal Credit Opportunity Act, which is typically supplied concurrently with the FCRA adverse action notice and requires that the consumer be informed of the "specific reasons" for the adverse action,[191] may itself alert the consumer to inaccuracies in the underlying consumer report – for example, if one reason for adverse action were "too many finance company loans" and the consumer knew that he or she had *no* finance company loans.

The proposal could be implemented in such a way as to require creditors to supply the underlying information that had generated the score, but this would impose additional costs on creditors. Creditors would need to purchase, store, and process information that they do not otherwise need in order to make it available to consumers who experience adverse action and

---

189. Comment of American Financial Services Association, at 4. Similarly, Wells Fargo noted that "[t]he overwhelming majority of consumer reports used by credit grantors – more than 90% – are obtained in electronic format and never converted to paper. In most cases, the contents of the report are analyzed by an automated decision system, and even if a 'manual' review of the decision is performed, only certain aspects of the report will be converted to a human-readable form. Even when a consumer report is provided to a creditor on paper, or converted to human-readable form by the creditor, the information is displayed in a highly condensed form using codes and abbreviations that would be meaningless to most consumers." Comment of Wells Fargo & Company, at 1. *See also* Comment of MasterCard International, at 5; Comment of Coalition to Implement the FACT Act, at 1-2.

190. Comment of The National Consumer Law Center, the Consumer Federation of America, Consumer's Union, The Electronic Privacy Information Center, The Identity Theft Resource Center, Privacy Rights Clearinghouse, Privacy Times, and U.S. Public Interest Research Group, at 5.

191. *See* 12 CFR § 202.9(a)(2)(i). Section 202.6(b)(6)(ii) of Regulation B, which implements the Equal Credit Opportunity Act, also provides a vehicle for a consumer to bring to the attention of a creditor ". . . any information the applicant may present that tends to indicate the credit history being considered by the creditor does not accurately reflect the applicant's creditworthiness . . . ." 12 CFR § 202.6(b)(6)(ii).

Federal Trade Commission ──────────────────────────────────

request it. Also, creditors would need to purchase this extra information for all consumers, because they have no way of knowing in advance which consumers will be turned down on the basis of information in the report.[192]

## D. Conclusion

When a consumer disclosure does not include information that led a creditor to take an adverse action, the consumer protections provided by the FCRA can be significantly compromised. The proposed requirement seeks to address this situation by ensuring that the consumer receives the "same report" as that provided to the creditor. Because there may be substantial costs associated with the proposal, and given the uncertainty and limited nature of its benefits, together with the possibility that new duties under the FACT Act will reduce the problem addressed by the proposal, the Commission does not recommend adopting the same report proposal at this time.

This requirement may benefit consumers when a creditor has relied on a report regarding the wrong consumer in lieu of, or in addition to, a report regarding the correct consumer. In such cases, the consumer would be able to quickly determine what had gone wrong and begin to take steps to address the problem. As discussed above, this benefit is most likely when a creditor's inquiry identifies multiple reports, but a consumer's request identifies only one. If the "secondary" report or reports contain negative information, the consumer's disclosure may not reveal the cause of an adverse action. We do not at this time have data that allows us to determine how often this occurs. However, multiple reports are provided in less than 1% of cases, and many creditors take extra steps to determine whether multiple reports all pertain to the consumer in question. Therefore, the harm caused in these instances, and the presumed benefits of the proposed requirement, are not clear.

At the same time, the same report proposal would impose substantial costs on consumers and industry. The costs to consumers include (1) costs associated with reliance on a historical document rather than a current report; (2) privacy concerns raised by receiving a report that belongs to someone else; and (3) a possible increase in identity theft if the proposal led to an increase in the volume of reports circulating. Although the benefits, if any, would be realized in less than 1% of cases, these costs would be imposed every time a consumer is sent a file disclosure.

The costs to industry would likely be substantial because:

- If the CRA were required to provide the "same report," it would have to build systems to store historical documents, even though only a small fraction of these would ever be sent to a consumer. This would be expensive, and the higher costs could be passed on to users of consumer reports.

- If creditors were required to provide the "same report," they would have to build systems to create and store consumer-friendly versions of these documents. Further, because many

───────────────────────────────

192. Although the requirement could be fashioned to allow creditors to obtain this information later, after they decide to take an adverse action, this would not be consistent with the proposal, because it would not provide consumers with the same report that had led to the creditor's negative decision.

creditors currently receive only summary or partial data, their disclosure to consumers could be missing key information or the creditors would need to supplement their data.

Because the same report proposal would impose substantial costs to obtain uncertain (and likely limited) benefits, it may be more appropriate to develop a response that focuses on instances in which the creditor may be using a report that pertains to the wrong consumer. Certain provisions of the FACT Act, which are designed to address identity theft and are still being implemented, provide such a response. Section 315 requires CRAs to notify the user of a consumer report when the address provided by the user "substantially differs" from the addresses on file for the consumer, and requires creditors to develop procedures for responding to this notification. Section 114 requires users of consumer reports to implement procedures to identify and respond to identity theft "red flags." Such procedures are intended to help creditors spot possible instances of identity theft and then to act to prevent the possible identity theft.

Both measures will impose extra responsibilities on creditors to determine that a credit applicant is indeed the person to whom a consumer report pertains. Thus, they appear to address the problems described in this study more directly than would the proposed same report requirement. For example, if the creditor receives two consumer reports, including a "secondary" report that pertains to the wrong consumer, it is likely that the secondary report will contain an address that does not match that of the applicant. This will trigger a notification under section 315. Although the creditor's obligations under the FACT Act have not yet been finalized, it is likely that they will increase the chance that the creditor or consumer will discover whether the secondary file in fact pertains to the consumer.

If these measures succeed in ensuring that credit decisions are based on the right applicant's file, the benefits of imposing an additional same report requirement would be reduced considerably. Given the substantial costs associated with the proposal, the uncertainty and limited nature of its benefits, and the possibility that new duties under the FACT Act will reduce the problem addressed by the proposal, the Commission does not recommend adopting the same report proposal at this time.

# VI.  Negative Information Notices

## A.  Introduction

Section 318(a)(2)(B) of the FACT Act requires the Commission to study:

the effects of requiring notification to consumers when negative information has been added to their credit reports, including – (i) the potential impact of such notification on the ability of consumers to identify errors on their credit reports and (ii) the potential impact of such notification on the ability of consumers to remove fraudulent information from their credit reports.

To understand the effects of the proposed notice, Commission staff consulted the relevant literature and conducted interviews with representatives of consumers, CRAs, and furnishers of credit information. Based on these sources, the study describes current reporting of negative

**Federal Trade Commission**

information and existing negative information notices, and discusses what the Commission has learned about the costs and benefits of the proposed requirement.

The goal of a negative information notice would be to give consumers a chance to identify and correct any errors in their consumer reports before the errors caused harm. Currently, the FCRA requires creditors to notify consumers when they take "adverse action" based on information in a consumer report.[193] By the time a consumer receives this notification, however, it may be too late for the consumer to salvage the transaction by correcting any inaccuracies in the report. The idea behind the proposed notice is that consumers would learn about negative information in their reports *before* they apply for credit, when there could be sufficient time to remedy any errors.

The proposed notice could also fill any "gaps" that remain when consumers obtain their free file disclosures under the FACT Act.[194] The FACT Act now gives consumers the right to obtain a free consumer report from each nationwide CRA once a year. This right should help consumers spot inaccuracies in their consumer reports and thereby avoid injury. However, some consumers might not order reports that they assume will be accurate. Further, even consumers who check their consumer reports every year might be harmed if inaccurate information is added shortly after they examine the report.

There are many ways that the proposed notice requirement might be implemented. Some of the main issues to consider include: what information would trigger the notice; what form the notice should take; and who would send the notice. In order to focus the discussion, the study makes the following assumptions:

- *The notice would be triggered when a furnisher reports payment delinquencies, collection accounts, or public records.* The elements that would trigger notification are consistent with Section 217 of the FACT Act, which defines "negative information" as "information concerning a customer's delinquencies, late payments, insolvency, or any form of default."[195] Other information could lower a consumer's credit score, but would not generally be considered "negative information."[196]

- *The notice would be required the first time that a particular account delinquency appears on a consumer's report.* For example, if a furnisher reports that a consumer is 30 days late in paying an account, and the consumer does not pay within the following 30 days, the

---

193. *See* FCRA § 615, 15 U.S.C. § 1681m. *See also* discussion of risk-based pricing notice *infra* note 199.

194. FACT Act § 211.

195. As discussed below, Section 217 of the FACT Act requires creditors to notify consumers when they report negative information about the consumers to a CRA.

196. Many types of credit-related activities, such as opening a new credit account, applying for credit, or using a high percentage of available credit, can have a negative effect on a consumer's credit score. However, attempting to include any event that lowers a consumer's credit score would entail sending notices in response to relatively innocuous events (such as a change in the balance of a credit card) and would risk reducing the impact of the notices by overloading consumers with too much information. This seems well beyond the purpose of the proposal. The proposed approach is also consistent with the language of the FACT Act, which refers to "negative information [that] has been added to [consumers'] credit reports," not "information that has a negative effect on consumers' credit scores." *See* FACT Act § 318(a)(2)(B).

furnisher will typically report that the consumer is 60 days late. This study assumes that the required notice would be triggered only by the first appearance of a delinquency or other negative information on a consumer's report. Additional notices regarding the same event would have sharply diminishing additional benefits in terms of alerting consumers to possible inaccuracies.[197]

- *The notice would be specific enough to allow the consumer to dispute the information.* For example, the notice might state that "This is to inform you that [Creditor] has reported that payment on your account ending in [#1234] is 90 days late. This information will be included in your consumer report whenever it is provided by [CRA]. If you believe this information to be in error, you may contact [CRA]/[Creditor] as follows . . . ."

Either the CRA or the company that furnishes the negative information to the CRA could send the notice. Each approach has unique costs and benefits. For example, many creditors could provide the notice at relatively little cost, because they are already in regular contact with consumers. On the other hand, a notice provided by CRAs could alert consumers to some types of error, such as those arising from mixed files, that consumers could not discover directly from furnishers. In considering the benefits and costs of the proposal, this report discusses each of these approaches.

## B.  Background

### 1.   Existing notice requirements

The law already requires that consumers in certain situations be notified when negative information in their consumer reports has caused them harm. As noted above, an "adverse action notice" must be given to any consumer who suffers adverse action based in whole or in part on the consumer's report.[198] The FACT Act also amends the FCRA to require that consumers receive a "risk-based pricing notice" from creditors that offer credit on terms that are materially less favorable than the terms available to a substantial proportion of the creditor's other customers.[199] These existing notices seek to alert consumers that information in their consumer reports could be affecting them. The proposed notice would notify consumers of negative information earlier, which would allow consumers to take steps to address any inaccuracy before it causes harm.

Another provision of the FACT Act (Section 217) requires that consumers be notified when a creditor reports negative information about them to a CRA. The law provides, however, that

---

197. It may be more costly, however, to determine whether each report of negative information is the "first" one than to simply send negative information notices whenever negative information is reported.

198. *See* FCRA § 615 (a), 15 U.S.C. § 1681m(a).

199. Section 311 of the FACT Act amends FCRA Section 615 by requiring that "if any person uses a consumer report in connection with an application for, or a grant, extension, or other provision of, credit on material terms that are materially less favorable than the most favorable terms available to a substantial proportion of consumers from or through that person, based in whole or in part on a consumer report, the person shall provide an oral, written, or electronic notice to the consumer . . . ."

creditors may notify consumers *before* negative information is reported, including through a generic notice in routine statements to customers.[200]  Therefore, although the Section 217 notice could educate consumers generally about the consumer reporting implications of account defaults, it is unlikely to alert consumers to the need to check for specific potential errors.

## 2.    Sources of inaccurate information

There are three main sources of inaccuracies in consumer reports.  Depending on how the proposed notice is implemented, it could help address all three, to varying degrees.

- *Mistakes in existing accounts.*  When a furnisher's records contain errors, the information provided to the CRA will also contain errors.  When such an error is harmful, the notice would call it to the consumer's attention.  As discussed below, consumers already are likely to learn about such errors when they have an ongoing relationship with the furnisher.

- *Mixed files.*  When a CRA places one consumer's information in another consumer's file, the consumer will typically be unaware of the event until the consumer examines his or her own consumer report.  If the inaccurate information is negative, the proposed notice could provide the consumer with early notice of the problem.

- *Identity theft.*  When an identity thief opens new accounts using the victim's name, the fraudulent accounts will appear on the victim's consumer report.  The notice requirement could alert consumers to the theft after at least one such account becomes delinquent, potentially enabling the consumer to limit the damage.

## 3.    How much negative information is currently reported?

The recent Federal Reserve Board studies (discussed in more detail in Part III of this report) provide some insight into how often negative information is reported.  These studies use large samples from one CRA to estimate the proportion of consumer reports and credit accounts in those reports that have various characteristics.[201]

There are three categories of negative information that would trigger the proposed notice: credit account information (such as a late payment or default on a credit card); collections information (such as an unpaid utility or medical bill that has been sent to a collection agency); and public records (such as a bankruptcy).

---

200. As required by the FACT Act, the Federal Reserve Board has provided model language for furnishers to use in the notice.  The model allows for the following language:  "We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report."  69 Fed. Reg. 33,281, 33,285 (June 15, 2004) (amending 12 C.F.R. part 222).

201. *See* 2003 FRB Study, *supra* note 2; 2004 FRB Study, *supra* note 38.

The studies showed the following:

- Three percent of actively reported credit accounts were delinquent (based on data collected in 1999).[202] In most cases, this figure does not represent the first report of that particular delinquency. For example, current payment delinquencies include 90 or 120-day delinquencies that typically would have been first reported as delinquencies of shorter time periods, such as 30 or 60 days. A reasonable estimate is that, in any given month, about one percent of all accounts are being reported as delinquent for the first time, although the number could be as low as one-half of one percent.[203] A one percent rate would translate into over 132 million notices sent each year.[204]

- 36.5% of files had at least one collection action reported by a collection agency, mostly related to unpaid medical and utility bills.[205] Such information could be quite old, and it is difficult to translate this into an estimate of how often collections information is added.

- 12% of the sampled consumer reports contained at least one public record item.[206] These include bankruptcies, tax liens, foreclosures, and civil judgments.

It should be noted that these estimates reflect only one CRA's files. Because most large creditors report to all three nationwide CRAs, the total number of negative reports could be up to three times higher.

---

202. "Credit accounts" include revolving, nonrevolving, mortgage, and installment loan accounts from financial institutions, major retailers, and other businesses such as oil and gas companies. Some utility and medical companies also report on their accounts. "Actively reported" refers to credit accounts for which the latest report was within the prior two months. Many of these accounts are closed. Overall, 26% of the accounts analyzed were not currently reported while 74% were, with 57% of the latter being closed accounts. Thus, much of the derogatory information on credit accounts is associated with closed accounts that are still being reported.

203. Payment status as of the most recent report is distributed among *all* credit accounts (currently reported as well as not currently reported) as follows: no derogatory, 94.6%; 30-59 days late, 0.5%; 60-89 days late, 0.3%; 90-119 days late, 0.2%; 120-149 days late, 0.5%; and "other major derogatory," 3.8%. *See* 2003 FRB Study, *supra* note 2, at 62 (table 7). Assuming that the "other major" derogatories relate to accounts that are not currently reported, it is likely that the negative information underlying these reports has previously been conveyed to the consumer. Some creditors, however, do not report delinquencies of less than 60 days, and some do not report minor derogatories (delinquencies up to 119 days) at all, which means that some portion of 60 plus day delinquencies as well as of the "other" major derogatories may reflect the first appearance of delinquency.

204. This figure is based on estimates that, as of 1999, records on about 1.1 billion credit accounts were actively reported to the three national CRAs. *See* 2003 FRB Study, *supra* note 2, at 52 (derived from information in table 2). The number of notices could be roughly 20-25% higher because the Federal Reserve data adjust for joint accounts and co-signers so that each account is counted only once. *See id.* at 54, note 14. Under the proposal, notices would be sent to each individual on whose report the negative information appears.

205. *See* 2004 FRB Study, *supra* note 38, at 303 (table 1).

206. *See id.*

Federal Trade Commission

## 4.   Current examples of negative information notices

### a.   Notification in Colorado

The Colorado Consumer Credit Reporting Act requires CRAs to notify a consumer by mail and provide him or her with the ability to request a copy of her consumer report, whenever either of the following events occurs within a 12-month period: (1) the CRA receives eight credit inquires pertaining to the consumer or (2) the CRA receives a report that would add negative information to the consumer's file.[207]  Thus, Colorado has already imposed one specific form of a negative information notification requirement on CRAs.[208]

The CDIA reports that, over a typical one-year period in Colorado, CRAs on average sent 2.6 million of these notices to consumers.  As a result of these notices, an average of 180,000 consumer reports were sent to consumers by each CRA, which in turn generated an average of 9,000 calls or inquiries (including disputes) by consumers.  Thus, 5% of consumer reports sent pursuant to the Colorado requirement were associated with a call to a CRA, and about 0.34% of the original notices were ultimately associated with a CRA contact.  These numbers indicate a low contact rate for the CRA notice of negative information required in Colorado.[209]

### b.   Market-provided credit monitoring services

Recently, a market has developed for credit monitoring services offered by the nationwide CRAs and others.  These services offer consumers notification, often by electronic mail, when certain types of information are added to their credit files.[210]  Consumers must sign up for these fee-based services in order to receive the notices.  This market is only just emerging and is in flux; it is currently not known how much the market may grow or how effectively it will function.  However, the development of this market provides evidence that notification of negative information is valued by at least some consumers, and that the market is providing one type of response.

---

207. Colo. Rev. Stat. Ann. § 12-14.3-104(2) (2004).  The Colorado law provides generally that consumers may obtain one consumer report annually from each CRA at no cost, but the notification provision does not provide the right to an additional free report.

208. The Colorado law, however, requires that consumers be notified, at most, only once per year.  This means that a number of distinct pieces of negative information could be added to a consumer's consumer report before the consumer is notified of any of them.  *See id.* § 12-14.3-104(2)(b).  Note also that the law requires notification of a substantial number of inquiries, as well as of the addition of negative information.  *See id.* § 12-14.3-104(2)(a). A spike in inquiries can indicate the presence of fraudulent activity, similar to a spike in new accounts opened.

209. It is unclear what proportion of the Colorado notices are sent only because negative information was added to a consumer report, or because the CRA received eight or more inquiries about the consumer.  Another qualification of the Colorado data is that consumers are notified about information added to their consumer reports over the entire previous year, rather than only very recent information, and this may reduce the contact rate.

210. All three nationwide CRAs sell credit monitoring services directly to consumers.  Some other firms offer the service, either selling directly to consumers (as with Fair Isaac) or through credit card companies (as with Intersections, Inc.).  *See* Lavonne Kuykendall, *Young Credit Monitoring Firm Gets Cap One Feather in Cap*, *American Banker*, Sept. 15, 2004, at 7.  The article also reports that the top six firms that offer monitoring services have over 20 million subscribers.

## C. The Benefits and Costs of Negative Information Notices

### 1. Benefits to consumers of early notification

Currently, consumers often discover harmful errors only after experiencing an adverse action. In some cases, learning about the error earlier would have had considerable benefits. For example, suppose a consumer makes an offer to buy a house, but the consumer's mortgage application is turned down because of an error in his or her report. It will take some time to correct the information with the CRA, and in the meantime the seller may find another buyer for the house. Moreover, there is no guarantee that the consumer will be able to convince the lender to reconsider his or her mortgage application. The proposed notice would give consumers a better chance to correct errors before they create these obstacles.

For victims of identity theft, early notification could provide the opportunity to prevent the thief from causing further damage. However, when it comes to identity theft, notification after negative information has been added to a consumer's file may be "too little, too late." Among other things, many victims would receive the notice only after the fraudulently opened account had become delinquent. The Commission's study of identity theft indicates that many victims discover the identity theft within 30 days of the theft, and most victims discover the theft within 60 days.[211] It would generally be at least 30 days, and probably much longer, before the resulting negative information would be reported to a CRA. Consumers would gain more from a notice that occurs earlier, such as at the time the thief first opens an account in the victim's name. Such notification is offered with some credit monitoring services, and this is the motivation for Colorado's inclusion of inquiries as a source of notices. Other measures in the FACT Act will require creditors to look for "red flags" identifying potential identity theft, such as address changes.[212]

### 2. The cost of additional disputes

To the extent that the negative information notice would increase consumers' detection and disputing of possibly inaccurate information in their reports, that benefit would come with an associated cost. It is costly for consumers, CRAs, and furnishers to generate and process disputes. These costs, however, are a necessary part of the dispute resolution mechanism prescribed by the FCRA. In other words, the FCRA reflects a congressional judgment that the cost of resolving disputes (including invalid disputes) is generally justified by the benefits of

---

211. FTC's Identity Theft Survey Report is available at http://www.ftc.gov/os/2003/09/synovatereport.pdf (the data cited, however, were obtained from the survey results and were not included in the published report). For the purposes of the Identity Theft Survey, "identity theft" includes fraudulent use of an existing account. Victims may discover fraud sooner in those cases because the fraudulent activity will appear on regular billing statements.

212. *See* FACT Act § 114. Another provision under the FACT Act will require CRAs to notify potential credit grantors when an application for credit carries an address significantly different from the one that the CRA has on file for that consumer. *See* FACT Act § 315. If the creditor notes multiple addresses for the applicant, and sends a negative information notice to both addresses, victims would be more likely to learn about negative information caused by identity theft. More importantly, the provision should improve the ability of creditors to detect attempted identity theft in the first place, decreasing the number of inaccuracies that arise from it.

correcting erroneous information. However, without data indicating whether disputes generated by negative information notices are more or less likely to lead to invalid disputes than are disputes under the current system, it is not possible to assess additional costs and benefits from the notices' potential to generate more disputes.

### 3. Provision of notice by furnishers

Requiring furnishers to provide the proposed notices would generate costs for furnishers, and at the same time might not achieve all of the benefits intended by the proposal. Although most furnishers are already in regular contact with consumers, they likely would need to revise their systems and procedures to add the notice. For example, if furnishers were to provide the notice to consumers through a regular billing statement, they would need to link their billing systems with their information furnishing systems – that is, the system that generates regular statements to consumers of amounts due would also have to notify consumers of what information was furnished to CRAs.

Where there is no monthly statement, it would not be possible for the furnisher to notify consumers through a regular statement, in which case a new mailing would have to be made to the consumer. For instance, creditors may not provide consumers with regular statements for certain types of accounts – e.g., some closed-end credit accounts. In addition, some creditors may not send a statement if there was no billing activity during a given period.

Although furnisher notices could benefit consumers by enabling them to correct erroneous information, those benefits would be limited in certain respects. Furnishers are not in a position to notify consumers about every type of negative information that might be added to their files. For example, most public record information is not "furnished" by the entity that generates the information (e.g., county courthouses) but is gathered by independent contractors who in turn supply it to CRAs.

Further, to the extent furnishers do know about the negative information, they may already be informing consumers about it. There are three types of records that could contain negative information: credit accounts, collection accounts, and public records. When negative information is added to credit records, consumers generally learn about it directly from the creditor (i.e., the furnisher). The creditor usually sends the consumer a regular billing statement, and will often make further efforts to notify consumers about any delinquency. This means that if a creditor mistakenly adds negative information to a consumer's account, the consumer will already have a chance to discover it and incentives (such as avoiding added interest or fees) to dispute it. In this circumstance, a separate notice would not be useful in alerting consumers that negative information has been added to their accounts.[213]

---

213. Under the proposed requirement, the creditor would also have to inform the consumer that the information will be reported to a CRA. This might be helpful to some consumers. For example, if a creditor mistakenly records a consumer as being 30 days late in making a payment, the late fees for this delinquency may be quite minor. The consumer may be content with confirming with the creditor that the account is now current, and not bother to dispute the accuracy of the past delinquency. But if the consumer knows that his or her credit record will be affected, the consumer may be more likely to dispute and correct the reported delinquency.

Federal Trade Commission

For collection accounts, the notice may be somewhat more useful. Although collection agencies do not have established relationships with consumers, they contact consumers in order to collect payments and often inform them that negative information will be reported to a CRA.[214] Some debt collectors, however, do not notify consumers that they are reporting negative information to a CRA.[215] Moreover, the collector may not be licensed to do business in the state in which the consumer resides, and therefore collectors believe that they could not legally initiate contact with the consumer through a negative information notice.[216]

For public records, a furnisher notice is not likely to be useful at all. Indeed, public records are not "furnished" to CRAs in the way that credit and collection accounts are. Rather, each CRA must collect them itself (or hire another firm to do so). Thus, only CRAs are in the position to notify consumers when public records are added to their files. The benefits and costs of a CRA notice requirement are discussed in the next section.

In addition, when an inaccuracy stems from a mixed file or identity theft, a furnisher-provided notice is likely to fail because it probably will be sent to the wrong consumer.[217]

In sum, requiring furnishers to provide negative reporting notices would have some benefits to consumers, although those benefits might be limited. At the same time, such a requirement is likely to have costs for furnishers that might outweigh any benefits.

### 4. Provision of the notice by the CRAs

Requiring CRAs to provide negative information notices would more directly address the goals of the proposal. There are certain types of errors that can be detected only through the CRAs' data: mixed files, errors in transmission, errors in public records, and negative information due to identity theft. As a result, there is reason to believe that CRAs would be the best source of a negative information notice.

---

The size of this benefit is unclear, however. First, creditors already have an incentive to notify consumers that negative information is likely to hurt their credit ratings because this information helps to motivate consumers to pay their bills on time. Second, many consumers are generally aware that failure to pay bills on time is recorded in one's credit history. Third, much of the negative information that is inaccurate will be challenged by the consumer simply because the consumer wants to avoid penalties for delinquency, regardless of any additional notice required by the FCRA.

214. One reason is that doing so increases a consumer's incentives to repay the debt.

215. In recent years the Commission, along with consumer groups, has received complaints from consumers that collection account information was sent to a CRA without the consumer ever being notified by the collection agency.

216. See Comment Letter on Matter No. R411013, ACA International, at http://www.ftc.gov/os/comments/FACTA-summaries/511461-0016.pdf (stating that debt collectors may furnish information to credit bureaus about consumers residing in states in which the collector is not licensed to do business, and that any direct contact with the consumer might be an "attempt to collect a debt" in violation of state law).

217. For mixed files, if consumer A's account is placed in consumer B's file, the furnisher will not realize this and will send the notice to consumer A. For identity theft, the victim will be unaware of the theft if billing statements are being sent to a false address (a common element in identity theft). In this case, the negative information notice would go to the false address as well.

**Federal Trade Commission**

On the other hand, CRA provision of the notices could entail much higher costs. Every year, a considerable amount of negative information is added to consumer reports from a variety of different sources. Although much of this information is correct, the CRAs would incur substantial expense if they were required to send a notice each time such information is added.[218] The most obvious costs come from processing the notices and mailing them to consumers.

In addition, the CRAs argue that many consumers are not familiar with the CRAs and it is thus not clear how consumers would respond to the proposed notices, especially when they do not recognize the sender. Some would not read the notice, or would ignore it if they did read it. Furthermore, the CDIA has argued (citing its experiences with the Colorado law) that consumers do not like being reminded about negative information of which they are already aware, and that many of them, particularly the elderly, find unsolicited notices offensive and even threatening.

The situation may also open avenues for fraud. In particular, unscrupulous entities posing as CRAs might be able to trick consumers into providing personal information under the pretense of confirming negative information in a consumer report.[219] Furthermore, unsolicited CRA notices could provide additional opportunities for identity thieves to acquire consumers' personal information. Since a consumer would not necessarily be expecting a notice, he or she might simply throw it away without opening it, unaware that it contains information that could be used to open a fraudulent account in the consumer's name.

Many of these concerns arise from the fact that the CRAs would be sending the notices to consumers who are not expecting them. These concerns could be addressed by having consumers "opt in" to a system that would notify them when negative information has been added to their reports. Such systems are essentially what the market has begun to provide in the form of credit monitoring services.

The provision of credit monitoring services requires that consumers pay for a service that provides notices relating to changes in their consumer reports. Consumers frequently receive the notices by electronic mail, reducing delivery costs substantially. Unlike recipients of unsolicited notices, consumers who purchase credit monitoring services are not only familiar with the CRAs, but expect to receive notices from them and are willing to pay for them. Because the notices are expected, consumers are also less likely to be susceptible to "phishing" and other fraudulent schemes. Another advantage of the market approach is that CRAs have incentives to determine what products are most useful – for example, some monitoring services notify consumers about new accounts, address changes, and significant changes in account balances.

---

218. The experience with Colorado's notices, for example, shows that almost 300 negative information notices were sent for every item that was disputed. *See* discussion *supra* page 72.

219. The CDIA relates that the Colorado Attorney General's office discovered that a letter had been sent to consumers ostensibly from a CRA complying with the Colorado law. The letter asked consumers to provide a host of personal and financial information. No CRA had sent the letter. The practice of "phishing," whereby a party uses a pretext to request personal or financial information from consumers to be used in perpetrating credit fraud or identity theft, has raised concerns at the FTC, which has addressed it through enforcement and education. *See, e.g.,* FTC v. Zachary Keith Hill, Civ. Action No. H 03-5537 (S. D. Tex. 2004) (final order) http://www.ftc.gov/opa/2004/03/phishinghilljoint.htm; *see also How Not to Get Hooked by a "Phishing" Scam*, FTC Consumer Alert, available at http://www.ftc.gov/bcp/online/pubs/alerts/phishingalrt.htm.

Overall, a market-based notice may be the most efficient one available for improving accuracy at minimal cost and ensuring that consumers get notices that they want and will read. Consumers have shown that they are willing to pay for such notices, but the market is new and evolving, so it is probably too soon to tell whether the benefits to consumers outweigh their costs.[220]  This is particularly true in light of the fact that free reports will become available to consumers beginning in 2005.  As the market develops, the costs and benefits of these types of notices should become more clear.

## D.  Conclusion

A negative information notice would encourage consumers to check the accuracy of information in their consumer reports when the potential benefits from doing so are the highest, enabling them to correct errors before they become an obstacle to obtaining credit, employment, insurance, or other services.  However, this requirement would also have substantial costs.

A requirement that data furnishers provide the notice would be costly even when they have relationships with consumers, and such a notice would not alert consumers to many important inaccuracies, including mixed files, inaccuracies in public records, and accounts generated by fraud.  A CRA notice could address these limitations, but could be associated with higher costs for both consumers and industry.

An opt-in system in which consumers elect to receive negative information notices would avoid many of these costs.  The market already provides such a service, for a price.  These services are new, and are being offered at a time when consumers are becoming more and more aware of consumer reports and their importance.  Moreover, implementation of free annual file disclosures will make an important difference in consumer access to consumer reports. Accordingly, the Commission believes that imposing on furnishers or CRAs a requirement to notify consumers when negative information is reported is premature at this time.

## VII. Common Unreported Transactions

## A.  Introduction

Sections 318(a)(2)(D) and (E) of the FACT Act require the Commission to study:

> any common financial transactions that are not generally reported to the consumer reporting agencies, but would provide useful information in determining the credit worthiness of consumers; and

> any action that might be taken within a voluntary reporting system to encourage the reporting of [these] types of transactions. . . .

---

220.  Some consumer groups have expressed concern that credit monitoring services may be too expensive for some consumers to afford, and that internet-based services would not be accessible to all consumers.

The concern prompting this request is that many Americans may be missing out on the benefits associated with the consumer reporting system even though they may have a demonstrable history of financial responsibility. For example, if someone has made mortgage payments consistently and on time for many years, this typically will be reflected in his or her file in nationwide CRA databases. On the other hand, if someone has paid rent consistently and on time for many years, it probably will not. Although both types of payments may be evidence of financial responsibility, rental information is generally not reported to the nationwide CRAs and thus will not be conveyed to creditors evaluating the renter's creditworthiness.

This study differs from the others mandated in section 318 because the Commission has not been asked to consider any specific proposal. The goal of the study is to describe the main types of transactions that could provide valuable information about the creditworthiness of consumers who are not well represented in the consumer reporting system.

In gathering information for this study, Commission staff contacted a wide variety of individuals and groups with an interest in these issues, including consumer representatives, CRAs, users of credit information, and organizations attempting to gather and report the types of information described in this section of the Act. The study describes what Commission staff learned about the obstacles to reporting such "non-traditional" credit information, recent private-sector initiatives to make this information available to creditors, and some measures that could be taken to encourage greater reporting of this information.

## B   Background

### 1.   Who would benefit from the reporting of additional payment information?

Fair Isaac Corporation estimates that of the roughly 215 million non-incarcerated adults in the United States, 22 million have no credit files at all.[221] An additional 32 million have "thin files," meaning files that do not contain sufficient information to calculate a standard credit score.[222] Creditors find it difficult to predict performance for consumers with little or no credit history, and are therefore reluctant to extend them credit. A lack of credit history information can stand in the way of obtaining a credit card, buying a car on credit, or purchasing a home.

There are a variety of reasons why someone might have little or no credit history. Of the 54 million Americans without a file that can be scored, about 10 million are recent immigrants. Others include young people living on their own for the first time; people who established credit through a spouse or other family member and not in their own names; and people who have either not used credit or who rely on credit sources, such as pay-day loans, that do not report to the major CRAs.

Minorities are over-represented among persons with limited or no credit histories. African Americans represent 6.0% of persons with a credit score based on four or more accounts, but 14.6% of persons without a credit history or with a history too thin to be scored by traditional

---

221.  Information with respect to Fair Isaac came from the company's website, http://www.myfico.com, and from interviews with Fair Isaac executives.

222.  *See* http://www.fairisaac.com/Fairisaac/Solutions/FICO+Expansion+Score/Value+to+Lenders/.

models. Hispanics represent 8.5% of those with a credit score based on four or more accounts, but 24.5% of those with no credit history or a credit history too thin to be scored.[223]

The mandate for this study is to determine whether there are transactions that consumers with limited or no credit histories undertake that could be reported and would be useful in predicting creditworthiness. For some groups, such as young people moving out on their own for the first time, the existence of such transactions is unlikely. For the same reasons they do not have credit histories, they are unlikely to have histories of other non-traditional transactions that could be useful in evaluating creditworthiness. Identifying such transactions is more feasible for people who have engaged in repeated non-traditional credit transactions for an extended period of time, but who do not participate in mainstream credit markets.

## 2.    The importance of "scoreable" credit files in automated underwriting

Automated underwriting is a tool that allows lenders to accept applicants based on automated decisions, rather than relying on more expensive and time consuming manual underwriting. It has become particularly important in the mortgage market – for example, Desktop Underwriter is a program provided by Fannie Mae that will tell a lender if Fannie Mae will purchase the loan without full manual underwriting.[224] According to industry sources, the percentage of mortgage loans that are made through automated underwriting has stabilized at about 75%. In 2003, 94% of lenders had implemented at least one automated underwriting system, up from 83% in 2001 and 91% in 2002.[225]

Credit scores are an increasingly important component of many credit transactions, and are of particular importance in automated underwriting. Frequently, consumers whose files contain insufficient information to calculate a score are not considered in systems that rely on automated underwriting. For example, a 2003 survey of mortgage lenders found that "no credit score" was the single most important reason why loan applications were not submitted to an automated underwriting system.[226] Thus, for consumers who currently have no file or insufficient information in their file, the potential to build a file through data that are not now reported is of heightened value.

---

223.  *See* Presentation by Eric Rosenblatt, *Automated Underwriting for Non-Traditional Credit Borrowers: Where Mission, Market Opportunity and the American Dream Converge*, Presentation at the Fifth Annual Fannie Mae Fair Lending Conference, Washington, DC (Sept. 29, 2004) [hereinafter Rosenblatt Presentation].

224.  Information in this section is based on the Rosenblatt Presentation. *See id.*

225.  *See id.* Automated underwriting has a number of advantages both for lenders and borrowers. A major advantage to lenders is that automated underwriting can save them $1,000 per loan versus manual underwriting. Automated underwriting streamlines origination and frees up underwriting staff to focus on more complex loans. It also facilitates point-of-sale underwriting decisions and allows lenders to expand their product offerings using statistically based and validated underwriting models. For borrowers, automated underwriting allows them to provide less documentation than traditional underwriting, can carry lower origination fees, and can lead to quicker lending decisions.

226.  Cited in Rosenblatt Presentation, *supra* note 223.

Federal Trade Commission

### 3.  Possible additional sources of data

Users of consumer reports have identified several things that they would look for in a consumer report system based on non-traditional credit information: (a) the system must cover a large number of people without traditional credit files; (b) the data must be predictive of loan default, that is, it must provide useful information about whether or not the borrower is likely to make timely payments; (c) the system's effectiveness at predicting creditworthiness must be explained and well-supported; and (d) the value of the information must be worth the cost of collecting and evaluating it.

In order for data to be a useful supplement or substitute for traditional credit history information, the data must be predictive of credit behavior.  The most likely data candidates are rent payment history and utilities payments.[227]  These types of payments, as well as remittances from recent immigrants to their families abroad, are discussed below.

#### a.  Rental payment information

In principle, payments for rental housing would appear to be a useful source of information for determining whether or not an individual would be responsible in making credit payments, particularly mortgage payments.  Although rent is not technically credit, because it is paid in advance, it is like a mortgage payment in that it is typically a routine, regularly scheduled payment.  For most people, rent is a major expense relative to income.[228]

Given its potential value, the question arises – why is rental information not typically included in a consumer report?  The most likely answer is the diffuse nature of the rental market. Ninety percent of rental units are owned by individual investors, who may own a small number of units.  Although approximately 35 to 40 million households rent their homes, the top 50 landlords own only 2.5 million units, less than 8% of the total rental properties.  Even these top 50 landlords would face serious barriers to reporting to the CRAs because they do not typically centralize their payment information, but rather maintain it at the rental location.  To report their tenants' payment information to the CRAs, landlords would either need to completely revamp their recordkeeping systems or submit data from 12,000 different locations.

One CRA explained that all of the account data it receives from banks and credit unions is furnished via approximately 9,500 collection points.[229]  In contrast, the CRA would have to collect data from 12,000 locations in order provide payment information for only 8% of renters. This means that collecting rental data covering a substantial portion of renters would be much more expensive than collecting data from *all* banks and credit unions.  These substantial costs are the biggest barrier to using rental payments to determine creditworthiness.

227.  Without collecting and testing the data, one cannot determine with any certainty which types of information would actually be predictive of credit performance.  Nevertheless, this report discusses various considerations and possible effects.

228.  Consumers might be expected to perform better on mortgage payments than rental payments.  This is because mortgage payments are typically a repayment of principal, in part, and therefore a mortgage payment builds equity.  Further, the costs associated with failing to pay a mortgage – the potentially high costs of foreclosure – are probably greater for most people than the costs of eviction.

229.  FTC staff conversation with CRA representatives.

*b.    Utility payment information*

Utility payment history also appears to be a good candidate for providing information about a consumer's creditworthiness. Utilities' services are provided on credit, as they are paid for after services are provided. Utility payments are sometimes secured by a security deposit, and because most utilities have the power to withhold future services, there can be strong incentives for customers to pay.

Utilities do not face the same type of problem as landlords in reporting data. There are far fewer utility companies in the country, and they have centralized billing systems that could be used to generate data for CRA files. Utilities, however, currently provide only limited reporting to the CRAs. To the extent that they do report, the information reported tends to be only negative information, such as when unpaid utility bills are sent for collection. Although partial reporting such as this has some benefits for the system as a whole, it provides no way for a consumer to demonstrate consistent on-time payment of utility bills to other potential creditors.

There are a number of reasons why utilities may be reluctant to report their customers' full credit information to the CRAs. Some utilities may face regulatory barriers to reporting. For example, one California law forbids telephone companies from revealing payment information without the express permission of the customer.[230] Further, some state regulatory schemes may create disincentives to reporting. Theoretically, utilities should have an incentive to report data to the CRAs because reporting such data might encourage consumers to pay their bills on time.[231] However, under certain state rate-setting systems,[232] any reductions in cost (including those associated with more timely payment by customers) may lead state regulators to lower the rate utilities can charge for their services, thereby reducing the incentives for utilities to report.

Another barrier to reporting may be the costs that the FCRA imposes on data furnishers. If utilities reported to the CRAs, they would be required to devote resources to responding to consumer disputes concerning information contained in consumer reports.[233] CRAs and furnishers express particular concern[234] about the new requirement for free annual file disclosure,[235] because they expect that, as more consumers examine their consumer reports, more consumers will dispute information contained in them. In addition, one CRA said that it

---

230.  *See* Cal. Pub. Util. Code § 2891(a) (2004). . However, such an approach – in which consumers with negative information could effectively "opt-out" of reporting their utility payment history – would differ from that used in the reporting system in general, which seeks to report comprehensively both positive and negative information.

231.  As an example, Nicor Gas, a Midwestern utility, experienced a 20% reduction in bad debts over three years after it started full-file reporting. TransUnion LLC, *TransUnion Case Study: How Reporting Helped Nicor Gas Reduce Bad Debt* (May 2002), at 2.

232.  For example, a "rate of return" regulatory system specifies the rate of return that a utility can earn on its capital. Because a reduction in costs would imply a higher rate of return, it will lead to a rate adjustment that could eliminate the benefit of the cost reduction. Many states use other regulatory strategies that do maintain incentives to reduce costs.

233.  In the Nicor Gas example, the annual customer dispute rate was less than 1%. TransUnion LLC, *supra* note 231.

234.  FTC staff communication with CRA and utility representatives.

235.  FACT Act § 211.

Federal Trade Commission ──────────────────────────────────

experienced a decrease in reporting by utilities following the 1996 FCRA amendments, which imposed liability on furnishers of data.[236]

Finally, cellular phone companies rarely provide full-file reporting to CRAs. This appears to be at least in part a strategic decision. Because the market is very competitive, with customers frequently switching carriers, companies are reluctant to provide information to CRAs which may facilitate competitors' marketing efforts through prescreened offers.[237]  Because of the value of credit data, it is possible that these companies would benefit from providing full-file reports to the CRAs; nevertheless, the incentives facing each individual company causes them to choose not to report.

### c.   Other potential sources of information

There may be other information, not currently reported, that would be useful in assessing consumers' eligibility for credit. Most sources of such data have various pragmatic or other barriers to traditional reporting.[238]  At this time, the Commission does not have specific information regarding other sources of information or the likely value of their utilization in existing credit reporting. As discussed above, several innovative products have recently been introduced to address the needs of consumers who lack traditional reported credit experience. At this point it is important to gain more experience with the implementation, possible effectiveness, and potential benefits of these products.

## C.   Possible Approaches to Increase Reporting of Non-Traditional Credit Data

### 1.   Commercial efforts to supplement existing consumer report data

Approximately 160 million consumers have consumer files that contain enough information from which to calculate a credit score.[239]  The provision of financial services to these consumers is considered to be a mature market. In contrast, providing services to the remaining 54 million consumers who have no files or whose files currently lack sufficient information for a score

---

236.  FACT Act § 312.

237.  This is similar to the decision by some credit card issuers not to furnish credit limit information to the CRAs, which is discussed in Section III of this report.

238.  An example is remittances by recent immigrants, many of whom send money to their families in their countries of origin. Each year, $70 billion is sent out of the country in this manner. Remittances to Mexico alone exceed $13 billion. Although these types of payments do not arise from a business transaction, some businesses are exploring whether remittances could be used as evidence of financial responsibility and the ability to make regular payments. There are many questions, however, about how a reporting scheme for remittances would work. For example, the equivalent of centralized billing records do not exist, and these payments do not translate naturally into existing concepts of on-time or delinquent payments. Despite these hurdles, several companies are exploring these payments as a possible source of information on creditworthiness, including PayRentBuildCredit, Experian, Fannie Mae, and others. *See* Rosenblatt Presentation, *supra* note 223. *See also* "A Bid to Cuts Cost [sic] Of Money Transfers For Immigrants," *Washington Post*, November 29, 2004, E 1.

239.  *See* https://www.ficoexpansionscore.com/Content/LenderValue.aspx (Fair Isaac "Expansion" score website).

represents an opportunity for growth.[240]  Credit firms therefore have an interest in products that can aid them in assessing the creditworthiness of these consumers.

One example can be seen in the mortgage market.  In a 2003 survey of lenders, respondents identified allowing non-traditional credit as the most important change to automated underwriting that would allow more loans to be made to under-served groups.[241]

In response to the demand for information that can be used to estimate the creditworthiness of consumers with thin or no credit files, several firms have recently introduced products that rely on other sources of payment information.  Development of these products is very recent, and in some cases the products have been launched during the time this study was being completed.  In general, however, these developments suggest that the market is rapidly developing mechanisms to meet a need.  It remains to be seen how successful these efforts will be in expanding the benefits of consumer reporting.  Thus, we believe it is premature to consider additional legislative recommendations at this time.

    *a.   PayRentBuildCredit*

PayRentBuildCredit ("PRBC") is a new for-profit firm, based in Annapolis, MD, that was publicly launched on December 10, 2003.  It has introduced one private sector response to lack of payment information.  The firm is in the process of gathering rental and other payment information for the purpose of determining creditworthiness, and considers itself to be a CRA regulated by the FCRA.[242]  The firm has also obtained letters from the Federal Reserve Board and other government entities stating that lenders will receive credit under the Community Reinvestment Act for using PRBC's services.

In an interview with FTC staff, the firm's founder and CEO, Michael Nathans, stated that he recognizes the difficulties that the major CRAs have had in collecting payment information from landlords, and says that he does not believe that this would be easier for his start-up firm.  He has therefore focused on getting consumers to voluntarily report their rental payment information through third parties.  As of this writing, these third parties, called "Verification Partners," consist of a dozen firms, including mortgage brokers, realtors, and an insurance company (State Farm).  The verification partners examine paper records (such as cancelled checks and bank statements), verifying that consumers have made rental payments, utility payments, insurance payments, day care payments, etc.  The consumer and the verification partner jointly enter this information into PRBC's database.  Consumers are not charged to enroll or enter their data.  Creditors are charged a fee to access a consumer's PRBC consumer report.

---

240.  *See* notes 221-222 *supra* and text accompanying.

241.  Cited in Rosenblatt Presentation, *supra* note 223.

242.  Information about PayRentBuildCredit is based upon the firm's website, available at http://www.payrentbuildcredit.com and FTC staff's interview with founder Michael G. Nathans.

Federal Trade Commission

### b. Expansion

"Expansion" is a new product from Fair Isaac, introduced in July of 2004.[243] It is a credit score specifically designed to evaluate those with thin or no traditional credit files. In order to sell this product, Fair Isaac has established a CRA subsidiary, which will combine payment data derived primarily from non-traditional credit sources, such as payday loan payments and product purchase payment plans.[244] These data will be maintained in consumer files, which can be used to calculate the Expansion score.

### c. NTreport (Non-Traditional Credit Report)

NTreport is a new product from First American CREDCO. a large reseller of consumer reports. The company introduced the product in September 2004.[245] NTreport is sold as a supplement to First American CREDCO's Instant Merge consumer report. The Instant Merge report is created by combining information from an applicant's consumer reports from the three nationwide CRAs. For loan applicants with thin or no consumer reports, NTreport supplements the Instant Merge report with "alternative credit sources (e.g., rent payments, gas bills, phone bills, etc.)." First American CREDCO has stated that the supplemental information is then "researched and verified."[246] The FTC does not have information on the sources of data First American CREDCO is using.

## 2. Possible steps to encourage greater voluntary reporting of non-traditional data

Given the diffuse nature of the market for rental housing, the barriers to widespread reporting of rental payment information appear to be largely based on cost. For some individuals, however, such as people with limited credit histories who wish to buy a home, the benefits of credibly demonstrating a good rent payment history may well outweigh the costs. Several third-party verification firms, such as PayRentBuildCredit, are trying to provide that service. It remains to be seen whether this will be a successful business model.

It may be more feasible to increase the voluntary reporting of utility payment information. Data on utility payments are much more centralized than rent payment information, and some utilities are already providing full-file reports to CRAs. To the extent that state regulations create barriers to reporting, these regulations would need to be addressed at the state level. For example, states might actively encourage utilities to report. They might also be able to change the way cost savings are treated in the rate setting process. As noted above, current rate-setting schemes may create disincentives for the utilities to promote timely payments through reporting.

---

243. *See* https://www.ficoexpansionscore.com/Content/LenderValue.aspx.

244. The National Community Reinvestment Coalition has expressed concern about the product because of the use of payday lending data. *See* Comment of John Taylor, President and CEO of the National Community Reinvestment Coalition, RE: FACT Act Scores Study, Matter No. P044804 (Aug. 10, 2004), available at http://www.ftc.gov/os/comments/creditscoresstudy/index.html.

245. The product is described at First American CREDCO's website, at http://www.credco.com/emergingmarkets.

246. *Id.*

## D.  Conclusion

As discussed above, there is a sizeable portion of the population that is difficult to evaluate for credit purposes because they have thin credit files or no credit history.  At the same time, there is a growing interest among providers of credit to serve these customers, and certain non-traditional credit transactions may be useful in evaluating their creditworthiness.  These include rent and utility payment information.

Many of the barriers to reporting this information appear to be based on cost.  Others may be tied to state regulatory systems.  Despite these barriers, certain private efforts are underway to collect and report this data.  These efforts are still at their beginning stages.  As they develop, the FTC will continue to monitor these effects to determine whether they succeed in providing greater access to common, unreported transactions.  At this time, however, it appears premature to make legislative recommendations to address an issue that is the subject of developments in the marketplace that may provide responsive remedies more rapidly and efficiently than statutory approaches.

## VIII.  Conclusion

This report has examined a variety of issues related to the accuracy and completeness of consumer reports.  It serves as the FTC's interim Report to Congress under Section 319 of the FACT Act, which mandates an ongoing study of accuracy and completeness, and the FTC's Report to Congress under Section 318, which mandates a study of four possible ways to improve operation of the FCRA.

Section III of this report discusses the Commission's research and findings thus far in its ongoing accuracy and completeness study.  Among other things, the report discusses the history and current practices of the consumer reporting industry; the potential sources of error in consumer reports; the accuracy and completeness requirements of the FCRA, as well as FTC efforts to promote compliance with them; and the studies conducted to date on consumer report accuracy and completeness.  The FTC's review of the studies, which included a roundtable with a diverse group of experts, showed that none of the prior studies provided a comprehensive view of consumer report accuracy and completeness, and many had methodological problems that limit their usefulness as a "baseline" measure.  As discussed in the report, the Commission plans to conduct a pilot study to determine the feasibility and cost of conducting a more comprehensive survey of consumer report accuracy and completeness.

The Section 318 part of the report assesses the benefits and costs of three specific proposals to improve accuracy and completeness – stricter data matching, "same report" disclosures, and negative information notices – and examines whether there are common, unreported financial transactions that would be useful in determining creditworthiness.  Given the lack of a reliable baseline to gauge current levels of accuracy and completeness, it is difficult to quantify the precise effects of the three proposals.  Nevertheless, the studies were able to identify the likely benefits and costs and draw certain conclusions.  In particular, they concluded that each of the proposals addresses important concerns and could benefit some consumers in certain situations, but that the costs to consumers and industry as a whole could be substantial.  As to common

**Federal Trade Commission**

unreported transactions, the study concluded that there are such transactions – most notably, rental and utility payment information – and that some private sector efforts are underway to collect and provide this data to potential creditors.

Based on its findings and conclusions, the Commission is not making legislative or administrative recommendations at this time. In addition to concluding that the costs of specific proposals examined in the studies could outweigh benefits to consumers, the Commission believes that it is premature to enact alternative requirements of this nature. As discussed in Part III of this report, the FACT Act imposed a host of new requirements that should further enhance the accuracy and completeness of consumer reports, including measures to strengthen the dispute and reinvestigation process, a new consumer right to obtain a free annual file disclosure, measures designed to reduce identity theft, and new requirements on those who furnish information to the CRAs. Many of these requirements are still being implemented, and their precise effects on accuracy and completeness are yet to be seen. However, when fully implemented, these new requirements are likely to improve accuracy and completeness and should also address some of the specific concerns underlying the proposals in Section 318. For example, consumers' new right to obtain a free annual disclosure should help consumers spot negative information before it causes harms, consistent with the goals of the negative information notice proposal. Also, the FACT Act now requires CRAs to notify users of consumers reports when the address provided for a consumer substantially differs from the address in the CRA's file – a requirement that coincides with the proposed matching requirements.

In addition, the consumer reporting industry is in a period of rapid change, due not only to the FACT Act reforms but also to the increasing prominence of consumer reports in today's economy. Once limited to credit transactions, consumer reports are now used, for example, to screen job applicants and price insurance. Consumers are also increasingly aware of the importance of consumer reports and the need to check their accuracy. In the midst of these changes, the market appears to be responding to some of the problems highlighted in the Section 318 proposals. For example, the industry now provides credit monitoring services that, for a fee, alert consumers when certain information is added to their files. Although these services are fairly new, and consumer groups have expressed concerns about their cost, they could fulfill some of the same goals as the negative information notice. Further, new products have been introduced that attempt to gather information on rental payments, utility payments, and other common unreported transactions. The success of these products remains to be seen, but they could help ensure that this data is considered in evaluating consumers for credit. The combination of new requirements under the FACT Act and recent market developments lead the Commission to conclude that additional legislation is not called for at this time.

Finally, the ongoing study that the Commission is considering, beginning with the pilot study, should help shed light on the continuing concerns about accuracy and completeness that are addressed in this report. As the Commission pursues the study, it will attempt to identify any areas where further reform is needed, as well as any improvements observed due to the FACT Act or the ongoing changes in the marketplace.

# Appendix A: Roundtable Federal Register Notice

**Federal Trade Commission**

## FEDERAL RESERVE SYSTEM

### Formations of, Acquisitions by, and Mergers of Bank Holding Companies

The companies listed in this notice have applied to the Board for approval, pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*) (BHC Act), Regulation Y (12 CFR Part 225), and all other applicable statutes and regulations to become a bank holding company and/or to acquire the assets or the ownership of, control of, or the power to vote shares of a bank or bank holding company and all of the banks and nonbanking companies owned by the bank holding company, including the companies listed below.

The applications listed below, as well as other related filings required by the Board, are available for immediate inspection at the Federal Reserve Bank indicated. The application also will be available for inspection at the offices of the Board of Governors. Interested persons may express their views in writing on the standards enumerated in the BHC Act (12 U.S.C. 1842(c)). If the proposal also involves the acquisition of a nonbanking company, the review also includes whether the acquisition of the nonbanking company complies with the standards in section 4 of the BHC Act (12 U.S.C. 1843). Unless otherwise noted, nonbanking activities will be conducted throughout the United States. Additional information on all bank holding companies may be obtained from the National Information Center website at *www.ffiec.gov/nic/.*

Unless otherwise noted, comments regarding each of these applications must be received at the Reserve Bank indicated or the offices of the Board of Governors not later than July 6, 2004.

**A. Federal Reserve Bank of New York** (Jay Bernstein, Bank Supervision Officer) 33 Liberty Street, New York, New York 10045–0001:

*1. Rhinebeck Bancorp, MHC,* Poughkeepsie, New York; to become a bank holding company by acquiring 100 percent of the voting shares of Rhinebeck Savings Bank, Rhinebeck, New York.

**B. Federal Reserve Bank of Chicago** (Patrick Wilder, Assistant Vice President) 230 South LaSalle Street, Chicago, Illinois 60690–1414:

*1. Wintrust Financial Corporation,* Lake Forest, Illinois; to acquire 100 percent of the voting shares of Northview Financial Corporation, Northfield, Illinois, and thereby indirectly acquire voting shares of Northview Bank & Trust, Northfield, Illinois.

**C. Federal Reserve Bank of St. Louis** (Randall C. Sumner, Vice President) 411 Locust Street, St. Louis, Missouri 63166–2034:

*1. First Centralia Bancshares, Inc.,* Centralia, Kansas, and Morrill Bancshares, Inc., Merriam, Kansas; to acquire directly and indirectly up to 36.8 percent of the voting shares of Century Capital Financial, Inc., Kilgore, Texas, and thereby indirectly acquire voting shares of Century Capital Financial–Delaware, Inc., Wilmington, Delaware, and City National Bank, Kilgore, Texas.

*2. Davis Bancorporation, Inc.,* Davis Oklahoma; to acquire up to 17.90 percent of the voting shares of Century Capital Financial–Delaware, Inc., Wilmington, Delaware, and Century Capital Financial, Kilgore, Texas, and thereby indirectly acquire voting shares of City National Bank of Kilgore, Kilgore, Texas.

Board of Governors of the Federal Reserve System, June 4, 2004.

**Robert deV. Frierson,**

*Deputy Secretary of the Board.*

[FR Doc. 04–13148 Filed 6–9–04; 8:45 am]

BILLING CODE 6210–01–S

## FEDERAL RESERVE SYSTEM

### Notice of Proposals to Engage in Permissible Nonbanking Activities or to Acquire Companies that are Engaged in Permissible Nonbanking Activities

The companies listed in this notice have given notice under section 4 of the Bank Holding Company Act (12 U.S.C. 1843) (BHC Act) and Regulation Y (12 CFR Part 225) to engage *de novo,* or to acquire or control voting securities or assets of a company, including the companies listed below, that engages either directly or through a subsidiary or other company, in a nonbanking activity that is listed in § 225.28 of Regulation Y (12 CFR 225.28) or that the Board has determined by Order to be closely related to banking and permissible for bank holding companies. Unless otherwise noted, these activities will be conducted throughout the United States.

Each notice is available for inspection at the Federal Reserve Bank indicated. The notice also will be available for inspection at the offices of the Board of Governors. Interested persons may express their views in writing on the question whether the proposal complies with the standards of section 4 of the BHC Act. Additional information on all bank holding companies may be obtained from the National Information Center website at *www.ffiec.gov/nic/.*

Unless otherwise noted, comments regarding the applications must be received at the Reserve Bank indicated or the offices of the Board of Governors not later than July 6, 2004.

**C. Federal Reserve Bank of St. Louis** (Randall C. Sumner, Vice President) 411 Locust Street, St. Louis, Missouri 63166–2034:

*1. First Centralia Bancshares, Inc.,* Centralia, Kansas, and Morrill Bancshares, Merriam, Kansas; to acquire up to 77.7 percent of FBC Financial Corporation, and thereby indirectly and indirectly acquire 1st Bank Oklahoma, both of Claremore, Oklahoma, and thereby engage in operating a savings association, pursuant to section 225.28(b)(4)(ii) of Regulation Y.

Board of Governors of the Federal Reserve System, June 4, 2004.

**Robert deV. Frierson,**

*Deputy Secretary of the Board.*

[FR Doc. 04–13149 Filed 6–9–04; 8:45 am]

BILLING CODE 6210–01–S

## FEDERAL TRADE COMMISSION

### Notice of Roundtable To Aid Federal Trade Commission Staff in Conducting a Study of the Accuracy and Completeness of Consumer Reports, Pursuant to Section 319 of the Fair and Accurate Credit Transactions Act of 2003

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice of roundtable meeting.

**SUMMARY:** The Federal Trade Commission (the "Commission" or "FTC") is conducting a study of the accuracy and completeness of consumer reports, as mandated by section 319 of the Fair and Accurate Credit Transactions Act of 2003 ("the Act" or "FACT Act"). The Commission's Bureau of Economics is holding a roundtable with scholars, researchers, and other relevant parties on a review of methodologies pertinent to testing the accuracy and completeness of consumer reports.

**DATES:** The roundtable will take place on June 30, 2004.

**ADDRESSES:** The roundtable will be held at the Federal Trade Commission, 601 New Jersey Avenue, NW., Washington, DC 20580.

**FOR FURTHER INFORMATION CONTACT:** Persons seeking to attend the roundtable should contact Marie Tansioco at (202) 326–3613 (Federal Trade Commission, Bureau of Economics, 601 New Jersey Avenue, NW., Washington, DC 20580) by June 18, 2004. Please include in your request an explanation or statement

setting forth expertise in or knowledge of methodologies pertinent to assessing the accuracy and completeness of consumer reports. As a reminder, the roundtable will not be dealing with policy matters.

The FTC Act and other laws the Commission administers permit the collection of information concerning persons seeking to attend the roundtable to consider and use in this proceeding as appropriate. More information, including routine uses permitted by the Privacy Act to the extent applicable, may be found in the FTC's privacy policy, at *http://www.ftc.gov/ftc/privacy.htm.*

**SUPPLEMENTARY INFORMATION:** The FACT Act was signed into law on December 4, 2003. Fair and Accurate Credit Transactions Act of 2003, Public Law 108–159 (2003). In general, the Act amends the Fair Credit Reporting Act ("FCRA") to enhance the accuracy of consumer reports and to allow consumers to exercise greater control regarding the type and amount of marketing solicitations they receive. To promote increasingly efficient national credit markets, the FACT Act also establishes uniform national standards in key areas of regulation regarding consumer report information. The Act contains a number of provisions intended to combat consumer fraud and related crimes, including identity theft, and to assist its victims. Finally, the Act requires a number of studies to be conducted on consumer reporting and related issues.

Section 319 of the Act mandates that the Federal Trade Commission shall conduct an ongoing study of the accuracy and completeness of information contained in consumer reports prepared or maintained by consumer reporting agencies and methods for improving the accuracy and completeness of such information. The time horizon for the mandated study, inclusive of a series of biennial reports to Congress, runs eleven years. The first report is due in early December 2004.

The roundtable has a limited purpose: it is a review of various methodologies pertinent to testing the accuracy and completeness of consumer reports (also known as "credit reports"). This review is not part of any rule-making procedure and does not address any FTC policy matter. Also, in reference to the language of the Act, the roundtable discussion is solely a forum for review of methodologies applicable exclusively to the accuracy and completeness aspect of the section 319 study and will not address methods for *improving* accuracy and completeness, nor the costs and

benefits of requirements, or potential requirements, pertaining to credit reports.

By direction of the Commission.

**Donald S. Clark,**
*Secretary.*

[FR Doc. 04–13081 Filed 6–9–04; 8:45 am]
**BILLING CODE 6750–01–P**

---

**FEDERAL TRADE COMMISSION**

**[File No. 031–0201]**

**Itron, Inc., et al.; Analysis To Aid Public Comment**

**AGENCY:** Federal Trade Commission.

**ACTION:** Proposed consent agreement.

**SUMMARY:** The consent agreement in this matter settles alleged violations of Federal law prohibiting unfair or deceptive acts or practices or unfair methods of competition. The attached Analysis to Aid Public Comment describes both the allegations in the draft complaint that accompanies the consent agreement and the terms of the consent order—embodied in the consent agreement—that would settle these allegations.

**DATES:** Comments must be received on or before July 2, 2004.

**ADDRESSES:** Comments should refer to "Itron, Inc., *et al.,* File No. 031 0201," to facilitate the organization of comments. A comment filed in paper form should include this reference both in the text and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/Office of the Secretary, Room H–159, 600 Pennsylvania Avenue, NW., Washington, DC 20580. Comments containing confidential material must be filed in paper form, as explained in the **SUPPLEMENTARY INFORMATION** section. The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form (except comments containing any confidential material) should be sent to the following e-mail box: *consentagreement@ftc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Matthew Reilly, FTC, Bureau of Competition, 600 Pennsylvania Avenue, NW., Washington, DC 20580, (202) 326–2350.

**SUPPLEMENTARY INFORMATION:** Pursuant to section 6(f) of the Federal Trade Commission Act, 38 Stat. 721, 15 U.S.C.

46(f), and section 2.34 of the Commission's Rules of Practice, 16 CFR 2.34, notice is hereby given that the above-captioned consent agreement containing a consent order to cease and desist, having been filed with and accepted, subject to final approval, by the Commission, has been placed on the public record for a period of thirty (30) days. The following Analysis to Aid Public Comment describes the terms of the consent agreement, and the allegations in the complaint. An electronic copy of the full text of the consent agreement package can be obtained from the FTC Home Page (for June 3, 2004), on the World Wide Web, at *http://www.ftc.gov/os/2004/06/index.htm.* A paper copy can be obtained from the FTC Public Reference Room, Room 130–H, 600 Pennsylvania Avenue, NW., Washington, DC 20580, either in person or by calling (202) 326–2222.

Public comments are invited, and may be filed with the Commission in either paper or electronic form. Written comments must be submitted on or before July 2, 2004. Comments should refer to "Itron, Inc., *et al.,* File No. 031 0201," to facilitate the organization of comments. A comment filed in paper form should include this reference both in the text and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/Office of the Secretary, Room H–159, 600 Pennsylvania Avenue, NW., Washington, DC 20580. If the comment contains any material for which confidential treatment is requested, it must be filed in paper (rather than electronic) form, and the first page of the document must be clearly labeled "Confidential." [1] The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form should be sent to the following e-mail box: *consentagreement@ftc.gov.*

The FTC Act and other laws the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. All timely and responsive

---

[1] Commission Rule 4.2(d), 16 CFR 4.2(d). The comment must be accompanied by an explicit request for confidential treatment, including the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. The request will be granted or denied by the Commission's General Counsel, consistent with applicable law and the public interest. *See* Commission Rule 4.9(c), 16 CFR 4.9(c).

## Appendix B:  Pilot Study Federal Register Notice

**Federal Trade Commission**

**Federal Register** / Vol. 69, No. 202 / Wednesday, October 20, 2004 / Notices     **61675**

Bank Holding Company Act (12 U.S.C. 1843) (BHC Act) and Regulation Y (12 CFR Part 225) to engage *de novo*, or to acquire or control voting securities or assets of a company, including the companies listed below, that engages either directly or through a subsidiary or other company, in a nonbanking activity that is listed in § 225.28 of Regulation Y (12 CFR 225.28) or that the Board has determined by Order to be closely related to banking and permissible for bank holding companies. Unless otherwise noted, these activities will be conducted throughout the United States.

Each notice is available for inspection at the Federal Reserve Bank indicated. The notice also will be available for inspection at the offices of the Board of Governors. Interested persons may express their views in writing on the question whether the proposal complies with the standards of section 4 of the BHC Act. Additional information on all bank holding companies may be obtained from the National Information Center website at *www.ffiec.gov/nic/*.

Unless otherwise noted, comments regarding the applications must be received at the Reserve Bank indicated or the offices of the Board of Governors not later than November 3, 2004.

**A. Federal Reserve Bank of Boston** (Richard Walker, Community Affairs Officer) 600 Atlantic Avenue, Boston, Massachusetts 02106–2204:

1. *Boston Private Financial Holdings, Inc.*, Boston, Massachusetts; to acquire KLS Professional Advisors, LLC, New York, New York, and thereby engage in financial and investment advisory activities, pursuant to sections 225.28(b)(6) and (b)(6)(vi) of Regulation Y.

**B. Federal Reserve Bank of Cleveland** (Cindy C. West, Banking Supervisor) 1455 East Sixth Street, Cleveland, Ohio 44101–2566:

1. *Wesbanco, Inc.*, Wheeling, West Virginia; to acquire Winton Financial Corporation, Cincinnati, Ohio, and thereby indirectly acquire The Winton Savings and Loan Company, Cincinnati, Ohio, and thereby engage in owning and operating a savings and loan association, pursuant to section 225.28(b)(4)(ii) of Regulation Y.

Comments regarding this application must be received at the Reserve Bank or the office of the Board of Governors not later than November 15, 2004.

Board of Governors of the Federal Reserve System, October 14, 2004.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 04–23421 Filed 10–19–04; 8:45 am]
**BILLING CODE 6210–01–S**

# FEDERAL RESERVE SYSTEM

## Sunshine Act Meeting

**AGENCY HOLDING THE MEETING:** Board of Governors of the Federal Reserve System.

**TIME AND DATE:** 11:30 a.m., Monday, October 25, 2004.

**PLACE:** Marriner S. Eccles Federal Reserve Board Building, 20th and C Streets, N.W., Washington, D.C. 20551.

**STATUS:** Closed.

**MATTERS TO BE CONSIDERED:**

1. Personnel actions (appointments, promotions, assignments, reassignments, and salary actions) involving individual Federal Reserve System employees.

2. Any items carried forward from a previously announced meeting.

**FOR FURTHER INFORMATION CONTACT:** Michelle A. Smith, Director, Office of Board Members; 202–452–2955.

**SUPPLEMENTARY INFORMATION:** You may call 202–452–3206 beginning at approximately 5 p.m. two business days before the meeting for a recorded announcement of bank and bank holding company applications scheduled for the meeting; or you may contact the Board's Web site at *http://www.federalreserve.gov* for an electronic announcement that not only lists applications, but also indicates procedural and other information about the meeting.

Board of Governors of the Federal Reserve System, October 15, 2004.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 04–23544 Filed 10–15–04; 4:43 pm]
**BILLING CODE 6210–01–S**

# FEDERAL TRADE COMMISSION

## Notice of a Pilot Study to Aid Federal Trade Commission Staff in Conducting a Study of the Accuracy and Completeness of Consumer Reports, Pursuant to Section 319 of the Fair and Accurate Credit Transactions Act of 2003

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice of pilot study and request for comment.

**SUMMARY:** Pursuant to section 319 of the Fair and Accurate Credit Transactions Act of 2003 ("the Act" or "FACT Act"), the Federal Trade Commission (the "Commission" or "FTC") is evaluating ways to study the accuracy and completeness of consumer reports. The purpose of the current pilot study is to evaluate the feasibility of a methodology that involves direct review by consumers of the information reported in their consumer reports. Due to the small size of the study group, statistical conclusions will not be drawn from this pilot study. Comments will be considered before the FTC submits a request for Office of Management and Budget ("OMB") review under the Paperwork Reduction Act.

**DATES:** Public comments must be received on or before December 20, 2004.

**ADDRESSES:** Interested parties are invited to submit written comments. Comments should refer to the "Accuracy Pilot Study: Paperwork Comment" to facilitate the organization of the comments. A comment filed in paper form should include this reference both in the text and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/Office of the Secretary, Room H–159 (Annex Y), 600 Pennsylvania Avenue, NW., Washington, DC 20580. Comments containing confidential material must be filed in paper (rather than electronic) form, and the first page of the document must be clearly labeled "Confidential." [1] The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form (except comments containing any confidential material) should be sent to the following e-mail box: *AccuracyPilotStudy@ftc.gov.*

The FTC Act and other laws the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. All timely and responsive public comments, whether filed in paper or electronic form, will be considered by the Commission, and will be available to the public on the FTC Web site, to the extent practicable, at *http://www.ftc.gov.* As a matter of discretion, the FTC makes every effort to remove home contact information for individuals from public comments it receives before placing those comments on the FTC Web site. More information, including routine uses permitted by the

---

[1] Commission Rule 4.2(d), 16 CFR 4.2(d). The comment must be accompanied by an explicit request for confidential treatment, including the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. The request will be granted or denied by the Commission's General Counsel, consistent with applicable law and the public interest. *See* Commission Rule 4.9(c), 16 CFR 4.9(c).

**61676**     **Federal Register** / Vol. 69, No. 202 / Wednesday, October 20, 2004 / Notices

Privacy Act, may be found in the FTC's privacy policy, at *http://www.ftc.gov/ftc/privacy.htm.*

**FOR FURTHER INFORMATION CONTACT:** Peter Vander Nat, Economist, (202) 326–3518, Federal Trade Commission, Bureau of Economics, 601 New Jersey Avenue, NW., Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:** The Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108–159 (2003), among other purposes, amends the Fair Credit Reporting Act ("FCRA") to enhance the accuracy of consumer reports. The FACT Act requires the FTC to conduct a number of studies on consumer reporting and related issues.

Section 319 of the FACT Act requires the FTC to study the accuracy and completeness of information in consumers' credit reports and to consider methods for improving the accuracy and completeness of such information. The Act requires the Commission to issue a series of biennial reports to Congress over a period of eleven years. The first report is due in December 2004.

As the first step in conducting the accuracy and completeness study, the FTC is conducting a pilot study which will evaluate the feasibility of a methodology that directly involves consumer review of the information contained in their credit reports. The pilot study does not rely on the selection of a nationally representative sample of consumers, and statistical conclusions will not be drawn from the pilot study. The FTC has designated a contractor with high-level expertise in credit reporting and related issues, subject to OMB clearance for the study under the Paperwork Reduction Act. The pilot study will involve a small group of consumers who give the contractor permission to review their credit reports. The contractor will help the consumers to understand their reports and to discern inaccuracies or incompleteness in them.

The FTC invites comments on: (1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, which includes the duties provided by the FACT Act, and whether the information will have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses. The FTC will submit the proposed information collection requirements to OMB for review, as required by the Paperwork Reduction Act, 44 U.S.C. 3501–3520.

**Description of the Collection of Information and Proposed Use:**

The design elements of the study are the following:

1. The study will consist of approximately 35 consumers having a diversity of credit scores covering at least three broad categories: poor, fair, and good.[2] The study group will consist of adult members of households to whom credit has been extended in the form of credit cards, automobile loans, home mortgages, or other forms of installment credit. The study group will be constructed by using list-assisted random digit telephone numbers with associated addresses. The FTC will send an official letter from the FTC regarding the nature and purpose of the pilot study to potential study participants. The study contractor then will screen consumers through telephone interviews. As various consumers give consent to participate (and thereby give the contractor permission to know their credit scores), if the respective categories of credit scores have an unequal distribution of consumers, then an array will be chosen to favor consumers with the relatively lower credit scores.

2. The contractor will help the participants obtain their credit reports from the three national repositories ("credit bureaus"): Equifax, Experian, and Trans Union.[3] Each study participant will request his or her three credit reports on the same day; although different participants will generally request their reports on different days.

3. The contractor will help the participants review their credit reports by (a) resolving common misunderstandings that they may have about the information in their reports

(this will involve educating the participant wherever appropriate), (b) helping to identify errors or potential errors, and (c) helping to locate any material differences or discrepancies among their three reports, and checking whether these differences indicate inaccuracies.

4. The contractor will facilitate a participant's contact with the credit bureaus and with the furnishors of information to help resolve items on the credit report the participant views as inaccurate. After the completion of the review, the contractor will determine whether the credit report information has changed, and whether any such change on the credit report led to a change in the participant's credit score.

5. To the extent necessary, the contractor will guide participants through the FCRA dispute process (by law, this process is limited to 30 days, but may be extended to 45 days if the consumer submits relevant information during the 30-day period). Specifically, participants who have issues that could not be resolved informally will use the dispute process provided by the FCRA. At the conclusion of this process, the contractor will ascertain whether the credit report information has changed, and whether any such change led to a change in the credit score.

The most important information to be obtained from the study is an assessment of the degree of difficulty with which each of the above tasks was performed by the participants, including the average amount of time needed for the respective tasks. The contractor also will provide an opinion on the feasibility of a national survey of credit reports using a methodology similar to that of the pilot study.

*Estimated Hours of Burden*

Consumer participation involves the initial screening and any subsequent time spent to understand, to review, and if deemed necessary, to dispute information in credit reports. The FTC staff estimates that up to 225 consumers may need to be screened through telephone interviews and that each screening interview may last up to 10 minutes, resulting in approximately 38 hours (225 contacts × (1/6) hour per contact).

With respect to the hours spent by study participants, in some cases, the relative simplicity of a credit report may render little need for review, and the consumer's participation may only be an hour. For reports that involve difficulties, it may require a number of hours for the participant to be educated about the report and to resolve any disputed items. For items that are

---

[2] A credit score is a numerical summary of the information in a credit report and is designed to be predictive of the risk of default. Credit scores are created by proprietary formulas that render the following general result: the higher the credit score, the lower the risk of default. The designated contractor for the pilot study plans to use the "FICO" credit score, which is a commonly used score in credit reporting that is developed by the Fair Isaac Corporation.

[3] Participants will use the Web site *http://www.myfico.com* to request credit reports. For participants who do not have Internet access, the contractor will provide it.

disputed formally, the participant must submit a dispute form, identify the nature of the problem, present verification from the participant's own records to the extent possible, and, upon furnisher response, perhaps submit follow-up information. All participants will have expert assistance available to them, and staff estimates that, on average, approximately 5 hours would be spent per participant, resulting in a total of 175 hours (5 hours × 35 participants).[4] Total burden hours are thus in a neighborhood of 200 hours (up to 38 hours for screening plus approximately 175 hours for study participants, then rounded to the nearest 50 hours).

*Estimated Cost Burden*

Participation by the consumer is voluntary. All participants will benefit by receiving assistance from the contractor in reviewing their credit reports, and identifying and resolving any errors. No monetary costs are involved for the consumer; specifically,

---

[4] From testimony before Congress by the Consumer Date Industry Association (*see* Statement of Stuart K. Pratt, CDIA, Before the Committee on Banking, Housing and Urban Affairs of the United States Senate, July 9, 2003), there were approximately 16 million consumer-requested credit reports across the three major credit bureaus for year 2003. Roughly 50% of these reports did not lead to any further response from the consumer (such as a call to, or dispute with, the credit bureaus). Regarding the remaining reports, about half of these (*i.e.*, about 4 million reports) involved questions or clarifications; the other half (roughly another 4 million reports) involved some type of dispute. These data, although approximate, can be used to help create an estimate of the average time spent by participants in reviewing their credit reports.

The following estimates are for the purpose of calculating burden under the Paperwork Reduction Act. The estimates are conservative and likely overestimate the amount of time that will be spent by study participants. For reports that do not require the participants to pose any questions to a credit bureau about their report (estimated to be 50% of reports), staff estimates the participant's time spent to be an hour or less. For reports that involve questions to a credit bureau but not a formal dispute (estimated to be 25% of reports), staff estimates the participant's time spent to be 2 to 3 hours. For reports that involve a formal dispute (estimated here to be 25% of consumer-requested reports), there may be significant differences for time spent by the participants, and this variation is itself one element to be discerned by the pilot study. Staff believes that, as a preliminary estimate, a formal dispute would not involve more than 15 hours of the participant's time, particularly in light of the fact that the participants will have expert assistance available to them, including guidance through the FCRA dispute process. Overall, the staff has calculated the average time per participant by using the weighted average over the three categories of reports: (.50 × 1 hour) + (.25 × 3 hours) + (.25 × 15 hours) = 5 hours.

participants will not pay for their credit reports.

**John D. Graubert,**
*Acting General Counsel.*
[FR Doc. 04–23453 Filed 10–19–04; 8:45 am]
BILLING CODE 4750–01–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Committee on Vital and Health Statistics: Meeting

Pursuant to the Federal Advisory Committee Act, the Department of Health and Human Services (HHS) announces the following advisory committee meeting.

*Name:* National Committee on Vital and Health Statistics (NCVHS).
*Time and Date:* November 4, 2004, 9 a.m.– 3 p.m.. November 5, 2004, 10 a.m.–3:15 p.m.
*Place:* Hubert H. Humphrey Building, 200 Independence Avenue, SW., Eisenberg Room—Room 800, Washington, DC 20201.
*Status:* Open.
*Purpose:* At this meeting the Committee will hear presentations and hold discussions on several health data policy topics. On the morning of the first day the Committee will hear updates and status reports from the Department on topics including Clinical Data Standards, the Consolidated Health Informatics Initiative, and the HIPAA Privacy Rule. There will also be updates on activities of the National Center for Health Statistic's (NCHS) Board of Scientific Counselors and on the National Health Information Infrastructure (NHII). In the afternoon the Committee will hear a presentation on the Census Bureau's American Community Survey and will discuss various materials prepared by NCVHS Subcommittees.

On the second day the Committee will be briefed on the National Institutes of Health's (NIH) Roadmap for the Future plan and the Clinical Trial Research Agenda. The Committee will also discuss plans for its annual report to Congress and there will be reports from the Subcommittees and a discussion of agendas for future Committee meetings.

The times shown above are for the full Committee meeting. Subcommittee breakout sessions are scheduled for late in the afternoon of the first day and in the morning prior to the full Committee meeting on the second day. Agendas for these breakout sessions will be posted on the NCVHS Web site (URL below) when available.

*For Further Information Contact:* Substantive program information as well as summaries of meetings and a roster of committee members may be obtained from Marjorie S. Greenberg, Executive Secretary, NCVHS, National Center for Health Statistics, Centers for Disease Control and Prevention, 3311 Toledo Road, Room 2402, Hyattsville, Maryland 20782, telephone (301) 458–4245. Information also is available on the NCVHS home page of the HHS Web site: *http://www.ncvhs.hhs.gov/,* where further

information including an agenda will be posted when available.

Should you require reasonable accommodation, please contact the CDC Office of Equal Employment Opportunity on (301) 458–4EEO (4336) as soon as possible.

Dated: October 12, 2004.

**James Scanlon,**
*Acting Deputy Assistant Secretary for Science and Data Policy, Office of the Assistant Secretary for Planning and Evaluation.*
[FR Doc. 04–23412 Filed 10–19–04; 8:45 am]
BILLING CODE 4151–05–M

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Committee on Vital and Health Statistics: Meeting

Pursuant to the Federal Advisory Committee Act, the Department of Health and Human Services (HHS) announces the following advisory committee meeting.

*Name:* National Committee on Vital and Health Statistics (NCVHS), Workgroup on the National Health Information Infrastructure (NHII).
*Time and Date:* November 12, 2004, 9 a.m.–5 p.m.
*Place:* Hubert H. Humphrey Building, 200 Independence Avenue, SW., Room 705A, Washington, DC 20201.
*Status:* Open.
*Purpose:* The Workgroup will hold the first in a series of hearings to gather information about personal health records, including key issues and current approaches. Subsequent hearings will be scheduled early in 2005.
*For Further Information Contact:* Substantive program information as well as summaries of meetings and a roster of committee members may be obtained from Mary Jo Deering Ph.D., Lead Staff Person for the NCVHS Workgroup on the National Health Information Infrastructure, NCI Center for Strategic Dissemination and NCI Center for Bioinformatics, National Cancer Institute, National Institutes of Health, 6116 Executive Boulevard—Room 4087, Rockville, MD 20852, telephone (301) 594–8193, or Marjorie S. Greenberg, Executive Secretary, NCVHS, National Center for Health Statistics, Centers for Disease Control and Prevention, 3311 Toledo Road, Room 2402, Hyattsville, Maryland 20782, telephone (301) 458–4245. Information also is available on the NCVHS home page of the HHS Web site: *http://www.ncvhs.gov/,* where an agenda for the meeting will be posted when available.

Should you require reasonable accommodation, please contact the CDC Office of Equal Employment Opportunity on (301) 458–4EEO (4336) as soon as possible.

Dated: October 12, 2004.

**James Scanlon,**
*Acting Deputy Assistant Secretary for Science and Data Policy, Office of the Assistant Secretary for Planning and Evaluation.*
[FR Doc. 04–23413 Filed 10–19–04; 8:45 am]
BILLING CODE 4151–04–M

**Federal Trade Commission**

**Appendix C:  "Same Report" Federal Register Notice**

**Federal Trade Commission**

**Federal Register** / Vol. 69, No. 114 / Tuesday, June 15, 2004 / Notices                                          **33387**

The proposed order's specific provisions are as follows:

Paragraph II.A prohibits respondents from entering into or facilitating any agreement between or among any physicians: (1) To negotiate with payors on any physician's behalf; (2) to deal, not to deal, or threaten not to deal with payors; (3) on what terms to deal with any payor; or (4) not to deal individually with any payor, or to deal with any payor only through an arrangement involving the respondents.

Other parts of Paragraph II reinforce these general prohibitions. Paragraph II.B prohibits the respondents from facilitating exchanges of information between physicians concerning whether, or on what terms, to contract with a payor. Paragraph II.C bars attempts to engage in any action prohibited by Paragraph II.A or II.B, and Paragraph II.D proscribes inducing anyone to engage in any action prohibited by Paragraphs II.A through II.C.

As in other Commission orders addressing providers' collective bargaining with health care purchasers, certain kinds of agreements are excluded from the general bar on joint negotiations. First, respondents would not be precluded from engaging in conduct that is reasonably necessary to form or participate in legitimate joint contracting arrangements among competing physicians, whether a "qualified risk-sharing joint arrangement" or a "qualified clinically-integrated joint arrangement." The arrangement, however, must not facilitate the refusal of, or restrict, physicians from contracting with payors outside of the arrangement.

As defined in the proposed order, a "qualified risk-sharing joint arrangement" possesses two key characteristics. First, all physician participants must share substantial financial risk through the arrangement, such that the arrangement creates incentives for the physician participants jointly to control costs and improve quality by managing the provision of services. Second, any agreement concerning reimbursement or other terms or conditions of dealing must be reasonably necessary to obtain significant efficiencies through the joint arrangement.

A "qualified clinically-integrated joint arrangement," on the other hand, need not involve any sharing of financial risk. Instead, as defined in the proposed order, physician participants must participate in active and ongoing programs to evaluate and modify their clinical practice patterns in order to control costs and ensure the quality of services provided, and the arrangement must create a high degree of interdependence and cooperation among physicians. As with qualified risk-sharing arrangements, any agreement concerning price or other terms of dealing must be reasonably necessary to achieve the efficiency goals of the joint arrangement.

Also, because the order is intended to reach agreements among horizontal competitors, Paragraph II would not bar agreements that only involve physicians who are part of the same medical group practice (defined in Paragraph I.E).

Paragraph III, for a period of three years, bars Ms. Gomez and Ms. Ray from negotiating with any payor on behalf of SENM or any SENM member, and from advising any SENM member to accept or reject any term, condition, or requirement of dealing with any payor. This temporary "fencing-in" relief is included to ensure that the alleged unlawful conduct by these respondents does not continue.

Paragraph IV, for three years, requires respondents to notify the Commission before entering into any arrangement to act as a messenger, or as an agent on behalf of any physicians, with payors regarding contracts. Paragraph IV sets out the information necessary to make the notification complete.

Paragraph V, which applies only to SENM, requires SENM to distribute the complaint and order to all physicians who have participated in SENM, and to payors that negotiated contracts with SENM or indicated an interest in contracting with SENM. Paragraph V.B requires SENM, at any payor's request and without penalty, or within one year after the Order is made final, to terminate its current contracts with respect to providing physician services. Paragraph V.C requires SENM to distribute payor requests for contract termination to all physicians who participate in SENM. Paragraph V.D.1.b requires SENM to distribute the complaint and order to any payors that negotiate contracts with SENM in the next three years.

In the event that SENM fails to comply with the requirements of Paragraph V.A or Paragraph V.D.1.b, Paragraph VI would require Ms. Ray to do so.

Paragraphs VII and VIII generally require Ms. Gomez and Ms. Ray to distribute the complaint and order to physicians who have participated in any group that has been sponsored by Ms. Gomez or Ms. Ray since August 1, 2001, and to each payor with which Ms. Gomez or Ms. Ray has dealt since August 1, 2001, for the purpose of contracting.

Paragraphs V.E, V.F, VIII.B, IX, and X of the proposed order impose various obligations on respondents to report or provide access to information to the Commission to facilitate monitoring respondents' compliance with the order.

The proposed order will expire in 20 years.

By direction of the Commission.

**Donald S. Clark,**

*Secretary.*

[FR Doc. 04–13483 Filed 6–14–04; 8:45 am]

**BILLING CODE 6750–01–P**

---

## FEDERAL TRADE COMMISSION

### Public Comment To Aid Staff in Preparing the FACT Act Section 318(a)(2)(C) Study

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice and request for public comment.

---

**SUMMARY:** The Federal Trade Commission (the "Commission" or "FTC") is conducting a study of the effects of requiring that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action, as required by the Fair and Accurate Credit Transactions Act of 2003 (FACT Act or the Act). The Commission is requesting public comment on a number of issues to assist in preparation of the study.

**DATES:** Public comments must be received on or before July 16, 2004.

**ADDRESSES:** Interested parties are invited to submit written comments. Comments should refer to "FACT Act section 318(a)(2)(C) Study, Matter No. P044804" to facilitate the organization of comments. A comment filed in paper form should include this reference both in the text and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/Office of the Secretary, Room H–159 (Annex M), 600 Pennsylvania Avenue, NW., Washington, DC 20580. Comments containing confidential material must be filed in paper form, as explained in the **SUPPLEMENTARY INFORMATION** section. The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form (except comments containing any confidential material) should be sent to the following e-mail box: *FACTAStudy@ftc.gov.*

The FTC Act and other laws the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. All timely and responsive public comments, whether filed in paper or electronic form, will be considered by the Commission, and will be available to the public on the FTC Web site, to the extent practicable, at *www.ftc.gov*. As a matter of discretion, the FTC makes every effort to remove home contact information for individuals from public comments it receives before placing those comments on the FTC Web site. More information, including routine uses permitted by the Privacy Act, may be found in the FTC's privacy policy, at *http://www.ftc.gov/ftc/privacy.htm*.

**FOR FURTHER INFORMATION CONTACT:** Carolyn Cox, Economist, (202) 326–3434, Federal Trade Commission, Bureau of Economics, 601 New Jersey Avenue, NW., Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. Current Requirements Under the Fair Credit Reporting Act

Section 615 of the Fair Credit Reporting Act currently requires parties who take an adverse action on the basis of information contained in a consumer report to provide consumers with an adverse action notice that, among other things, contains the name, address, and telephone number of the consumer reporting agency that furnished the report, that notifies the consumer of his or her right to receive a free copy of a consumer report from the consumer reporting agency, and explains his or her right to dispute with the consumer reporting agency the accuracy or completeness of any information in that report. Section 615 provides no time limit within which the notice must be supplied. As a practical matter, however, most creditors who are required to supply an adverse action notice by the Equal Credit Opportunity Act [section 202.9 of Regulation B, 12 CFR 202.9] , which requires notification within 30 days [section 202.9(a)(1) of Regulation B, 12 CFR 202.9(a)(1)], combine the FCRA and ECOA notices.

A consumer who requests a copy of his or her credit report subsequent to receiving an adverse action notice may receive a credit report that looks different than the one that the creditor relied on in making its decision. For example, the report that the consumer receives may contain more up-to-date information or be in a more consumer-friendly format. In addition, if the creditor and the consumer each

provided different identifying information to request a copy of the report, then the reports received by the two parties may differ. This difference could, for example, be due to errors in transcription by clerks or differences in the amount of the identifying information provided. In some instances, the creditor may even receive multiple reports from a single consumer reporting agency on an individual consumer, while the consumer only receives one report. Thus, the report that the consumer receives and the report that the creditor receives and relies on may differ.

In contrast, a consumer who experiences an adverse action regarding employment obtains a copy of the same consumer report that the party taking the adverse action relied on. Section 604 (b) (3) (A) of the FCRA notes that, except under certain circumstances, "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—(i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter, as prescribed by the Federal Trade Commission, under section 609 (c)(1) [section 1681g(c)(1) of this title]."[1]

### B. Study Required by the FACT Act

The FACT Act was signed into law on December 4, 2003. Pub. L. 108–159, 117 Stat. 1952. Section 318 (a) (2) (C) of the Act requires the FTC to examine "the effects of requiring that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action, including—(i) the extent to which providing such reports to consumers would increase the ability of consumers to identify errors in their credit reports; and (ii) the extent to which providing such reports to consumers would increase the ability of consumers to remove fraudulent information from their credit reports." Section 318 (a) (3) specifies that the Commission "shall consider the extent to which such requirements would benefit consumers, balanced against the cost of implementing such provisions."[2]

We believe it is significant that the Act requires the FTC to study only the effects of a consumer receiving a copy of the "same credit report that the creditor relied on" following an adverse action. Although "credit report" is a commonly-used non-technical term for "consumer report," because the provision refers also to "creditors," we interpret the study to encompass only the use of consumer reports in credit transactions. Of course, consumer reports are not only used to determine credit eligibility; they may also be used for the purposes of reviewing an account or making decisions involving insurance, employment, or government benefits.[3] Consumer reporting agencies may also provide reports to persons who have a "legitimate business need" for the information, such as a landlord deciding whether to rent an apartment to a consumer.[4] The scope of the study, however, would not include situations in which these other users of consumer reports rely on a consumer report in taking an adverse action.

Although the FACT Act requires the FTC to study "the effects of requiring that a consumer * * * receives a copy of the same credit report * * * relied on" following an adverse action, it does not specify who would be responsible for supplying a copy of the credit report or the manner in which it would be supplied. In particular, the Act does not specify whether the consumer reporting agency or the creditor would be required to supply the consumer with a copy of "the same credit report" or the manner by which they should fulfill the requirement. For example, a creditor could send a copy of the credit report or a notification of the consumer's right to receive a credit report from them, along with each adverse action notice. Alternatively, a consumer reporting agency could comply with a requirement to supply the same report relied on by a creditor in taking an adverse action to consumers who experience an adverse action by sending a copy of the report to consumers (regardless of whether they will experience an adverse action) at the same time that they send a copy to the creditor, or by responding to requests of consumers who experience an adverse action related to credit and request a copy of their report.

---

[1] The exceptions have to do with interstate truckers [section 604 (b) (3) (C) of the FCRA, 15 U.S.C. 1681b(b)(3)[C]] and investigations of workplace misconduct [section 603(x) of the FCRA, 15 U.S.C. 1681a(x)].

[2] Section 318 (b) notes that "Not later than 1 year after the date of enactment of this Act, the Chairman of the Commission shall submit a report to the Committee on Banking, Housing, and Urban

Affairs of the Senate and the Committee on Financial Services of the House of Representatives containing a detailed summary of the findings and conclusions of the study under this section, together with such recommendations for legislative or administrative actions as may be appropriate."

[3] FCRA section 604(a)(3); 15 U.S.C. 1681b(a)(3).

[4] FCRA section 604(a)(3)(F); 15 U.S.C. 1681b(a)(3)(F).

The Act also does not define "the same credit report that the creditor relied on," and it is not clear in all situations what the term means. For example, in the case of a creditor who uses a credit score to evaluate a consumer's creditworthiness, the "same" report could consist of only the score itself or it could also include all of the information that was used to derive the score. Likewise, if a creditor received multiple scores concerning an individual, the "same" report could mean only the score or scores that the creditor chose to use or all of the scores the creditor received. In addition to issues regarding the content of the report, providing the "same" report to consumers as to creditors also raises issues concerning the format of the report. If the report that the creditor relies on is received in an electronic file that can only be understood using queries made through a specialized software package, would the "same" report consist of the unintelligible electronic files, or might it consist of a reporting of the information contained in the files in some new, more consumer friendly format? The costs and benefits associated with providing the consumer a copy of "the same report" depend on what one means by the term "the same report."

## II. Request for Public Comments

The Commission is seeking comment on all aspects of the proposed requirement that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action. The Commission specifically requests comment on the questions noted below, but these questions are intended to assist the public and should not be construed as a limitation on the issues on which public comment may be submitted. Responses to these questions should cite the numbers and subsection of the questions being answered. For all comments submitted, please submit any relevant data, statistics, or any other evidence upon which those comments are based.

The Commission requests that, as a threshold matter, parties explain how they define "the same report that the creditor relied on." In addition, in answering the questions please use both the most restrictive and the most expansive definition possible and feel free to comment on how your answer would change if an alternative definition were used. For example, in instances where a creditor used a credit score, under the most restrictive definition, the "same report" would

consist of only the score, while under the most expansive definition, the "same report" would include the score and the underlying data in a consumer-friendly format. Thus, in instances where a creditor used a credit score, the Commission seeks comment on the benefits and costs under these two scenarios, but welcomes comment on additional scenarios that might arise if an alternative definition were used.

The Commission notes that the term "adverse action" has a specific definition under the FCRA. In particular, in terms of credit, the term adverse action "has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act [Section 1691(d)(6)] of this title * * *." Thus, the term adverse action means "(i) a refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered; (ii) a termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts; or (iii) a refusal to increase the amount of credit available to an applicant who has made an application for an increase." Therefore, situations that trigger a risk-based pricing notice would not be considered an "adverse action" for the purposes of this study. The Commission requests that comments use "adverse action" as it is defined under the FCRA, but welcomes parties to opine on how a more expansive definition of the term "adverse action" (e.g., one that included situations that trigger a risk-based pricing notice) would impact specific scenarios.

### A. Extent to Which the Proposed Requirement Would Benefit Consumers

1. How does the credit report received by the creditor currently differ from the information that consumers receive from a consumer reporting agency when they request a copy of their credit report in response to an adverse action notice?

a. What are the different types of consumer reports that are used by a creditor (e.g., credit score, "in file" credit report,[5] merged credit report)? To what extent are credit scores, as opposed to "in file" or merged credit reports, relied on by creditors in making decisions regarding the extension of

credit? To what extent do creditors rely on two or more types of consumer reports (e.g., a credit score, an "in file" credit report, and/or a merged credit report) in their decisions on whether to extend credit? Does the form in which the credit file information is revealed to creditors differ significantly among creditors? If so, how?

b. How frequently are multiple "in files" and/or multiple credit scores received in response to a request for information on a single individual? How are multiple "in files" and/or multiple credit scores treated by parties in their credit granting decisions?

c. Does the creditor use all of the information that it receives in response to a request for information on an individual, or, in certain situations, does it use only a subset of that information? For example, if a reseller or a creditor receives multiple "in files" does the creditor rely on all of the "in files" in making its credit granting decision, or does it screen the "in files" to determine which files it will rely on in making its decision? What are the situations in which the creditor relies on a subset of the information in its credit granting decision?

d. Are credit scores based on more information than that which appears in a file that is disclosed to consumers? For example, is information used that is blocked or suppressed from the consumer's file?

e. Do consumers ever receive multiple file disclosures in response to their request to see their credit file? If so, how often does this occur?

f. What factors account for the differences in the consumer report that is relied on by a creditor versus the credit report that is seen by a consumer who requests a credit report after receiving an adverse action notice? In particular, are there differences due to (i) differences in the time at which the credit report is requested, (ii) differences in the format in which a credit report is presented to a consumer versus a creditor, or (iii) differences in the identifying information that is used to request a credit report? Are there differences due to the matching technologies used to respond to requests for information by the consumer versus the user of a consumer report? If the same identifying information was used by the creditor and the consumer to request a credit file and if the requests were placed at the same time, could the creditor receive multiple "in files" while the consumer only receives one file? Are there differences due to other factors? If so, what are these factors and why do they result in different credit reports being relied on by the creditor

---

[5] The term "in file" credit report refers to a set of information that a party (e.g., creditor or reseller) receives from a credit reporting agency in response to a request for information about an individual.

versus the consumer? Please describe in detail the source of any differences.

g. What information do consumer reporting agencies require consumers to provide to obtain a copy of their credit report? What information do consumer reporting agencies require creditors to provide to obtain information on an individual? To the extent that there are differences in the credit report seen by the creditor versus the consumer due to differences in identifying information, are these differences due to (i) differences in the amount of information that is required (e.g., a creditor is not required to provide the middle name of the individual, but the consumer is required to provide a middle name), (ii) differences in the completeness of the information (e.g., the consumer reports his name as John Doe, Jr., but the creditor reports only John Doe), (iii) typographical errors (e.g., social security number or name is typed in incorrectly by the creditor), or (iv) something else? Please describe in detail the source of any differences, as well as the extent to which they occur.

2. What current problems exist when the consumer receives a report that is different in form or content from the report relied on by the creditor? Please provide examples of specific situations in which consumers would benefit from the proposed requirement that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action.

a. Do the problems arise primarily from differences in the scope of the information seen by the creditor versus the consumer, differences due to the time at which the report is requested, or both? For example, are the concerns related to situations in which a consumer does not know what information led to the adverse action because the information is already corrected by the time the report is normally seen by the consumer? Or, is it more likely that any problems come from a situation where the creditor has information in a consumer report or in multiple "in files" that actually pertains to another individual?

b. Would the proposed requirement increase the ability of consumers to identify errors in their credit reports? If so, how?

c. Would the proposed requirement aid consumers who seek to have the adverse action decision reversed because of inaccuracies or incomplete information in the credit report relied on by the creditor?

d. Would the proposed requirement aid consumers who seek to obtain credit

from other parties following an adverse action?

e. Would the proposed requirement increase the ability of consumers to identify identity theft and/or remove fraudulent information from their credit report? If so, how?

f. Is the proposed requirement, in and of itself, sufficient to generate the benefits noted above, or are other requirements also necessary (e.g., credit report must be provided by a certain party at a certain time in the credit granting decision process) in order for the benefits to be generated? If so, what additional requirements are necessary?

g. Would the proposed requirement generate benefits other than those noted above? If so, what benefits would likely be generated?

3. What information would consumers gain if they receive the same credit report that the creditor relied on in taking the adverse action?

a. Is there any information that appears in the report that the creditor relied on that is not currently reported to consumers, that, if corrected or deleted, would improve the consumer's ability to obtain credit?

b. Is there any information that appears in the report that the creditor relied on that is not currently reported to consumers that would enable the consumer to detect if he/she is a victim of identity theft, or if he/she continues to be a victim of identity theft?

c. Is there information that appears in the report that the creditor relied on that is not currently reported to consumers that generates benefits other than those noted above? If so, what additional information generates the benefits and what are the benefits?

4. Are there situations in which the consumer already has an opportunity to see a copy of the credit report that the creditor is relying on prior to the creditor taking an adverse action? In particular, what is the extent to which this situation occurs in the mortgage industry?

5. Are there situations in which the consumer already receives a copy of the credit report that the creditor relied on in taking the adverse action, after the action is taken? In particular, what is the extent to which this situation occurs in the mortgage industry?

## B. The Cost of Implementing the Proposed Requirement

1. What are the various means by which the proposed requirement that a consumer who has experienced an adverse action based on a credit report receives a copy of the same credit report that the creditor relied on in taking the adverse action could be implemented?

What would be the costs associated with implementing the proposed requirement via these various means? Which party (creditor versus the consumer reporting agency) can provide the same report that the creditor relied on in taking the adverse action to consumers at least cost?

2. Why do consumer reporting agencies not currently give consumers a copy of the same credit report that the creditor relied on in taking the adverse action? What would be the costs to consumer reporting agencies of requiring them to do so?

a. Is the data base that is maintained by a consumer reporting agency kept in such a way that the consumer reporting agency can easily reconstruct a credit report from a prior date? If not, what would be the cost associated with requiring a change that would enable the consumer reporting agency to do that?

b. Would a consumer reporting agency know what information is drawn from a credit file by a creditor and the manner in which it is displayed to them? If not, how costly would it be for the consumer reporting agency to obtain this information?

c. Are there situations in which the cost of requiring the consumer reporting agency to provide a copy of the same credit report that the creditor relied on in taking the adverse action to a consumer who has experienced an adverse action would be minimal and/or nonexistent? If so, what are those situations?

3. Why do creditors not currently give consumers a copy of the same credit report that the creditor relied on in taking the adverse action? What would be the costs to creditors of requiring them to do so? Does the cost vary depending on the credit granting situation (e.g., mortgages versus instant credit)? Are there situations in which the cost of requiring the creditor to provide a copy of the same credit report that they relied on in taking the adverse action to a consumer who has experienced an adverse action would be minimal and/or nonexistent? If so, what are these situations?

4. What would be the cost to consumers associated with obtaining a copy of the credit report that the creditor relied on in taking the adverse action in addition to or in lieu of the credit report that the consumer currently receives if he or she requests one after receiving an adverse action notice?

a. Would the proposed requirement lead consumers to mistakenly conclude that there are inaccuracies in their credit reports? Would giving consumers an

older version lead them to dispute inaccuracies that may have already been corrected? What sort of costs might result from these disputes?

b. Would the proposed requirement make it more difficult for consumers to determine if there are inaccuracies in their credit report? Are there situations where a consumer who views the version that the creditor has relied on might miss the opportunity to fix inaccurate information that appears on the report after it was requested by the creditor? What sort of costs (*e.g.*, denial of future credit) might result from these situations?

c. What would be the cost to creditors associated with retooling their credit granting process to produce consumer friendly versions of the consumer report that they relied on?

d. Would the proposed requirement make it more difficult for consumers to determine if they are, or continue to be, a victim of identity theft? If so, why?

e. Could the proposed requirement unintentionally increase identity theft, particularly in situations where credit is denied because identity theft is suspected or in situations in which multiple "in files" or scores are received by the creditor in response to a request for information on a single individual?

f. Could the proposed requirement raise privacy concerns in situations in which multiple "in files" or scores are received by the creditor in response to a request for information on a single individual?

*C. Additional Information*

1. Do the experiences of other countries (*e.g.*, Sweden) that have a similar, but not identical requirement that consumers receive the same report as that relied on by the creditor, inform our analysis here?

2. Do the FCRA's section 604 requirements regarding adverse action in employment, where the consumer already receives a copy of the same consumer report that the party taking the adverse action relied on inform our analysis here?

3. What other additional information should the Commission consider in studying the effects of the proposed requirement?

All persons are hereby given notice of the opportunity to submit written data, views, facts, and arguments addressing the issues raised by this Notice. Comments must be received on or before July 16, 2004. Comments should refer to "FACT Act Section 318(a)(2)(C) Study, Matter No. P044804" to facilitate the organization of comments. A comment filed in paper form should include this reference both in the text

and on the envelope, and should be mailed or delivered to the following address: Federal Trade Commission/ Office of the Secretary, Room H–159 (Annex N), 600 Pennsylvania Avenue, NW., Washington, DC 20580. If the comment contains any material for which confidential treatment is requested, it must be filed in paper (rather than electronic) form, and the first page of the document must be clearly labeled "Confidential." [6] The FTC is requesting that any comment filed in paper form be sent by courier or overnight service, if possible, because U.S. postal mail in the Washington area and at the Commission is subject to delay due to heightened security precautions. Comments filed in electronic form (except comments containing any confidential material) should be sent to the following e-mail box: *FACTAStudy@ftc.gov*.

The FTC Act and other laws the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. All timely and responsive public comments, whether filed in paper or electronic form, will be considered by the Commission, and will be available to the public on the FTC Web site, to the extent practicable, at *www.ftc.gov*. As a matter of discretion, the FTC makes every effort to remove home contact information for individuals from public comments it receives before placing those comments on the FTC Web site. More information, including routine uses permitted by the Privacy Act, may be found in the FTC's privacy policy, at *http://www.ftc.gov/ ftc/privacy.htm*.

By direction of the Commission.

**Donald S. Clark,**

*Secretary.*

[FR Doc. 04–13482 Filed 6–14–04; 8:45 am]

**BILLING CODE 6750–01–P**

---

[6] Commission Rule 4.2(d). 16 CFR 4.2(d). The comment must be accompanied by an explicit request for confidential treatment, including the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. The request will be granted or denied by the Commission's General Counsel, consistent with applicable law and the public interest. *See* Commission rule 4.9(c). 16 CFR 4.9(c).

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**[60Day–04–62]**

**Proposed Data Collections Submitted for Public Comment and Recommendations**

In compliance with the requirement of section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 for opportunity for public comment on proposed data collection projects, the Centers for Disease Control and Prevention (CDC) will publish periodic summaries of proposed projects. To request more information on the proposed projects or to obtain a copy of the data collection plans and instruments, call the CDC Reports Clearance Officer on (404) 498–1210.

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Send comments to Sandra Gambescia, CDC Assistant Reports Clearance Officer, 1600 Clifton Road, MS–E11, Atlanta, GA 30333 or send an e-mail to omb@cdc.gov. Written comments should be received within 60 days of this notice.

**Proposed Project**

2005 National Health Interview Survey, OMB No. 0920–0214— Revision—National Center for Health Statistics (NCHS), Centers for Disease Control and Prevention (CDC).

The annual National Health Interview Survey (NHIS) is a basic source of general statistics on the health of the U.S. population. Respondents to the NHIS also serve as the sampling frame for the Medical Expenditure Panel Survey which is conducted by the Agency for Healthcare Research and Quality. The NHIS has long been used by government, university, and private researchers to evaluate both general health and specific issues, such as cancer, AIDS, and access to health care. Journalists use its data to inform the general public. It will continue to be a leading source of data for the

**Federal Trade Commission**

| FEDERAL TRADE COMMISSION | www.ftc.gov |
| --- | --- |
| 1-877-FTC-HELP | FOR THE CONSUMER |