IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT V. TOWNES, IV,<br>individually and on behalf of<br>all persons similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-1488-JJF |
| | ) | |
| TRANS UNION, LLC, and<br>TRUELINK, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF JOINT MOTION FOR
## FINAL APPROVAL OF SETTLEMENT

Carmella P. Keener (#2810)
Rosenthal, Monhait & Goddess, P.A.
Counsel for Plaintiff
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19801
Phone: (302) 656-4433
Fax: (302) 658-7567
        *Counsel for Plaintiff*


William M. Lafferty (#2755)
Jay N. Moffitt (#4742)
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19899
Phone: (302) 658-9200
Fax: (302) 658-3989
        *Counsel for Defendants*

FILED: August 20, 2007

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................ 1

II.   NATURE AND STAGE OF THE PROCEEDINGS ...................................... 3

III.  STATEMENT OF FACTS ...................................................................... 3

    A.    The Relevant Class Action Litigation ........................................ 3

        1.    The Townes Action............................................................ 3

        2.    Related Class Litigation Against Defendants' Competitors. ..................... 5

            a.  Equifax and Fair Isaac Litigation ............................ 5

            b.  Experian Litigation ............................................... 8

        3.    The Townes Settlement........................................................ 9

IV.   SUMMARY OF ARGUMENT .................................................................. 13

V.    ARGUMENT ........................................................................................ 14

    A.    The Settlement Class Should Be Certified.................................. 14

        1.    The Elements of Rule 23(a) Are Satisfied ............................. 14

            a.  Numerosity ........................................................ 14

            b.  Commonality...................................................... 15

            c.  Typicality .......................................................... 16

            d.  Adequacy of Representation .................................. 17

        2.    The Elements of Rule 23(b) Are Satisfied ............................. 19

            a.  Predominance..................................................... 19

            b.  Superiority......................................................... 20

    B.    The Notice Program Was Reasonably Calculated To Apprise Class Members Of The Settlement. ..................................................... 21

    C.    The Proposed Settlement Is Fair, Reasonable And Adequate ............................ 26

        1.    The Settlement Is Entitled To a Presumption Of Fairness...................... 28

        1.    The *Girsh* Factors Weigh In Favor Of the Settlement............................ 29

            a.  Complexity, Expense, and Likely Duration of the Settlement............ 30

            b.  The Reaction of the Class to the Settlement. ...................................... 31

            c.  Stage of Proceedings and Amount of Discovery Completed............. 32

            d.  Risks of Establishing Liability and Damages. ................................... 32

            e.  Risks of Maintaining Class Action Status through Trial. .................. 34

f. Ability to Withstand Greater Judgment.............................................. 36

g. The Range of Reasonableness of Settlement in Light of the Best
Possible Recovery and All Attendant Risks of Litigation. ...................... 36

D.    Any Objections To The Settlement Are Without Merit And Should Be
Overruled ............................................................................................... 39

VI.    CONCLUSION............................................................................................................ 39

CHGO1\31088227.1

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### FEDERAL CASES

*Alpern v. Utilicorp United, Inc.*,
    84 F.3d 1525 (8th Cir. 1996) ...................................................................................16

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)......................................................................14, 16, 19, 20

*Appleyard v. Wallace*,
    754 F.2d 955 (11th Cir. 1985) .................................................................................16

*Baby Neal ex rel Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994)..........................................................................................15

*Bennett v. Behring Corp.*,
    96 F.R.D. 343 (S.D. Fla. 1982), *aff'd* 737 F.2d 982 (11th Cir. 1984) ...................26, 27

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ...................................................................................20

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003).............................................................................15

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ................................................................................26

*DeBoer v. Mellon Mortgage Co.*,
    64 F.3d 1171 (3d Cir. 1995).....................................................................................15

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
    177 F.R.D. 54 (D. Mass. 1997)................................................................................18

*Eisen v. Carlisle & Jaquelin*,
    417 U.S. 156 (1974)..................................................................................................22

*Forbush v. J.C. Penney Co.*,
    994 F.2d 1101 (5th Cir. 1993) .................................................................................15

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975)........................................................................26, 27, 30

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ..............................................................................22, 24

iii

*Haywood v. Barnes,*
    109 F.R.D. 568 (E.D.N.C. 1986) .............................................................................15

*Helms v. Consumerinfo.com, Inc.,*
    236 F.R.D. 561 (N.D. Ala. 2005)......................................................7, 16, 21, 33, 35

*Hillis v. Equifax Consumer Services, Inc.,*
    237 F.R.D. 491 (N.D. Ga. 2006)................................................7, 16, 21, 33, 35, 38

*In re Cendant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001)......................................................27, 32, 34, 36, 38

*In re Diet Drugs Prod. Liab. Litig.,*
    1999 WL 33644489 (E.D. Pa. Dec. 3, 1999) ........................................................29

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995)............................................26, 28, 29, 32, 36

*In re Global Crossing Sec. & ERISA Litig.,*
    225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................................26

*In re Prudential Sec. Inc. Ltd. Pships Litig.,*
    164 F.R.D. 362 (S.D.N.Y. 1996) ...................................................................22, 24

*In re Prudential Ins. Co. of America Sales Practices Litig.,*
    962 F. Supp. 450 (D.N.J. 1997), *aff'd* 148 F.3d 283 (3d Cir. 1998)..........16, 17, 20, 21

*In re Warfarin Sodium Antitrust Litig.,*
    212 F.R.D. 231 (D.Del. 2002) ......................................15-17, 21, 27, 31, 32, 34, 36-38

*In re Warfarin Sodium Anitrust Litig.,*
    391 F.3d 516 (3d Cir. 2004).........................................................................30, 38

*Kyriazi v. Western Elec. Co.,*
    647 F.2d 388 (3d Cir. 1981)...........................................................................22

*Limpert. v. Cambridge Credit Counseling Corp.,*
    328 F. Supp. 2d 360 (E.D.N.Y. 2004) .............................................................33, 34

*Plattner v. Edge Solutions, Inc.,*
    422 F. Supp. 2d 969 (N.D. Ill. 2006) .................................................................33

*Mullane v. Central Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950)....................................................................................22

CHGO1\31088227.1

*Weigner v. City of New York,*
  852 F.2d 646 (2d Cir. 1988)..................................................................22

*Silber v. Mabon,*
  18 F.3d 1449 (9th Cir. 1994) ...............................................................22

*Simpson v. Firemen's Fund Ins. Co.,*
  2007 WL 46785 (N.D. Cal. 2007) .........................................................23

*Weinberger v. Kendriek,*
  698 F.2d 61 (2d Cir. 1982)...................................................................24

## FEDERAL STATUTES

Credit Repair Organizations Act,
  15 U.S.C. § 1679 <u>et</u> <u>seq</u>.......................................................... *passim*

Federal Rules of Civil Procedure
  Rule 23 ......................................................................................... *passim*

## TREATISES & OTHER PUBLICATIONS

Herr, David, <u>Manual For Complex Litigation,</u>
  (4th Ed. 2007) .....................................................................................25

Mingus, Jennifer, <u>E-Mail: A Constitutional (And Economical) Method of
Transmitting Class Action Notice</u>, 47 Clev. St. L. Rev. 87 (1999) ...........23

CHGO1\31088227.1

# I.    **INTRODUCTION**

On September 11, 2007, the Court is scheduled to conduct a hearing to determine whether to order final approval of the Settlement between Class Plaintiff, Robert V. Townes IV ("Townes"), on behalf of himself and the Settlement Class, and Defendants Trans Union LLC ("Trans Union") and TrueLink, Inc. (now known as TransUnion Interactive, Inc) ("TrueLink"), the Parties, pursuant to Fed. R. Civ. P. 23(e), submit this memorandum in support of their joint motion for final approval of the Settlement. For the reasons more thoroughly discussed below, the Parties respectfully request that the Court approve the Settlement because the best notice practicable has been provided to the Settlement Class, because the settlement is fair, reasonable and adequate, and because there are very few opt-outs or objections.

Following extensive discovery, as well as settlement discussions that spanned over a year, the Parties reached a settlement of all claims on a class-wide basis. The Settlement itself provides both monetary (in-kind) and injunctive relief to Settlement Class Members – all of whom were provided with the opportunity to opt out in the event they did not wish to participate in the Settlement.

On April 16, 2007, the Court entered a Hearing Order preliminarily approving the Settlement, and approving the notice plan called for under the Settlement. Since that time, the Parties have complied with the Court's Hearing Order concerning class notice, and, as detailed below, have fully complied with all other requirements outlined in the Hearing Order in connection with the Settlement. Accordingly, the Court is properly in a position now to evaluate the fairness of the Settlement and to grant final approval.

Having previously found the Settlement to be fair for preliminary purposes, the Court should take notice of the new "data" concerning the Settlement, namely, the reaction of the

Class. The Parties are pleased to report that the reaction of the Class has been overwhelmingly favorable. As of August 16, 2007, a mere 383 class members (or less than 1% of the Class) timely opted out of the Settlement.[1] This is an extraordinarily small number of opt-outs for a class of this size (in excess of 3.8 million), and it is a testament to the Class' favorable reaction to the Settlement. Similarly, the number of objections filed was small, and certainly at the low end of the range one would expect in a settlement of this type.[2] In that regard, of the over 3.8 million class members, only one single formal objection was filed on behalf of a total of one individual as of August 17, 2007 (the business day prior to the filing of this Brief), and Class Counsel has been advised that that objector has moved to withdraw her objection.[3] This paltry number of objections/comments – none of which has any merit – is a further testament to the Class' favorable reaction to the Settlement. For these reasons, the Parties jointly request that the Court finally approve the Settlement so that Settlement Class Members can obtain the benefits provided by the Settlement.

For the Court's convenience, the Parties begin this brief by discussing the background of the case (pp. 3-13). We then turn to the Parties' request that the Class, which was certified provisionally for settlement purposes on April 16, 2007, be certified finally (pp. 14-20). Next comes a discussion of the Notice campaign, demonstrating through affidavit support that the Notice was distributed pursuant to the Court's Hearing Order, and that the other components of the Settlement Notice (e.g., the Settlement website and telephone assistance) were followed (pp. 21-26). The Parties then turn to the heart of the matter and present the Court with an analysis of

---

[1]   The deadline for opting out is August 27, 2007. (Hearing Order, D.I. 69, ¶ 16).

[2]   The deadline for making objections to the Settlement is August 20, 2007. (Hearing Order, D.I., ¶ 12).

[3]   The only objection filed as of August 17, 2007 was filed by Debbie Ashley on August 1, 2007 (D.I. 89). She has since moved the Court to withdraw that objection. See D.I. 90; Declaration of Michael O'Neil ("O'Neil Decl.") filed contemporaneously herewith, ¶ 11, 12.

CHGO1\31088227.1

each of the factors that must be evaluated in determining whether the Settlement is fair, reasonable, and adequate such that it should receive final approval (pp. 26-39). Finally, the Parties address objections raised through August 17, 2007 in response to the Settlement. (p. 39).

## II.     NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff in the above-captioned *Townes* Action brought suit against defendants Trans Union LLC ("Trans Union") and TrueLink, Inc. (now known as TransUnion Interactive, Inc.) ("TrueLink") (collectively "Defendants") on behalf of himself and a putative nationwide class for violations of the federal Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.* ("CROA"), and for a claim of unjust enrichment. On October 31, 2005, this Court granted plaintiff's counsel's Motion for Appointment of Interim Counsel and appointed plaintiff's lawyers as interim counsel for the putative class. The plaintiff in the above-captioned action has conducted extensive discovery of both Defendants, as well as third parties. On June 27, 2006, counsel and party representatives in the *Townes* Action participated in a settlement conference before Magistrate Thynge, and settlement discussions continued over the next nine months, culminating in a class action Stipulation of Settlement signed on April 5, 2007. On April 16, 2007, this Court preliminarily approved the Stipulation of Settlement, and the parties have advised the Settlement Class of the Settlement pursuant to the Stipulation and Hearing Order.

## III.     STATEMENT OF FACTS

A.     The Relevant Class Action Litigation.

    1.     The *Townes* Action.

Plaintiff in the above-captioned *Townes* Action filed his complaint on December 1, 2004, "on behalf of himself and a proposed nationwide class of persons who purchased services from Defendants." (D.I. 1, ¶ 1). Plaintiff alleged that the sale of such services by Defendants violated

3

the consumer disclosure and other requirements of the CROA.[4] Citing the remedial provisions of

CROA, Plaintiff on behalf of himself and the class sought "actual damages" of any amounts paid

to Defendants by the class, punitive damages, and an award of attorney's fees (D.I. 1, p. 9).

Plaintiff separately alleged a claim for common-law "unjust enrichment" and sought

disgorgement of monies paid by plaintiff and the class, and other injunctive relief.

Only a few months after filing the *Townes* Action, and after learning of the filing of a

similar class action lawsuit in the Northern District of Alabama,[5] Plaintiff filed a motion

requesting that this Court appoint certain of his lawyers "interim counsel" under Rule

23(g)(2)(A) of the Federal Rules of Procedure. In its ruling on the motion, this Court first noted

that the Rule did not mandate the appointment of interim counsel in all circumstances. October

31, 2005, Memorandum Order, (D.I. 27, p. 3). Citing the 2003 Advisory Committee's Note to

Rule 23(g)(2)(A), this Court noted that competing class actions may create "rivalry or

uncertainty that makes formal designation of interim counsel appropriate." The Court therefore

granted plaintiff's motion and appointed plaintiff's lawyers as interim counsel for the putative

class. This Court noted that, even though the lawsuit referenced by Plaintiffs was voluntarily

dismissed without prejudice, the lawsuit nonetheless "may be brought again, leading to the same

leadership and unity issues" which were underlying the motion. (*Id.*, p. 4).

Plaintiff in the above-captioned action has conducted extensive discovery of both

Defendants, as well as third parties. To date, Plaintiff's counsel have:  deposed ten (10)

---

[4] The Complaint further defines the class as anyone during the class period who purchased any "consumer" or "personal" service from defendant and such purchase was not compliant with CROA. (D.I. 1, ¶ 18). However, because Plaintiff alleged that Defendants generally did not comply with the technical requirements of CROA, (Id., ¶¶ 17 & 26), the class initially defined by the Plaintiff included all purchasers during the relevant time period.

[5] That case has since been dismissed, and there are no other class action cases pending against these defendants in which CROA claims have been made and remain pending.

CHGO1\31088227.1

employees of Defendants, including the deposition of TrueLink president John Danaher for three (3) days; served multiple sets of interrogatories, requests for production and requests for admissions on each defendant; and served subpoenas on multiple nonparties.

On June 27, 2006, counsel and party representatives participated in a settlement conference before Magistrate Thynge. Counsel continued settlement discussions over the next nine months, culminating in a class action Stipulation of Settlement signed on April 5, 2007. *See infra* pp. 9-10. Those settlement discussions were coordinated with negotiations occurring in similar lawsuits brought against Defendants' competitors, and the final settlement terms in the separate settlement agreements are substantively identical. (O'Neil Decl., ¶¶ 5-7; Declaration of Michael L. McGlamry filed contemporaneously herewith, ¶¶ 13, 16). Notably, one federal court has already given final approval to a virtually identical settlement, with competitors of Defendants in the direct-to-consumer credit reporting business, that resulted from those negotiations. *See* O'Neil Decl., ¶¶ 8, 9 at Exhibit A thereto.

2.     Related Class Litigation Against Defendants' Competitors.[6]

The claims asserted in the *Townes* Action mirror claims brought in other federal courts against Defendants' competitors in the direct-to-consumer credit reporting industry, including litigation brought by counsel for Plaintiff in the *Townes* Action.

i.     Equifax and Fair Isaac litigation

Plaintiff's counsel in the above-captioned *Townes* Action also represent the plaintiffs in both *Hillis v. Equifax Consumer Services, Inc. and Fair Isaac Corp.*, No. 1:04 CV 03400 BBM ("*Equifax*"), and *Slack v. Fair Isaac Corp et al.*, No. 3:05 CV 00257 MEJ ("Fair Isaac"),

---

[6] Section A.2 of the Statement of Facts describes numerous federal court cases whose docket sheets are available through each respective courts' PACER/ECF electronic case management system. The citations to the pleadings and rulings in the cases referenced herein refer to the corresponding docket item numbers for the case under discussion.

CHGO1\31088227.1

originally filed in the Northern District of California but transferred to Georgia and consolidated for settlement purposes with *Equifax*. Like Townes, both the *Equifax* and *Fair Isaac* plaintiffs brought CROA claims on behalf of a nationwide class of people who purchased credit monitoring and other products over the Internet. Negotiations regarding settlement of the two actions, which shared common defendants and common plaintiff's counsel, were coordinated. The parties on February 5, 2007, reached a class action settlement which resolved the claims of the putative classes in both lawsuits.[7] Subsequently, on February 6, 2007, the parties in *Equifax* and *Fair Isaac* filed with the Northern District of Georgia a joint motion to consolidate the two cases, and for preliminary approval of class action settlement. (D.I. 281 in *Equifax*).

The *Equifax/Fair Isaac* Settlement Agreement is nearly identical in structure and language to the class settlement agreement reached by the parties in the *Townes* Action. (*See* Settlement Agreement, Ex. A to O'Neil Decl.) As part of the *Equifax/Fair Isaac* Settlement, each class member is entitled to a free three-month credit monitoring subscription. (*Id.* at §V1, ¶ 71). Also like the defendants in *Townes*, the defendants in both *Equifax* and *Fair Isaac* have also agreed to injunctive relief which restricts the manner in which they market their products. (*Id.* at §V). On February 8, 2007, the Court preliminarily approved the *Equifax/Fair Isaac* Settlement Agreement. (D.I. 287 in *Equifax*). On June 12, 2007, following the June 4, 2007 Fairness Hearing, the Court entered an order granting final approval to the *Equifax/Fair Isaac* Settlement Agreement. (D.I. 313, 315 in *Equifax*). A true and correct copy of the Final Judgment, Including Proposed Findings of Fact and Conclusions of Law, Granting Final Approval to the Class Action Settlement Agreement Between the Class and Defendants, Equifax Consumer

---

[7] The parties later made minor, non-substantive amendments to the proposed Settlement Agreement. The original Equifax/Fair Isaac Settlement Agreement is attached as Ex. A to the O'Neil Decl.

Services, Inc., Fair Isaac Corporation, and MYFICO Consumer Services, Inc. (the "Equifax Final Approval Order") is attached hereto as Exhibit A.[8]

In *Hillis* the Court denied Plaintiff's Motion for Class Certification and granted in part and denied in part his Motion for Partial Summary Judgment. *See generally, Hillis v. Equifax Consumer Services, Inc.*, 237 F.R.D. 491 (N.D. Ga. 2006). The *Hillis* Court followed the prior denial of certification in another similar CROA case brought against Experian Information Systems, Inc.'s consumer affiliate (Consumerinfo.com), reasoning that the potential liability facing the Defendants was grossly disproportionate to the alleged misconduct. *See Hillis*, 237 F.R.D. at 505-07, citing and discussing *Helms v. Consumerinfo.com, Inc.*, 236 F.R.D. 561, 566-68 (N.D. Ala. 2005). As to the merits of the case, the *Hillis* Court narrowly construed the CROA statute, limiting its applicability to representations and conduct indicating an ability to repair past credit history. The *Hillis* Court concluded the CROA did not prohibit sellers of credit information from giving advice to consumers on prospective actions which could positively affect their credit score or rating. *Hillis*, 237 F.R.D. at 515-16. Thus, the *Hillis* Court denied Plaintiff Hillis' motion for summary judgment on liability and found there existed a genuine issue of fact for trial on his individual claim. The Court did find that Equifax and Fair Isaac were engaged in a joint venture. Plaintiff Hillis moved for reconsideration of the *Hillis* Court's rulings on class certification and summary judgment, and that motion was pending when the *Hillis* case was settled.

---

[8] The *Hillis v. Equifax* and *Slack v. Fair Isaac* cases are also discussed in Plaintiff and Class Counsel's Motion for Approval of Attorneys' Fees and Reimbursement of Reasonable Expenses, which Motion is filed contemporaneously herewith and incorporated herein with this reference. Plaintiff and Class Counsel include herein an abbreviated discussion of the *Hillis* and *Slack* cases.

CHGO1\31088227.1

In *Slack v. Fair Isaac Corporation and MYFICO Consumer Services, Inc.*, bearing case No. 3:05-CV-00257-MHP, filed in the United States District Court for the Northern District of California, Slack alleged that Fair Isaac was a "credit repair organization" within the meaning of the CROA, in connection with its sale of the "Suze Orman FICO Kit." While motions for summary judgment and class certification were pending, the *Hillis* Court ruled on the Motions pending there. Fair Isaac, of course, urged that the Slack Court rule similarly to the *Hillis* Court and the *Helms* Court, that is, deny class certification and narrowly construe the statute. The *Slack* Court did not rule on the motions for class certification and summary judgment pending in that case, but clearly, the risk analysis was substantially altered.

ii.     Experian Litigation

As discussed above, similar nationwide putative class claims under CROA were also brought against Experian North America, Inc. and its internet subsidiary Consumerinfo.com, based on their marketing and sale of direct-to-consumer credit reporting products over the Internet. *See Browning v. Yahoo! Inc., et al.*, No. C 04 01463 HRL (Northern District of California) ("*Browning*") and *Helms v. Consumerinfo.com*, No. CV 03 HS 1439 (Northern District of Alabama) ("*Consumerinfo.com*") (collectively "the Experian litigation"). Like here in the *Townes* Action, plaintiffs in the two related cases brought claims for violations of CROA and unjust enrichment.

The parties in *Consumerinfo.com* filed cross-motions for summary judgment on the issue of whether defendant Consumerinfo.com was a credit repair organization under the CROA. (D.I. 31 & 44 in *Consumerinfo.com*). On February 14, 2005, the *Consumerinfo.com* court granted in part and denied in part plaintiff's Motion for Summary Judgment, and ruled as a matter of law that defendant Consumerinfo.com was a credit repair organization under the CROA. (D.I. 89 in

8

*Consumerinfo.com*).    Approximately one month later, the *Consumerinfo.com* court denied Plaintiff's Motion for Class Certification.  (D.I. 90 in *Consumerinfo.com*).  Consumerinfo.com later sought interlocutory review of the District Court's ruling on the Motions for Summary Judgment and the United States Court of Appeals for the Eleventh Circuit granted the defendant's petition for permission to appeal.  (D.I. 97 in *Consumerinfo.com*).  The Eleventh Circuit stayed briefing on the appeal, as the parties in the Experian litigation conducted settlement negotiations.

As part of the nationwide class settlement that was finally reached by the parties in the Experian litigation, each class member is entitled to receive from defendants either two free months of credit monitoring <u>or</u> a free credit score.  (D.I. 137 in *Browning*).  In addition, the defendants agreed to remove certain language from their websites, and agreed to other restrictions on language used to market the credit monitoring product.  Class members who do not opt out release all claims relating to purported credit repair services.

In an Order dated December 27, 2006, the *Browning* court preliminarily approved an amended class settlement agreement in the Experian litigation, and set a final approval hearing for July 31, 2007.  (D.I. 137 in *Browning*).   That hearing was conducted on July 31, 2007, and the *Browning* Court subsequently directed the parties to submit a proposed order approving the settlement.  *See* D.I. 193 in *Browning*.

3.    The *Townes* Settlement.

The parties to the above-captioned action, after nine months of negotiation initiated by a settlement conference with Magistrate Thynge, and later coordinated with settlement discussions in the *Equifax/Fair Isaac* litigation, executed a Stipulation of Settlement (the "Settlement") on

9

April 5, 2007. This Court, by its Hearing Order dated April 16, 2007, preliminarily approved the Settlement "as being fair, just, reasonable and adequate." (D.I. 69, p. 2).

The Settlement defines the "Class" as all individuals who from December 1, 1999 through April 16, 2007, purchased "any of the Offerings through Defendants' Websites." (Settlement, Sec. 2.24). "Offering" is defined as a credit score, credit monitoring, or certain debt analysis products. (Settlement, Sec. 2.16) Therefore, excluded from the class are purchasers of single or tri-merge credit reports and certain other products. Thus, the definition of the settlement class is more narrow than that set forth in the complaint in the *Townes* Action, which included purchasers of "any" consumer service offered by Defendants, (D.I. 1, ¶18). Additionally, the defined "Class" expressly excludes "all persons who are named plaintiffs in any action pending against any of the Defendants on the date of entry of Hearing Order wherein the recovery sought is encompassed by the Released Claims." (Settlement, ¶2.24 (v)).[9]

Under the terms of the Settlement reached in the above-captioned *Townes* Action, class members will receive significant and valuable in-kind relief, and enjoy the benefit of the injunctive relief that Defendants have agreed to. Pursuant to Section 5 of the Settlement, entitled "Injunctive Relief," Defendants have agreed to restrictions on their marketing of the Offerings, including specifically restrictions on the representations which form the basis for the *Townes* Action (as well as the *Millett* Action). For example, the Settlement requires defendants to include two contractual disclaimers in their websites' Terms of Use and their marketing of certain products. First, Defendants must advise that they are not credit repair organizations, and

---

[9]    This provision excludes from the Class, *inter alia*, Steven and Melody Millett, two proposed intervenors in this action who have a separate action pending against TrueLink in this Court, *Millett v. TrueLink, Inc.*, No. 05-599-SLR (the "*Millett* Action"). The Parties' position with regard to the Milletts' motion to intervene is set forth in the briefs submitted in opposition to that motion, and is not repeated here.

CHGO1\31088227.1

do not provide credit repair advice; second, Defendants must explain that their credit monitoring product monitors only the credit file of the purchaser, and not any other consumer. (*Id.* at Secs. 5.1.5, 5.1.6). The Settlement also restricts the use of certain words and other language in Defendants' marketing in order to make clearer what their Offerings do and do not encompass, (*Id.* at Secs. 5.1.1-3), and requires Defendants to compel their marketing-partner "Contractual Associates" to similarly comply with these marketing restrictions. (*Id.* at Sec. 5.4).

In addition to securing significant changes in Defendants' marketing of their products, the Settlement also offers valuable in-kind relief to each class member, i.e., a free three-month subscription to Defendants' credit monitoring product. (*Id.* at Secs. 6.1, 6.2). As part of the free subscription, class members will receive 24-hour e-mail notice of certain critical changes in their credit file. However, the credit monitoring offering provides much more. The in-kind relief also offers class members unlimited access to their credit reports and credit scores during the three-month subscription, and up to $25,000 in identity theft insurance. Notably, no other settlement of the claims discussed *supra* offers this unlimited access to credit reports and credit scores during the free subscription period. The credit monitoring subscription – free to class members for three months – is currently offered by TrueLink for approximately $9.95/month. There are no strings attached.[10]

The proposed Settlement provides benefits to some 3.8 million Class Members, which benefits have a potential retail value of at least $29.85 per class member ($9.95 per month for three months), and cumulatively have a potential retail value of approximately $113,430,000.00 (3.8 million x $29.85). It is of course, highly unlikely that every class member will elect to

---

[10] Moreover, unlike the settlement reached in the Experian litigation (*see supra* p. 6), class members here will not need to provide a credit card number to obtain free credit monitoring and will not need to cancel their subscription after the free three-month period in order to avoid any payment.

participate in the benefits provided by the Settlement. Clearly, however, in this era of credit-related problems, including the importance of knowing and monitoring one's credit score and credit report to assure the lowest possible credit terms and to prevent identity theft, the credit monitoring offering available to class members has real value. Congress and the Federal Trade Commission ("FTC") have recognized these values, as Congress has enacted legislation requiring that the credit reporting agencies (like Trans Union) make available to each consumer one free credit report per year. Congress also has charged the FTC with setting reasonable maximum charges for the purchase of other credit reports and for the purchase of a credit score. *See* McGlamry Declaration, ¶¶ 17, 18 and Exhibits "2" and "4" thereto. The offering available here also includes up to $25,000 in identity theft insurance. Based on this and other information, Plaintiff's expert economist Professor Michael Daniels has estimated the full potential settlement value at $347,200,000. In that the exact number of persons taking advantage of the settlement will not be known until well after any final approval of this Settlement, Professor Daniels has discounted these values to account for relatively low take rates of 5% to 10%, thereby establishing a range of potential settlement values to include $17,360,500 to $34,722,000, respectively. *See* Daniels Declaration at ¶ 3, Exhibit "6" to McGlamry Declaration. Even at these lower settlement values, the attorneys' fees requested equate to a small percentage of the total potential settlement value.[11]

Those class members who do not opt out of the Settlement will release all claims relating to the marketing and sale of the offerings against Defendants (and their marketing partners who

---

[11] Class counsel negotiated a somewhat unique feature of the settlement which provides that, after final approval by this Court, a reminder notice will be sent to the Settlement Class advising class members of such final approval and reminding and urging them to take advantage of what would then be certain benefits available as a consequence of a finally approved settlement. *See* Stipulation of Settlement Between Lead Plaintiff and Defendants at ¶ 6.3.3 (D.I. 66.)

CHGO1\31088227.1

comply with the injunctive relief provisions of the Settlement), except claims brought under the Fair Credit Reporting Act. (Settlement, Sections 7-1, 2.20, 2.21).

As previously noted, plaintiff's counsel in the *Townes* Action is also counsel in the *Equifax/Fair Isaac* litigation. Also, at the suggestion of Magistrate Thynge, settlement discussions in the *Townes* Action were coordinated with similar discussions in the *Equifax/Fair Isaac* litigation. Not surprisingly, and significant for purposes of understanding the pending motion to intervene, the terms of the two settlement agreements are essentially identical, with one exception. The Settlement reached here mandates disclaimers by Defendants addressing the claims of the Milletts, proposed intervenors herein, that TrueLink misrepresented the scope of its credit monitoring product. *See* Settlement, ¶5.16. However, the *Equifax/Fair Isaac* settlement, to which the Milletts did not object or seek leave to intervene, and which has received final approval, does not contain such a provision.

## IV.    SUMMARY OF ARGUMENT

The Settlement should be finally approved. Like the similar settlements reached in the *Equifax/Fair Isaac* and the *Browning* (*Experian*) litigation, which have received (or are poised to receive) final approval from their respective courts, the Settlement reached by the Parties here is fair, reasonable, and adequate to the Class. For settlement purposes, the Class meets the requirements of Rule 23(a) and (b), and should be certified as a settlement class. In accordance with the Court-approved notice plan, Class members received the best notice practicable. The Settlement and it is also substantively fair, reasonable and adequate to the Class as demonstrated not only by the Settlement itself, but by the fact that the relief provided to the Class is superior to that provided under the *Equifax/Fair Isaac* and *Browning* settlements.

CHGO1\31088227.1

## V.    **ARGUMENT**

### A.   The Settlement Class Should Be Certified.[12]

As discussed above, the Court provisionally certified a settlement class on April 16, 2007. The Parties now request final certification of the settlement class.

### 1.    The Elements Of Rule 23(a) Are Satisfied.

In determining whether certification of a class for purposes of settlement is appropriate, the Court should determine whether the plaintiff can establish the requisite elements of numerosity, commonality, typicality, adequacy of representation, and superiority. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997). The settlement and its terms are in fact relevant to the determination that the action may be certified as a class action. *Id.* at 619-20. Each of the Rule 23 elements is satisfied in this case.

#### a.    Numerosity

For a class action to be certified, the members of the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Based upon the fact that over 3.868 million potential class members received Email and/or Postcard Notices (Keough Decl., ¶¶ 4, 5), and only 383 have opted out to date (Keough Decl., ¶ 7), the Settlement Class is expected to include roughly 3.8 million Class Members. This number easily satisfies the numerosity requirement.

---

[12] Although Defendants agree that certification of the proposed class is appropriate for settlement purposes, they do so without prejudice to their position on certification if the cases were to be litigated. Indeed, were this case to return to litigation, Defendants would oppose certification of a litigation class on all available grounds, as if no settlement had ever been reached. Plaintiff has agreed that Defendants' concession in settlement is not to be used against them, if the case is litigated. Similarly, Class Counsel joins in this discussion solely for purposes of advocating for approval of the settlement. Plaintiff and Class Counsel recognize that they faced significant obstacles to recovery, though they remained prepared to urge a different construction of the CROA and of applicable class action law. Class Counsel reserves all of its rights to continue to advocate the positions it has advanced in the litigation, in the event the Settlement is not approved.

CHGO1\31088227.1

*See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 247 (D. Del. 2002) (class of potentially 2 million or more easily meets numerosity requirement).

      b.    <u>Commonality</u>

      The commonality requirement is satisfied when the claims of the prospective class present common questions of law or fact. *See Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir. 1994). Common questions are those that arise from a common nucleus of operative fact *Haywood v. Barnes,* 109 F.R.D. 568, 577 (E.D.N.C 1986). "Commonality is not required on every question raised in a class action. Rather, Rule 23 is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171,1174 (3d Cir. 1995), *cert. denied sub nom., Crehan v. DeBoer,* 517 U. S. 1156 (1996) (citations omitted); *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 490 (S.D. Fla. 2003) ("Commonality requires that there is at least one issue affecting all or a significant number of proposed class members"); *Forbush v. J.C Penney Co.,* 994 F.2d 1101 (5th Cir. 1993) (commonality and typicality satisfied in challenge to pension calculation despite existence of four different pension plans).

      In this case, Defendants sold the Offerings to Plaintiff and all of the Class Members, and Defendants undisputedly did not provide the disclosures required of CROs under the CROA. The purchases were made, and the products or services were provided, via the internet. Questions common to the class include whether the Defendants are subject to the CROA—*i.e.,* whether they are "credit repair organizations" under the CROA. This common question was and is the crux of this case. And in the context of settlement, all Class Members are releasing the same claims and receiving the benefits for those releases. The commonality requirement is

15

therefore satisfied.  *See Hillis v. Equifax Consumer Services, Inc.*, 237 F.R.D. 491 (N.D. Ga. 2006) and *Helms v. Consumerinfo.com, Inc.*, 236 F.R.D. 561, 566-68 (N.D. Ala. 2005).

      c.    <u>Typicality</u>

Typicality is satisfied where the named plaintiff's claims are sufficiently similar to those of the absent class members to conclude that the representative will protect the interests of the class and that there are no antagonistic interests between the representative and the proposed class. "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Warfarin*, 212 F.R.D. at 250 (quoting *In re Prudential Ins. Co. of America*, 962 F. Supp. 450, 311 (D.N.J. 1997)).  The named plaintiff's claims are typical if they "arise from the same alleged course of conduct by the defendant" as class members' claims. *Id.*  Typicality is satisfied where the claims of the class representative have the same essential characteristics as the claims of the class, even if some factual distinctions exist. *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985).

One court explained the typicality requirement succinctly:

> Typicality under Rule 23(a)(3) means that there are "other members of the class who have the same or similar grievances as the plaintiff." The burden is "fairly easily met so long as other class members have claims similar to the named plaintiff." Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory.

*Alpern v. Utilicorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996) (citations omitted); *see also Amchem,* 521 U.S. at 626 n.20 (commonality, typicality and adequacy tend to merge and serve as guideposts for determining whether maintenance of a class action is economical, and whether the

named plaintiff's claims and the class claims are so interrelated that the interests of class members will be adequately protected).

With respect to the core statutory safeguard claims at issue, it appears there are no unusual or unique facts or circumstances concerning Townes' claims which make his claims atypical of the claims of class members. Like the Class Members, Townes purchased credit-related offerings on the internet by visiting one of TrueLink's websites. Like the Class Members, Townes did not receive those disclosures that the CROA would require if the CROA applies to the Defendants. No objector has argued otherwise. Townes' claims are therefore typical of the claims of the Settlement Class.

d.    Adequacy of Representation

Adequacy of representation merges with commonality and typicality to guide the Court in determining whether maintenance of the action as a class action is economical and whether the interests of the absent class members will be fairly and adequately protected. The adequacy requirement "tests the qualifications of the counsel to represent the class" and seeks to "uncover conflicts of interest between named parties and the class they seek to represent." *In re Warfarin*, 212 F.R.D. at 250 (quoting *In re Prudential*, 148 F.3d at 313).

In this case, Class Counsel has substantial experience in complex litigation generally, and in class actions concerning the CROA issues specifically. Pope, McGlamry, Kilpatrick, Morrison & Norwood, LLP, and Battle Fleenor Green Winn & Clemmer LLP, have both been involved in numerous cases properly described as complex litigation, have been determined to be adequate class counsel in numerous cases, and have successfully represented plaintiffs and defendants in class action litigation. (McGlamry Decl., ¶¶ 3, 22; Green Declaration, ¶¶ 4, 5). Arthur Miller, formerly the Bruce Bromley Professor of Law at the Harvard Law School, and currently a

17

professor of law at New York University, specializes in and has published numerous articles and treatises on civil procedure and complex litigation. (McGlamry Decl., ¶ 9.) Based on their representation of the class in this case and their successful representation of plaintiffs in similar litigation, Class Counsel respectfully submit that they have vigorously represented the class thus far and have provided capable and adequate representation for the Settlement Class. No objector has argued otherwise.

Just as Class Counsel has adequately represented the Settlement Class, so too has Townes. As set forth above in the discussion concerning commonality and typicality, his claims arise from the same course of conduct as the claims of the Class Members. Thus, his claims are similarly related and they will fairly and adequately protect the interests of the remaining Class Members for purposes of settlement. Townes' interests are consistent with those of the Class Members such that there are no conflicts between him and any of the Class Members. *See generally*, Townes Declaration.

Moreover, Plaintiff Townes does not seek relief different from or greater than that of other Class Members under the settlement. *See, e.g., Duhaime v. John Hancock Mut Life Ins. Co.*, 177 F.R.D. 54, 64 (D. Mass. 1997) ("unlike the class in *Amchem*, in which there were conflicts between class members with present injuries and class members with possible future injuries, here all class members are alleged to have been injured during the same period of time").[13] Like the other Class Members, Plaintiff claims he bought the Offerings without receiving the CROA disclosures and rights, and under the CROA (if it applies), Plaintiff and the

---

[13] Plaintiff Townes seeks an incentive award of $7,500 for bringing and prosecuting this action, but that compensates him for his substantial time and effort on behalf of the class. *See* Townes Declaration at ¶¶ 3, 4, 7, describing his participation in this action, including assisting in answering written discovery, attending Court-sponsored mediation, and participating in the case in many other ways. Beyond compensation for these individual efforts, he does not seek relief under the settlement that is not available to other Class Members.

18

Class Members would be entitled to the amount he paid Defendants for the Offerings if that were proven true at trial. Under the Settlement, Plaintiff and the Class Members release those claims in exchange for receiving substantial benefits available to all Class Members. Consequently, Plaintiff adequately represents the interests of the entire class, and his counsel are also adequate.

      2.   The Elements Of Rule 23(b) Are Satisfied.

In addition to satisfying the requirements of numerosity, commonality, typicality, and adequacy of representation, plaintiffs seeking class certification for damages claims must also show that prosecution of the class action would be convenient and desirable. *See Amchem,* 521 U.S. at 614-15. "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id.* at 615 (citations omitted). [14]

      a.   Predominance

The predominance inquiry requires the Court to determine whether the class is "sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. In *Amchem,* the Supreme Court noted the disparate questions undermining class cohesion in a mass tort-personal injury action. *Id.* at 624.

---

[14]   Rule 23(b)(3)(C) also requires consideration of "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." This factor also weighs in favor of class certification, given that the relevant contracts require that any litigation be filed in a court in Delaware. Rule 23(b)(3)(D) notes that the court's ability to manage a class action is relevant. However, the manageability issue, the U.S. Supreme Court has held, is basically irrelevant in the settlement context. *See Amchem,* 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial.").

The differences between this case and *Amchem* reveal that the predominance inquiry is satisfied here.    In the settlement context of this case, there are no disparate questions undermining class cohesion.[15]    The Class Members claim to have been harmed by a common course of conduct - Defendants' alleged violations of the CROA in their sales of the Offerings. Plaintiff alleges that the Class Members all suffered harms in the same manner.

These allegations unite the class, making it economical to settle the claims in one suit. *See Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976).   And in light of the settlement reached, these common issues are central issues uniting the class that predominate over any individual ones. "Predominance is a test readily met in certain cases alleging consumer or securities fraud..." *Amchem,* 521 U.S. at 625.   The predominance inquiry is satisfied.

      b.    <u>Superiority</u>

The same is true with respect to the superiority inquiry. In this regard, courts seek to determine whether a single resolution of the claims of class members via settlement is superior to individual litigation of the claims. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 523 (D.N.J. 1997), *aff'd,* 148 F.3d 283 (3d Cir. 1998). Undoubtedly, virtually all of the class members were unaware what their CROA rights might be, or whether the CROA applied to these Offerings. Thus, it is unsurprising that few (if any) Class Members have brought individual claims against Defendants.   Aside from Class Members' lack of knowledge concerning these matters, another obvious reason for a lack of lawsuits is that Class Members' claims are small,

---

[15]   Again, the fact that a settlement is before the court means that potential predominance obstacles which might be problematic in a contemplated trial are not present at this juncture. In *Amchem,* of course, the *settlement* and its structure created class conflict—the presently injured plaintiffs were effectively fighting the future claimants for the same "pot" of money. No such competing interests are present among class members in this case. All similarly situated Class Members get the same relief.

and some of their claims are old. *In re Prudential,* 962 F. Supp. at 523. Absent this class action, many individuals might not pursue these claims.

This class-wide settlement is a sensible means of adjudicating this controversy. Since the plaintiffs in the *Millett* Action voluntarily dismissed their CROA claims upon learning of the Settlement here, defense counsel is aware of no other individual lawsuits brought for violations of CROA pending against Defendants. *See* O'Neil Decl. ¶ 13. *See also In re Warfarin*, 212 F.R.D. at 251 (relatively small number of individual lawsuits pending against defendant supports superiority element by suggesting a lack of interest in individual prosecution).

Other courts have denied certification based on a perceived lack of superiority stemming from a concern that damages recoverable under section 1679g of the CROA (a recovery of all monies paid to the Defendants for the Offerings) would be disproportionate to the conduct of the Defendants and any actual harm to would-be class members. *See generally, Hillis*, 237 F.R.D. 491; *Helms*, 236, F.R.D. 561. The concern about disproportionality which caused other courts to deny certification of a litigated class is not present in the context of a settlement, where Defendants have voluntarily agreed to provide the relief under the settlement to Class Members. As with the other requisite elements, the superiority requirement is satisfied in this case.

Because the class meets all of the requirements of Rule 23(b)(3), the Settlement Class should be finally certified by the Court.

**B.    The Notice Program Was Reasonably Calculated To Apprise Class Members Of The Settlement.**

Pursuant to Fed. R. Civ. P. 23(c)(2)(B), for any class certified under Rule 23(b)(3), "the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable efforts." *See Eisen v.*

21

*Carlisle & Jacquelin,* 417 U.S. 156, 173 (1974) (individual notice must be sent to "all class members whose names and addresses may be ascertained through reasonable effort"). In *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950), the Supreme Court stated that this due process standard is met through "notice reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections."

For the due process standard to be met, every class member is not required to receive actual notice, so long as class counsel acts reasonably to select the best means likely to inform persons affected. *Weigner v. City of New York,* 852 F.2d 646, 649 (2d Cir. 1988) ("[t]he proper inquiry is whether [class counsel] acted reasonably in selecting means likely to inform persons affected, not whether each class member actually received notice."); *Silber v. Mabon,* 18 F.3d 1449, 1453-54 (9th Cir. 1994). Furthermore, in order to meet the standards of due process, notice must be sufficiently informative and give sufficient opportunity for response. *Kyriazi v. Western Elec. Co.,* 647 F.2d 388, 395 (3d Cir. 1981). The manner and form of the notice, however, is left to the trial court's discretion, and is subject only to the broad requirement of "reasonableness." *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 121 (8th Cir. 1975); *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 164 F.R.D. 362,368 (S.D.N.Y. 1996). This Class Action has been preliminarily certified under Fed. R. Civ. P. 23(b)(3). Therefore, all Class Members must receive the "best notice practicable" in compliance with Rule 23(c)(2) in order to comport with the standards of due process.

In the instant case, the Parties have met the standards necessary to satisfy Rule 23(c)(2) as well as the demands of due process. The Parties prepared a broad-sweeping notice campaign, providing Court-approved notice in three different forms: via E-mail ("E-mail Notice"), via U.S. Mail ("Postcard Notice"), and through an Internet Website (the "Settlement Website"). The

potential class of individuals involved in the suit interacted with the Parties primarily through the internet, thereby making the E-mail Notice particularly appropriate here. Email is increasingly being recognized as an effective means to provide notice in the class action context. *See Simpson v. Firemen's Fund Ins. Co.*, 2007 WL 46785 (N.D. Cal. 2007) (approving class notice plan that employed email and first class mail, and holding that this manner of notice "provide[s] the best notice practicable under the circumstances, and constitute[s] due and sufficient notice, in full compliance with the requirements of Rule 23(3) of the Federal Rules of Civil Procedure, the Constitution of the United States, and any other applicable law"); *see also* Jennifer Mingus, <u>E-Mail: A Constitutional (and Economical) Method of Transmitting Class Action Notice</u>, 47 Clev. St. L. Rev. 87 (1999) (advocating use of email to provide notice to class members). Notice to class members by E-mail and regular mail is the best practicable notice in the circumstances of this case. Class members purchased the Offerings at issue in the lawsuit over the Internet, and email is the only communication that defendants had with many of the class members.

The notice plan, which provided for notice to be sent via E-mail and directed the Parties to send this notice to all individual members of the Settlement Class within 30 days after entry of the April 16, 2007 Hearing Order (by May 16, 2007). (See Hearing Order, D.I. 69, at ¶ 5(a); *see also* Keough Decl., ¶ 4). In the event the E-mail Notice was returned or "bounced back," the Parties sent the individuals associated with those E-mail addresses Postcard Notices via U.S. Mail on or before June 15, 2007. (Keough Decl., ¶ 5). The Parties complied with these provisions and *all* individual members of the Class were afforded at least 8 weeks in which to respond with any requests to opt out or object.

The Parties sent out over 3.868 million E-mails, 2,881,830 of which were successfully sent. (*See* Keough Decl., ¶ 4). Upon receipt of any "bounce back" notifications, where it was determined

to be useful, the E-mail Notice was resent.  For those class members for whom E-Mail Notice was not successfully transmitted, the Parties promptly sent Postcard Notices via U.S. Mail to the last known address of the individual class member.  Over 986,700 Postcard Notices were sent.  (*See* Keough Decl., ¶ 5).  The Settlement Administrator utilized the National Change of Address process licensed by the U.S. Postal Service to locate updated address information. (*See* Keough Decl., ¶ 5).  While some Postcards were returned as undeliverable, this does not defeat the adequacy of the notice under due process.  In fact, mailing notice to class members' last known address is "a procedure that has been given wide-spread approval in other class actions." *In re Prudential,* 164 F.R.D. at 368 (S.D.N.Y. 1996); *Grunin,* 513 F.2d at 121 (mailing notice to the last known address of class members is constitutionally adequate even where one-third of class members were not reached by mailing); *see also Weinberger v. Kendriek,* 698 F.2d 61, 71 (2d Cir. 1982) (rejecting the contention that mailing of individual notices to last known addresses of all class members was inadequate).

Federal Rule of Civil Procedure 23(c)(2)(B) also requires that the notice state:

> in plain, easily understood language: the nature of the action; the' definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through counsel if the member so desires; that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and the binding effect of a class judgment on class members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). In the instant case, the language of E-mail Notice and the Postcard Notice (collectively the "Notices) was clear and its meaning was plain. The Notices clearly apprised the class members of the proceedings, the nature of the action, their rights with respect to the settlement, including their right to opt out of the class and the procedure for doing so, as well as the binding effect of remaining a Class Member. *(See* Keough Decl,. Exs. A & B).  The

24

Notices also directed the recipient to the Settlement Website (www.townessettlement.com), dedicated to informing potential Class Members about the settlement. The Settlement Website, which went live on May 8, 2007, provided potential Class Members with additional detailed information about the class Settlement, their rights as Class Members, the details of the opt out provision, links to each of the Notices and a Long Form Notice, as well as all of the key deadlines associated with the Settlement and the Class Action. (*See* Keough Decl., ¶ 3).

The use of the settlement website is recognized as an effective means to distribute information about a settlement.

> Posting notices on dedicated Internet sites, likely to be visited by class members and linked to more detailed certification information, is a useful supplement to individual notice, might be provided at a relatively low cost, and will become increasingly useful as the percentage of the population that regularly relies on the Internet for information increases. An advantage of Internet notice is that follow-up information can easily be added, and lists can be created to notify class members of changes that may occur during the litigation. Similarly, referring class members to an Internet site for further information can provide complete access to a wide range of information about a class settlement. Many courts include the Internet as a component of class certification and class settlement notice programs.

Manual for Complex Litig. § 21.311.

In addition to the Settlement Website, the Parties also established a toll-free phone number that potential class members could call to obtain information or ask questions. *(See* Keough Decl., ¶ 6). The use of toll-free numbers like that established here is also a common and valuable feature of class notice. *See id.* § 21.323 ("a voicemail system providing scripted answers to frequently asked questions, or a toll-free number with an automated menu or support staff can provide information efficiently without placing demands on court personnel").

CHGO1\31088227.1

Given the detailed information provided in the Notices and the Settlement Website, as well as the comprehensive, multi-media approach to serving Notice on each individual member of the Settlement Class, the Notice Plan provided for in this action meets the "best notice practicable" standard required under the Federal Rules of Civil Procedure and Due Process. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 448-49 (S.D.N.Y. 2004) (mailing of individual notices by first class mail to all reasonably locatable members of the class as well as publishing notice materials to an Internet website and establishing a toll free informational number collectively satisfy Rule 23(c)(2)(B) requirements).

## C.    The Proposed Settlement Is Fair, Reasonable And Adequate

Whether to approve a settlement in a class action lawsuit is a decision "left to the sound discretion of the trial court," and the court's decision will not be overturned absent a clear showing of abuse of that discretion. *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975). When exercising its discretion, the court should be mindful of the public and judicial policies that strongly favor the settlement of class action lawsuits. *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (hereafter "*In re General Motors*"); *accord Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). "[I]t has been repeatedly recognized that settlements are 'highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits.'" *Bennett v. Behring Corp*, 96 F.R.D. 343, 348 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984) (quoting *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977)). Settlement in class action cases are also favored because they conserve "significant judicial resources . . . by avoiding formal litigation." *In re General Motors,* 55 F.3d at 784.

"These economic gains multiply when settlement also avoids the cost of litigating class status –

often a complex litigation within itself." *Id.*

Against the backdrop of these strong policy considerations, the Court must determine

whether the Settlement is "fair, adequate and reasonable . . ." *Bennett*, 737 F.2d 982, 986 (11th

Cir. 1984); *see also* Fed. R. Civ. P. 23(e)(1)(C). The Settlement is entitled to a presumption of

fairness if the Court finds that "(1) the negotiations occurred at arm's length; (2) there was

sufficient discovery; and (3) the proponents of the settlement are experienced in similar

litigation; and (4) only a small fraction of the class objected." *In re Cendant Corp. Litig.*, 264

F.3d 201, 232 n.18 (3d Cir. 2001)(citing *In re General Motors*, 55 F.3d at 785); *Warfarin,* 212

F.R.D. at 254. As set forth in more detail below, these factors are met and the Settlement is

entitled to a presumption of fairness. In addition, the nine factors set forth by the Third Circuit in

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) weigh in favor of the Settlement.[16]

In assessing the fairness of the Settlement, it is important to note that the *Hillis* Court

granted final approval of a class settlement in the parallel litigation against Trans Union and

TrueLinks's competitors in the industry. As explained above, the *Hillis* action involved claims

factually and legally similar to those of Townes.[17] The Settlement reached here, however, is

superior to that approved in *Hillis* in two distinct respects: (1) the in-kind relief available to the

Settlement Class here includes unlimited access to credit reports and credit scores, which are not

part of the in-kind relief available to the *Hillis* class; and (2) the injunctive relief in the *Townes*

---

[16] There is significant overlap in the requirements for application of the presumption of fairness overlap and several of the *Girsh* factors discussed below.

[17] As evidenced by the *Browning* case described above, another federal court is poised to do the same thing as *Hillis* – grant final approval of a class-wide settlement of CROA claims similar to those at issue here.

Settlement requires additional disclaimer language, not provided in the *Hillis* settlement, regarding the scope of Defendants' credit monitoring offering.[18]

    1.    <u>The Settlement is Entitled to a Presumption of Fairness.</u>

In this case, there is no question that the settlement took place at arms-length. *In re General Motors*, 55 F.3d at 784. The settlement was reached after this action was pending for more than two years, and after the parties had litigated the case vigorously. *See* Section III(A)(3), *supra*. In addition, the negotiations that led to the final Settlement Agreement consumed more than nine months, and involved numerous negotiating sessions both in person and over the phone. McGlamry Decl., ¶¶ 15, 16; O'Neil Decl., ¶¶ 4-7.

To reach the Settlement, the parties were initially assisted by Magistrate Judge Thynge in a brief mediation session on June 27, 2006. While the mediation was cut short by the Magistrate's illness that day, the parties, at Magistrate Thynge's recommendation, engaged in continued discussions and negotiations to work toward a settlement of the litigation. McGlamry Decl., ¶¶ 13 – 16. The record supports a finding that the negotiations occurred at arm's length between parties with sharply different views of the strengths and weaknesses of their respective positions. McGlamry Decl., ¶¶ 13 – 16.

Extensive discovery taken over a period of many months was undertaken prior to a settlement being reached. *See In re General Motors*, 55 F.3d at 784. During that period, the parties responded to document requests, interrogatories, and requests to admit. Defendants produced in excess of 50,000 pages of documents relevant to the claims, and ten witnesses were deposed during the fact discovery process. In addition, Plaintiff served several document

---

[18] This additional disclaimer language serves to address the claims of the Milletts, proposed intervenors herein. Though the *Hillis* settlement does <u>not</u> contain such a provision, the Milletts did not object to the settlement there or seek leave to intervene in that action.

CHGO1\31088227.1

subpoenas upon third parties. In short, sufficient discovery was conducted to ensure that "the Settlement Agreement reached by the parties is the product of a thorough understanding of the legal and factual issues that had grown to maturity in this litigation." *In re Diet Drugs Prod. Liab. Litig.*, 1999 WL 33644489 at *4 (E.D. Pa. Dec. 3, 1999).

The parties are represented by counsel who are highly experienced in consumer class action litigation. These counsel negotiated the Settlement and are advocating its approval before this Court. *In re General Motors*, 55 F.3d at 784. Plaintiff's counsel are experienced class action litigators, who have particular expertise in claims based upon CROA. McGlamry Decl., ¶¶ 3, 12. This factor counsels in favor of finding that the settlement is entitled to a presumption of fairness.

Finally, as of August 17, 2007, only one person filed any objection to the Settlement, and there is nothing to indicate that a significant number of additional objectors will appear before the August 20, 2007 deadline, or that they would form a substantial portion of the Class. *See In re Diet Drugs*, 1999 WL 33644489 at *4. That single objection would have been subject to being overruled, but even that may not be necessary, as the objector has moved to withdraw that objection. *See* D.I. 90; O'Neil Decl., ¶¶ 11-12. A presumption of fairness of the Settlement is therefore warranted.

2.    The *Girsh* Factors Weigh in Favor of the Settlement.

When making the determination of whether the Settlement is "fair, adequate and reasonable," the Court must consider the following nine factors:

- the complexity, expense, and likely duration of the litigation;
- the reaction of the class to the settlement;
- the stage of proceedings and the amount of discovery completed;
- the risks of establishing liability;
- the risks of establishing damages;

29

- the risks of maintaining the class action through the trial;
- the ability of the defendants to withstand a greater judgment;
- the range of reasonableness of the settlement fund in light of the best possible recovery;
- the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534-35 (3d Cir. 2004) (citing *Girsh*, 521 F.2d at 157). For the reasons explained below, these factors weigh heavily in favor of approval of the Settlement.

> a.    Complexity, Expense, and Likely Duration of the Settlement

There is little doubt that the litigation involves complex legal and factual issues. Class Plaintiff aggressively pursued discovery in various forms, and in various locations. Following the close of fact discovery, the scheduling order set deadlines for expert disclosures, and filing separate motions and briefs on class certification and summary judgment. Though the Parties agreed to settlement terms before such motions were filed, Plaintiff and Defendants were each prepared to wage a substantial battle in these motions and at trial over the issues of class certification, liability, and damages. As described in subsections d and e below, the class certification, liability and damages issues are complex and would continue the already protracted litigation.

The litigation has also been expensive, and would continue to be if the Settlement is not approved and the litigation resumes. At the time the Settlement was reached, the Parties faced substantial pretrial motion practice, expert discovery, pretrial preparation, and a lengthy trial involving complex factual and legal issues. The parties have aggressively litigated each phase of this litigation, and almost certainly would have engaged experts, filed discovery motions,

motions for reconsideration, post-trial motions, and appeals (both interlocutory and from a final judgment), extending the litigation for years.

At the time of settlement, Class Plaintiff had advanced some $100,000 dollars for litigation expenses. *See* McGlamry Decl., ¶¶ 7, 8; Green Decl., ¶ 9; Affidavit of Catherine Keener. Further litigation through trial and post-trial motions and appeals would add to that expense, and additional expenses will be incurred during the final approval and Settlement process. Continued litigation of this action would be complex, the substantial expenses already incurred would continue to mount, and the litigation would have continued for years. For these reasons, the first *Girsh* factor weighs strongly in favor of settlement. *See Warfarin*, 212 F.R.D. at 254 (pretrial preparations, lengthy trial, and post trial appeals would have prolonged the litigation and reduced the recovery to the class).

b.    The Reaction Of The Class To The Settlement

At Defendants' expense, and  through the Settlement Administrator, the parties emailed more than 3.868 million settlement notices to potential class members, and followed up "bounced back" emails by sending more than 986,700 Postcard Notices to class members. Notice about the settlement was also distributed via the internet on a designated website for the settlement: www.townessettlement.com, and a toll-free telephone line was established to explain the settlement. In addition, links were placed in various locations on the Defendant Websites, allowing consumers to jump directly to the settlement website.

As noted above, as of August 17, 2007 (the last business day prior to filing of this Brief), only one person filed an objection to the Settlement, and that person has moved to withdraw the objection. That no other person of the more than 3.8 million class members who received notice

CHGO1\31088227.1

objected to the settlement is compelling evidence of the fairness of the settlement. *In re Cendant*, 264 F.3d at 234 (low number of objections "cuts strongly in favor of the settlement").

      c.    Stage of Proceedings And Amount Of Discovery Completed

Under this *Girsh* factor, the Court must determine whether the Class Plaintiff and their counsel had an adequately-developed record and appreciation for the strengths and weaknesses of the case before negotiating and concluding the settlement. *In re Cendant*, 264 F.3d at 235; *In re General Motors*, 55 F.3d at 813. At the time of settlement negotiations, the parties had litigated the case thoroughly and developed an extensive record. As noted earlier, there were 10 depositions taken in this case, and more than 50,000 pages of documents were exchanged. McGlamry Decl., ¶ 11. In addition, numerous document subpoenas were served on third parties who responded with production of documents representing a portion of the 50,000 pages of documents reviewed in this case. McGlamry Decl., ¶ 11.

Settlement negotiations began in earnest soon after the parties participated in court-ordered mediation with Magistrate Judge Thynge on June 27, 2006. Negotiations continued even while the parties proceeded to take additional discovery. The Class Plaintiff was represented by counsel well seasoned in evaluating similar types of claims. The settlement negotiations occurred only after development of a thorough record, including extensive evaluation of the strengths and weaknesses of the case and the claim for damages. Therefore, this factor strongly favors the settlement.

      d.    Risks Of Establishing Liability And Damages

In sharp contrast to the benefits to the class of the proposed settlement are the risks to the plaintiff and the putative class of recovering nothing if this case were litigated to judgment. *In re Warfarin Sodium*, 231 F.R.D. at 255-56 (analyzing whether the risks of establishing liability and

32

damages for the class support granting final approval to settlement).    The heart of plaintiff's complaint is that defendants are CROs regulated by CROA and subject to its technical requirements.  Complaint ¶ 11.  If defendants are not CRO's, then they would not be regulated by the act, and plaintiff's claims would fail.  *See* 15 U.S.C. §§ 1697c, d, e (provisions cited in plaintiff's complaint, and which state that their requirements only apply to CRO's).

The law, however, is unsettled whether defendants would be CROs in connection with the sale of products at issue in this lawsuit.  In *Helms v. Consumerinfo.com*, Judge Hopkins in the Northern District of Alabama granted in part the plaintiff's motion for summary judgment based on representations similar to those at issue here.    *See generally*, *Helms v. Consumerinfo.com*, 436 F. Supp. 2d 1220 (N.D. Ala. 2005).    That determination was under interlocutory review in the Eleventh Circuit Court of Appeals at the time the defendants there reached a settlement in a related case in California (the *Browning v. Yahoo* case).  However, in *Hillis*, 237 F.R.D. at 516, the court denied summary judgment to the plaintiff, reasoning that an issue of fact existed as to whether Equifax was a CRO with respect to each of the consumer products at issue in the lawsuit.  *Id.*

In *Plattner v. Edge Solutions, Inc.*, 422 F. Supp. 2d 969 (N.D. Ill. 2006), the court noted the literal breadth of the statutory definition of a credit repair organization under CROA, but held that legislative intent required that it be given a more limited reach.  In doing so, the *Plattner* court rejected the argument for a broad definition of credit repair organizations that mimics the basis of Plaintiff's claim here.  422 F. Supp. 2d at 974-75 (rejecting interpretation of CROA to apply to entities who do not offer stereotypical credit repair services, but whose "advice or services might ultimately result in an improved credit rating.").  *See also Limpert v. Cambridge*

33

*Credit Counseling Corp.*, 328 F. Supp. 2d 360, 364 (E.D.N.Y. 2004) (distinguishing CROA's application to illegitimate forms of credit repair from legitimate forms of credit counseling).

Accordingly, it is by no means clear that plaintiff would prevail on his claim that Defendants are, or were intended by Congress to be, "credit repair organization" as defined under CROA. Plaintiff faces a significant risk of recovering nothing if this case were litigated to judgment. In light of the uncertainty on this issue, a liability determination was far from certain at the time the settlement was reached. Accordingly, this factor favors settlement.

With regard to damages, Class Plaintiff claims millions of dollars in damages on behalf of the Class. The Defendants countered that Plaintiff suffered no damages as a result of the alleged technical violations of CROA, but on the contrary, benefited from the purchase of the Offerings. Given the night and day nature of the parties' positions on damages, the uncertainty about the eventual recovery for the Class weighs in favor of settlement.

e.    Risks of Maintaining Class Action Status Through Trial

The Parties reached an agreement on settlement terms prior to briefing any motion for class certification in this case. Accordingly, the Court has not yet considered whether Plaintiff's claims are well-suited for class certification, making this factor neutral in regard to settlement. *See In re Cendant*, 264 F.3d at 239 (although court may decertify during litigation, where risk of that happening is slight, this *Girsh* factor is neutral).

However, it is clear that there are substantial obstacles to Plaintiff's ability to achieve and maintain class action status if this case were not settled. *In re Warfarin Sodium*, 212 F.R.D. at 256-57 (analyzing whether the risks of maintaining class action status through trial support granting final approval to settlement). At least two courts have refused to certify a class in CROA cases involving claims similar to those brought here. These courts ruled that a class

34

action is not superior to individual litigation, as required by Federal Rule of Civil Procedure 23(b)(3). *See Hillis*, 237 F.R.D at 508; *Helms v. Consumerinfo.com, Inc.*, 236 F.R.D. 561, 569-70 (N.D. Ala. 2006). The *Hillis* and *Helms* courts cited several factors in support of this conclusion.

First, under the reading of CROA advanced by the plaintiffs in those actions, the defendants could be liable on a strict liability basis, even if they did not intentionally or even negligently violate the requirements of the act. In the words of the *Hillis* court, plaintiffs alleged "nothing more than unintentional technical violations of the CROA" by defendant. *Hillis*, 237 F.R.D. at 506, *see also Helms*, 236 F.R.D. at 569 ("[a]t most, Defendant has violated the 'technical requirements of a complex statutory scheme'"). In addition, the plaintiffs and the class did not claim any actual damages from the alleged CROA violations. Instead, they sought statutory damages authorized by the act, consisting of the amounts paid to the defendants by the plaintiff and the class. *Hillis*, 237 F.R.D. at 506; *Helms* 236 F.R.D. at 569-70. Given the size of the classes in those cases, the potential damages could be enormous; indeed, the *Hillis* court estimated that in that case, the damages sought could be approximately $200,000,000. *Hillis*, 237 F.R.D. at 507; *see also Helms*, 236 F.R.D. at 569-70. These damages could be found to be disproportionate both to the injuries suffered by the class as well as the culpability of the defendants. *Id.* In light of these facts, *Hillis* and *Helms* found that a class action would not be the superior vehicle to litigate this case.[19]

---

[19]   *Helms* and *Hillis* are strong authority against certifying a class in this action. As in those cases, Townes alleges here that Defendants are strictly liable for a violation of CROA's technical requirements. In addition, as in *Helms* and *Hillis*, plaintiff does not seek actual damages, but instead a recovery of all sums paid to the defendants by plaintiff and the class for the products at issue. The potential damages in this case are in the tens of millions of dollars.

CHGO1\31088227.1

In light of these authorities, there may be significant risks to Plaintiff's ability to maintain class action status through a trial. Accordingly, this factor is either neutral or weighs in favor of settlement.

f.    Ability To Withstand Greater Judgment

This *Girsh* factor addresses "whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant*, 264 F.3d at 240. There is little evidence as to whether the defendants could withstand a judgment up to and beyond Class Plaintiff's claims in this case. This factor therefore weighs neither for nor against the settlement. *Warfarin*, 212 F.R.D. at 257 (where there is no record evidence about ability to pay or whether the issue factored into settlement negotiations, this *Girsh* factor neither cuts for or against settlement).

g.    The Range of Reasonableness Of Settlement In Light of the Best Possible Recovery and All Attendant Risks of Litigation

Under these last *Girsh* factors, the Court must determine whether the settlement fairly reflects the strengths and weaknesses of the case. The Third Circuit has held:

> [I]n cases primarily seeking monetary relief, the present value of the damages Plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement. . . . The evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.

*General Motors*, 55 F.3d at 806.

The Settlement here was reached prior to the parties engaging in expert discovery. However, Class Plaintiff estimates that damages could exceed one hundred million dollars. The Defendants take the position that the Class Plaintiff actually benefited from the transaction, and

therefore suffered no damages; at a minimum, Defendants believe that the Class received real value in connection with their purchase of the Offerings. Therefore, the range of settlement without considering the risks of litigation is between $0 and the best possible recovery of over $100 million.

However, as discussed *supra*, two courts (*Hillis* and *Helms*) have denied class certification motions primarily on superiority grounds, concluding that the potential damages in a class action under the CROA and these factors are grossly disproportionate to the alleged misconduct. While the parties here were prepared to urge their respective positions to this Court on this issue, the *Hillis* and *Helms* rulings, if followed, not only would defeat class certification but also would eliminate any possibility of the "best case" damages number. In other words, Plaintiff's best case was the largest impediment to class certification, effectively making that best case highly disputed and, according to non-binding precedent, highly unlikely.

Moreover, the best possible recovery is not the yardstick used to determine a reasonableness of the settlement. In any case, and particularly here in light of the circumstances, the Court must discount the best case for the strengths and weaknesses of plaintiff's case. *Warfarin*, 212 F.R.D. at 258 (citing *In re Union Carbide Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989)). The parties have already set forth in detail the nature of Class Plaintiff's claims and the risks associated with the defenses raised by the Defendants. Given the nature, diversity, and strength of the defenses, a settlement in a range of $0 and/or $17,360,500 to $34,722,000 more appropriately reflects the possibilities of an unfavorable outcome and no recovery for the Class and/or for a reduced recovery based on the risks to the Class and the strength of Defendants' arguments and defenses.

37

These dollar ranges equate to 0% and/or between some 10% and 30% of the best possible recovery. The Settlement in this case compares favorably to the recovery rates in other cases in this Circuit. *In re Cendant*, 264 F.3d at 241 (citing range of recovery of 1.6% to 14% for securities class action settlements); *Warfarin*, 212 F.R.D. at 258 (33% of maximum possible recovery "quite reasonable" and compared favorably with typical recoveries in other class actions).

The Settlement represents a significant accomplishment given the numerous and meritorious defenses asserted by the Defendants and by similarly situated defendants to CROA claims. In addition, the Settlement should receive final approval because it is extremely generous to the class, especially when balanced against the risks and costs of continued litigation. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (noting that when an court is determining whether to grant final approval to a settlement, it should examine the range of reasonableness of the settlement in light of the best possible recovery and all attendant risks of litigation).

As discussed above, the Settlement provides to each class member three free months of credit monitoring services, which retails for approximately $9.95 per month. This benefit, which provides daily access to the consumer's credit report and credit score for three months, as well as with emails notifying the consumer of changes to his or her credit file, is a substantial one. Indeed, the Federal Trade Commission is on record as stating that "credit monitoring services – if promoted and sold in a truthful manner – can help consumers maintain an accurate credit file and provide them with valuable information for combating identity theft." *Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 514 (N.D. Ga. 2006) (quoting July 1, 2005, letter from

FTC to Rep. Edward R. Royce).[20]  *See also*, McGlamry Declaration at ¶¶ 16-18 (discussing the determinations made by Congress and the FTC of the importance of and value of credit reports and credit scores.  In addition to the in-kind relief provided, Defendants will make specific changes to the manner in which they describe and market their products.  These factors weigh strongly in favor of the Settlement.

**D.**    **Any Objections To The Settlement Are Without Merit And Should Be Overruled.**

As set forth in the Hearing Order, any objections class members may have to the Settlement must be postmarked and served upon counsel by August 20, 2007, and must be filed with the Court by August 27, 2007.  (Hearing Order, D.I. 69 at ¶¶ 12, 13).  As of August 17, 2007, counsel have received only one such objection – that of Debbie Ashley.  However, by Motion dated August 13, 2007 and received by counsel, Ms. Ashley seeks dismissal of her own objection. *See* D.I. 90;  O'Neil Decl. ¶¶ 11-12.

Any other objections that may be received by the deadlines set forth in the Hearing Order will be addressed by counsel in a separate submission. *See* Hearing Order, D.I. 69, ¶ 14 (counsel for the parties have until seven (7) days prior to the Fairness Hearing to file reply papers to any timely objections).

**VI.    CONCLUSION**

For all the foregoing reasons, Class Plaintiff Robert V. Townes, IV, and Defendants Trans Union LLC and TrueLink, Inc. (now known as TransUnion Interactive, Inc.), respectfully request that the Court grant final approval of the Settlement.

---

[20]  Moreover, members of the Settlement Class are likely to value credit monitoring highly.  The Settlement Class is defined as persons who purchased one of the listed "Offerings" from Defendants, one of which is credit monitoring.  Plaintiff does not complain that credit monitoring was defective or otherwise inadequate.  Accordingly, a substantial number of class members purchased credit monitoring from Defendants in an arms-length transaction and presumably valued what they purchased.

CHGO1\31088227.1

**ROBERT V. TOWNES, IV**


By: /s/ Carmella P. Keener
              Carmella P. Keener (#2810)
              ROSENTHAL, MONHAIT & GODDESS, P.A.
              Counsel for Plaintiff
              919 N. Market Street, Suite 1401
              P.O. Box 1070
              Wilmington, DE 19801
              Phone: (302) 656-4433
              Fax: (302) 658-7567

OF COUNSEL:

C. Neal Pope
Georgia Bar No. 583769
Wade H. Tomlinson, III
Georgia Bar No. 714605
POPE, McGLAMRY, KILPATRICK, MORRISON
& NORWOOD, LLP
1111 Bay Avenue, Suite 450
Columbus, Georgia 31901
Phone: (706) 324-0050
Fax: (706) 327-1536

Michael L. McGlamry
Georgia Bar No. 492515
The Pinnacle, Suite 925
3455 Peachtree Road, N.E.
Atlanta, Georgia 30326-3243
Phone: (404) 523-7706
Fax: (404) 524-1648

Wilson F. Green
Harlan F. Winn, III
BATTLE FLEENOR GREEN WINN &
CLEMMER LLP
The Financial Center, Suite 1150
505 N. 20th Street
Birmingham, Alabama 35203
Phone: (205) 397-8160
Fax: 205-397-8179

**TRANS UNION, LLC and TRUELINK, INC.**


By:  /s/ William M. Lafferty

      William M. Lafferty (#2755)
      Jay N. Moffitt (#4742)
      **Morris, Nichols, Arsht & Tunnell LLP**
      1201 N. Market Street
      Wilmington, DE 19899
      Phone:  (302) 658-9200
      Fax:  (302) 658-3989


OF COUNSEL:

Michael O'Neil
Paula D. Friedman
**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Phone: (312) 368-4000
Fax:    (312) 236-7516

41

<u>CERTIFICATE OF SERVICE</u>

I, Jay N. Moffitt, hereby certify that on August 20, 2007 I caused the foregoing

Brief In Support Of Joint Motion For Final Approval Of Settlement to be electronically filed

with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the

following:

Christopher J. Curtin, Esquire
Erisman & Curtin
629 Mount Lebanon Road
Wilmington, DE  19899

Carmella P. Keener, Esquire
Rosenthal, Monhait, & Goddess, P.A.
919 Market Street
Suite 1401
P. O. Box 1070
Wilmington, Delaware 19899


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Jay N. Moffitt (#4742)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
jmoffitt@mnat.com
    Attorneys for Defendants

August 20, 2007