# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ROBBIE HILLIS, individually and on behalf of all persons similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>EQUIFAX CONSUMER SERVICES, INC. and FAIR ISAAC CORPORATION,<br><br>    Defendants. | CASE NO. 1:04-CV-3400-TCB<br><br><br>**CLASS ACTION** |

AND

| | |
|---|---|
| CHRISTY SLACK, individually and on behalf of all persons similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>FAIR ISAAC CORPORATION and MYFICO CONSUMER SERVICES, INC.<br><br>    Defendants. | CASE NO. 1:07-CV-314-TCB<br><br><br>**CLASS ACTION** |

**FINAL JUDGMENT, INCLUDING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, GRANTING FINAL APPROVAL TO THE CLASS ACTION SETTLEMENT AGREEMENT BETWEEN THE CLASS AND DEFENDANTS, EQUIFAX CONSUMER SERVICES, INC., FAIR ISAAC CORPORATION AND MYFICO CONSUMER SERVICES, INC.**

This matter comes before the Court on the parties' motion for final approval of this class action settlement between Plaintiffs, Robbie Hillis and Christy Slack, on behalf of themselves and the Settlement Class (defined below), and Defendants, Equifax Consumer Services, Inc., Fair Isaac Corporation and myFICO Consumer Services, Inc. (collectively "Defendants"). After a thorough review of the parties' briefs, the record evidence, applicable law, the objections to the Settlement, and presentations by counsel, the Court issues the following order on all pending motions in this matter.

I.    **Background**

A.    **Overview**

This putative nationwide class action arises from the purchase by Plaintiffs Robbie Hillis and Christy Slack of certain Offerings from Defendants Equifax Consumer Services, Inc. and Fair Isaac Corporation.[1] Plaintiffs have alleged that they purchased these Offerings to improve their respective credit scores, but after attempting to follow the advice provided, their credit scores did

---

[1]    By Order dated February 8, 2007, this Court consolidated the *Slack* case with the *Hillis* case for settlement purposes. The claims asserted in the *Slack* case were substantially similar to those asserted in the *Hillis,* case and Fair Isaac Corporation was a named defendant in both cases.

Gibson, Dunn & Crutcher LLP

not improve.  Plaintiffs allege that in selling these Offerings Defendants failed to comply with various statutory requirements that are enumerated in the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679j ("CROA"), the anti-fraud provisions of the CROA, and related California state law.  California Credit Services Act of 1984, Cal. Civ. Code §§ 1789.10-1789.26.  Plaintiffs sought damages in the amount paid for the Offerings by the proposed class.

Defendant Equifax Consumer Services, Inc. ("Equifax") is a wholly-owned subsidiary of Equifax Inc. and was formed to sell credit-related services directly to consumers.  Non-party Equifax Information Services LLC ("EIS"), another subsidiary of Equifax Inc., is one of the three national credit reporting agencies and is responsible for gathering and maintaining credit reports on U.S. consumers.

Defendant Fair Isaac Corporation is the creator of the FICO score, a three-digit number ranging from 300 to 850 that represents an estimate of a consumer's creditworthiness.  Fair Isaac is not a credit reporting agency, but licenses with credit reporting agencies and other entities to generate and display FICO scores that are calculated using information in a consumer's credit report.  Defendant myFICO Consumer Services, Inc. is a wholly-owned subsidiary of Fair Isaac Corporation.

## B.    Previous Rulings

By order dated February 8, 2007 ("Preliminary Approval Order"), this Court conditionally certified the settlement class, granted the motion for preliminary approval of class action settlement, and scheduled the hearing on final settlement approval. In that order and in supplemental orders, this Court ordered that notice of the Settlement be published to the Class Members in accordance with the Preliminary Approval Order (and supplemental orders), and the process set forth in the Settlement Agreement.

In compliance with these orders, notice was published to the members of the Class, and *all* individual members of the Class were afforded at least four weeks and as long as eight weeks in which to respond with any requests to opt out or object. Notice and further information concerning the Settlement was also posted on a dedicated Settlement Website starting on February 27, 2007, and continuing through at least the distribution of the Benefit Codes. A telephone assistance program was also established through which Class Members could receive additional information concerning the Settlement. The Defendants also placed a link to the Settlement Website on their respective Consumer Websites.

3

### C.    Final Fairness Hearing

On June 4, 2007, the parties appeared at the final approval and fairness hearing represented by their respective attorneys of record.  All persons present were given the opportunity to be heard.  This Court has reviewed and considered all of the pleadings, motions and papers filed in connection therewith, all of the presentations and evidence submitted at the hearing in support of the Settlement, and the submissions and arguments of Objectors.[2]

## II.    Findings of Fact and Conclusions of Law

The proposed Settlement having been presented, and having been fully considered by the Court, the Court makes the following findings of fact and conclusions of law:

---

[2]    Formal objections were filed with the Court by (1) Steven F. Helfand (*Hillis*, Rec. Doc. No. 298); (2) Karen Shapiro (*Hillis*, Rec. Doc. No. 301); (3) Craig Friedberg, Diana Poulson, Richard D. Adams, Velma Lawson, Richard Lawson, Panina Aviles, Janice Tate, Nathan Lang, Melissa Huelsman, and Andy Ogilvie (*Hillis*, Rec. Doc. No. 302); (4) Meredith Whittington and Taren Hill (*Hillis*, Rec. Doc. No. 303); and (5) Christine Baker (*Hillis*, Rec. Doc. No. 304).  In addition, letters from six individuals appearing to disapprove of the settlement were served on counsel for the Parties and provided to the Court.  (*See Hillis*, Rec. Doc No. 310, App. A-E.)

A.    **Settlement Discussions**

1.    Both before and after the Court's August 18, 2006 Order, the Parties engaged in settlement discussions in *Hillis* and *Slack*. In October of 2005, toward the close of discovery in *Hillis*, the parties began discussing the possibility of settlement. Those initial discussions were held in several in-person meetings in Atlanta, Chicago, and San Francisco and included a mediation in the *Slack* case, from the fall of 2005 and into early 2006. Those settlement discussions continued through the spring of 2006, following briefing on Hillis's motion for class certification and partial summary judgment. This initial series of discussions culminated in a two-day mediation conducted in Atlanta, Georgia, in April of 2006, with the assistance of a second professional mediator. Although settlement discussions continued through the summer of 2006, the parties' initial efforts at settlement did not culminate in a deal at that time. However, these protracted initial discussions laid the groundwork for the settlement that was ultimately reached.

2.    Settlement discussions resumed in the aftermath of the Court's August 18, 2006 Order. Those discussions continued through the fall of 2006, and by October 13, 2006 (the date this Court heard oral argument on

Hillis's motion for partial reconsideration), those discussions were beginning to gain momentum.

**B.    The Cases Were Hard Fought**

3.    In *Hillis*, Defendants filed repeated motions to dismiss, which were granted in part. (*Hillis*, Rec. Doc. Nos. 6, 10, 36, 45.) The *Slack* Defendants also filed a motion to dismiss, which was granted in part. (*Slack*, Rec. Doc. No. 58.)

4.    In *Hillis*, the parties conducted nearly a year of discovery, during which time fifteen witnesses were deposed and over 39,000 pages of documents were produced. In *Slack*, the parties conducted discovery for nine months, taking twelve depositions and producing over 8,000 additional pages of documents. Because the *Hillis* and *Slack* cases involved overlapping factual and legal issues, the parties in the *Slack* case agreed that discovery in *Hillis* could be used in *Slack*.

5.    Discovery disputes arose on several occasions in the *Hillis* case, with the parties filing motions to compel and even a motion for sanctions. (*Hillis*, Rec. Doc. Nos. 73, 74, 75, 79, 167.)

6.    It was not until *after* the Court denied Hillis's motions for class certification and partial summary judgment (*Hillis*, Rec. Doc. No. 254) that

the parties were able to agree on terms to submit for Court approval. Even then the settlement talks were long and arduous involving numerous in-person meetings and conference calls over a period of months.

       7.     These cases were settled after a full evidentiary record had been developed. They settled with the benefit of complete discovery, extensive motion practice, and a judicial determination of several of the most critical issues in the *Hillis* case.

### C.    The Objectors Did Not Consider the Court's Rulings on Class Certification or Summary Judgment

       8.     A fatal flaw running throughout all of the objections is that the Objectors did not give adequate, or sometimes any, weight to the significant hurdles for Plaintiffs and the Class created by this Court's August 18, 2006 Order.

       9.     The Court's Order denying class certification and denying Hillis's motion for partial summary judgment on the issues of whether Defendants fall within the definition of a "credit repair organization" ("CRO") under the CROA highlight that, absent their motion for reconsideration and/or a successful appeal, Plaintiffs and the Class had little chance of obtaining through litigation benefits superior to (or even commensurate with) those conferred by the Settlement.

10.     In light of the Court's Order, it would be very difficult for Plaintiffs and the Class to establish that Defendants are CROs under the Court's construction of the term.  Thus, the bottom end of the "reasonable range" if the cases were to be litigated would be no recovery for the Class.  Moreover, in order for the Plaintiffs and the Class to have a realistic chance of obtaining a recovery, key elements of the August 18, 2006, Order would have to be either vacated or reversed, and even then, Plaintiffs and the Class would still have to win at trial.  Damages awarded under the CROA would potentially be subject to setoff in the *Slack* Action, or reduction under the Due Process Clause.  *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996); *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006); *Parker v. Time Warner Entertainment Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003).  Thus, the damages awarded to the Class may well have been minimal.

**D.     The Objections Have Been Minimal, and a Relatively Small Number of Class Members Opted Out**

11.     In the *Hillis* and *Slack* cases, there are a total of approximately 6.6 million Class Members.  (Second Declaration of Jennifer Keough, *Hillis*, Rec. Doc. No. 308, ¶ 4.)  To date, there have been five formal objections to the Settlement filed on behalf of fifteen Class Members (*Hillis*, Rec. Doc. Nos. 298, 301, 302, 303, 304.).  Thus, 0.0002% percent of the class has objected to the

Settlement. This total includes two objections filed by attorneys on behalf of twelve Settlement Class Members (*Hillis*, Rec. Doc. Nos. 302, 303), one objection filed *pro se* by an attorney (*Hillis*, Rec. Doc. No. 298), and one objection that was filed *pro se* but drafted by an attorney (*Hillis*, Rec. Doc. No. 301). The statistics with respect to Class Members opting out of the Settlement also evidence a lack of opposition to the Settlement. Only 835 Class Members, or 0.01%, have timely opted out of the Settlement. (Second Declaration of Keough, *Hillis*, Rec. Doc. No. 308, ¶ 10.)

### E.     Benefits of the Settlement

12.     The Settlement provides putative Class Members with an opportunity to receive three or six free months[3] of Score Watch,™ an Offering with a retail value of at least $24 (for three months) or $48 (for six months), which provides Class Members monitoring of their FICO Credit Score and Score Power for free on two occasions. (*See* https://www.econsumer.equifax.com/consumer/getLoanrate.ehtml?forward=swe_detail&categorySelected=0&typeSelected=mo

---

3     A Class Member who purchased an Offering from only one of the Defendants will receive three months of Score Watch. A Class Member who purchased an Offering from each of the Defendants will receive three months of Score Watch from each of the Defendants, for a total of six months.

rt01&stateSelected=US). The Class also receives the benefit of the injunctive relief. In addition, Defendants have agreed to pay attorneys' fees and costs separately from the relief to be provided to Class Members, and Defendants have agreed to pay for the costs of printing and mailing the Class Notice, as well as other settlement administrative expenses.

13.    Settlement Class Members are not required to subscribe to the Offering or to commit to purchase it in the future. The Settlement Agreement specifically provides when Class Members redeem their Benefit Code for the in-kind relief, Defendants will not specifically target and solicit Settlement Class Members to make additional purchases. (Settlement Agreement ¶ 72(v)). While Defendants retain the right to market to Settlement Class Members in the same manner that they would to all purchasers of Score Watch,™ that is not unusual or unfair given that by definition each Settlement Class Member has already purchased Defendants' Offerings and would already receive solicitations in the ordinary course of Defendants' businesses.

14.    In-kind relief is also appropriate because this is not a case where the core claims are directed at the utility or value of Defendants' Offerings. The core allegations are based on statutory disclosure requirements imposed by the CROA on CROs.

15.     The proposed injunctive relief is multi-faceted and comprehensive. It includes eliminating portions of certain Offerings, adding or maintaining links to specific websites, offering a free module previously offered only for a fee, providing clear disclaimers to assist consumers in understanding what Defendants are not offering, and substantial language changes designed to assist consumers. The components of the injunctive relief provide the Class with significant relief by mandating specific significant changes to Defendants' Offerings and marketing and advertising literature. These changes directly address the issues raised in the Complaints in these consolidated lawsuits concerning alleged misrepresentations by the Defendants.

16.     As part of the Settlement Agreement, Defendants have agreed to pay attorneys' fees and costs of up to $4 million, and Settlement Class Members are not responsible for any portion of those fees. In most class action cases, and in any contingency fee case, Class Counsel would be entitled to seek attorneys' fees and costs directly from any cash recovery to the Class Members. Under the Settlement Agreement, however, Class Counsel's attorneys' fees and costs of up to $4 million are being paid separately by Defendants.

17.     Defendants have also agreed to bear the costs of providing Class Notice and administering the Settlement. Defendants agreed to provide

11

notice at their own expense to the 6.6 million Class Members, and they also established a website to publish the Class Notice and other pertinent settlement documents on the Internet. Defendants also established a toll-free telephone service that provided helpful information to Settlement Class Members concerning the Settlement. The settlement administration costs will likely exceed $1 million. (Second Declaration of Keough, *Hillis*, Rec. Doc. No. 308, ¶ 11.)

18.    Under the Settlement, Class Members are eligible to receive three or six months of Score Watch.™ Score Watch™ currently sells for $8.95 per month. (*See* https://www.econsumer.equifax.com/consumer/getLoanrate.ehtml?forward=swe_detail&categorySelected=0&typeSelected=mort01&stateSelected=US) (last visited May 23, 2007). The Offering provides a number of useful benefits relating to monitoring one's FICO score and Equifax credit report. These benefits include:

•    Continuous score monitoring and notification when there is a change in a consumer's FICO® score;

•    Detailed explanations for key score changes and for understanding the score;

•    Daily monitoring of the consumer's Equifax Credit Report with email notification of key changes;

12

- Two Free Score Power® reports;

- Detailed explanation of what the consumer's current score means, a comparison of that score with national averages, and a graph of how lenders view that score; and

- Access to Customer Care available 7 days a week.

(See https://www.econsumer.equifax.com/consumer/getLoanrate.ehtml? forward=swe_detail&categorySelected=0&typeSelected=mort01&stateSelected= US).

19.     The Court finds that the potential retail value of the in-kind benefits under the Settlement is worth at least $100 million, and may be as high as $221 million. The Court is aware that not all consumers will avail themselves of an opportunity to redeem this benefit. Nevertheless, the offer of the benefit to each class member has a substantial value, as of course does the injunctive relief agreed to. Although Objectors have argued against this valuation of the in-kind benefits and of the injunctive relief, Objectors have offered no evidence on what they believe an appropriate valuation would be. Notably, the Plaintiffs negotiated for a Final Notice to Class Members that will be sent after Final Approval of the Settlement which advises Class Members of the Court's approval and provides Class Members with an additional 60 days to accept the

13

in-kind benefits contemplated by the Settlement.  As a result, Settlement Class Members will be provided with an additional reminder that they may avail themselves of the in-kind relief offered under the Settlement.

F.    **Attorneys' Fees**

20.    Class Counsel submitted declarations showing that the number of hours they logged collectively in these cases exceeded 7,800.  No Objector presented any evidence that Class Counsel worked fewer hours than claimed.

21.    No Objector offered an amount appropriate to pay Class Counsel.  Indeed, when one Objector was asked at the hearing for a suggested amount of fees that should be paid to counsel, the Objector had no suggestion.

22.    The Court believes that Class Counsel were highly professional, creative and tenacious in pursuing a novel theory of recovery on behalf of the Class.  Through the efforts of Class Counsel, the Class has been provided the benefits of the in-kind relief and the injunctive relief, which the Court regards as substantial, especially in light of the Court's August 18, 2006 Order.  Without the efforts of Class Counsel, the Settlement would not have been possible.

14

G.    Late Opt Outs

23.    Eighteen members of the class were untimely in their requests to be excluded from the class.

**THEREFORE, IT IS HEREBY ADJUDGED, ORDERED AND DECREED** that:

A.    Background

1.    This Court has jurisdiction over the claims of the members of the class asserted in this proceeding, personal jurisdiction over the settling parties (including all Class Members), and subject matter jurisdiction to approve the Settlement as set forth in the Settlement Agreement previously filed with this Court.

2.    The notice given to the members of the Class was reasonably calculated under the circumstances to apprise the Class of the pendency of this action, all material elements of the proposed Settlement, the opportunity for Class Members to exclude themselves from, to object to, or to comment on the Settlement and to appear at the Settlement hearing. The notice was reasonable and the best notice practicable under the circumstances; was adequate and sufficient notice to all Class Members; and complied fully with the laws of the United States and of the Federal Rules of Civil Procedure, due process and any

other applicable rules of court. A full opportunity has been afforded to the Class Members to participate in this hearing, and all Class Members and other persons wishing to be heard have been heard. Accordingly, the Court determines that all Class Members who have not timely excluded themselves from this litigation are bound by this Judgment, Final Order and Decree.

3.     Eight hundred and thirty-five members of the Class requested to be excluded from this Settlement in a timely manner, and a list of such Class Members is attached as Exhibit A to the Third Declaration of Jennifer Keough (*Hillis*, Rec. Doc. No. 312) (filed under seal). These individuals are hereby found to have properly excluded themselves from the Settlement Class, and this Judgment, Final Order and Decree shall not be binding on them.

4.     Eighteen members of the class were untimely in their requests to be excluded from the class. Each of these 18 persons are thus members of the Class, each is identified in Exhibit B to the Third Declaration of Keough (*Hillis*, Rec. Doc. No. 312) (filed under seal), and each is bound by this Judgment, Final Order and Decree and the Settlement.

5.     On February 8, 2007, this Court preliminarily approved certification of a Settlement Class defined (as modified by Order dated March 19, 2007) as:

> all consumers residing in the United States who, between
> November 19, 1999, and February 8, 2007, (i) entered into an
> agreement with any of the Defendants to purchase any of the
> Offerings, (ii) paid any of the Defendants for that Offering but
> did not later obtain a complete refund from any source or had
> a third party pay any of the Defendants on the consumers'
> behalf for that Offering, and (iii) received said Offering.

(*Hillis*, Rec. Doc. No. 294, at 3.)[4]

6.    For purposes of this Settlement, the Court decrees that the term

"Offering" means those products or services that are offered by Defendants for

sale to consumers in return for the payment of money and are further identified

as one of the following (including all components, features, content and variants

thereof, regardless of the website from which the purchase is made):  Score

Power; Credit Watch; Score Watch; 3-in-1 Monitoring; Credit Rankings with

Score Power; Credit Rankings with 3-in-1; 3-in-1 with Score Power; Score Power

by mail; Credit Watch by mail; FICO Score (with Equifax, TransUnion or

---

[4]    The class definition is subject to certain exclusions: (1) all judicial officers
in the United States and their families through third degree of relationship;
(2) all officers, directors, employees or counsel of the Released Parties;
(3) all persons who have already settled or otherwise compromised their
claims against Defendants; (4) all persons who opt out; and (5) all persons
who have pending against any of the Defendants on the date of entry of
the Preliminary Approval Order any action wherein the recovery sought is
encompassed by the Released Claims.

17

Experian reports); FICO Deluxe; Suze Orman FICO Kit; CreditSync; and Credit Advantage.

**B.    Final Certification of the Class**

7.    As discussed above, the Court provisionally certified a Settlement Class on February 8, 2007. The Parties now request final certification of the Settlement Class. The Court finds that class certification is an appropriate method for protecting the interests of the Class Members. There has been no objection to the Court's provisional certification of the Settlement Class save on the grounds of Plaintiff Robbie Hillis's adequacy.

8.    In determining whether certification of a class for purposes of settlement is appropriate, the Court should determine whether the plaintiff can establish the requisite elements of numerosity, commonality, typicality, adequacy of representation, and superiority. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). The settlement and its terms are in fact relevant to the determination that the action may be certified as a class action. *Amchem*, 521 U.S. at 619-20. The Court finds that each of the Rule 23 elements is satisfied in this case.

9.    For a class action to be certified, the members of the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P.

18

23(a)(1).  There is no single, fixed number of Class Members required to meet the numerosity requirement.  *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.), *cert. denied*, 479 U.S. 883 (1986).  In this case, there are approximately 6.6 million Class Members.  (*Hillis*, Rec. Doc. No. 308, ¶ 4.)  Numerosity is satisfied.  *See also Hillis*, 237 F.R.D. at 497.

10.    The commonality requirement is satisfied when the claims of the prospective class present common questions of law or fact.  *See Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 521 (M.D. Ala. 1992).  Common questions are those that arise from a common nucleus of operative fact.  *Haywood v. Barnes*, 109 F.R.D. 568, 577 (E.D.N.C. 1986).  The Court finds that this Settlement resolves common issues of fact and law arising out of the existence of the alleged violations of federal and state laws concerning credit repair and arising out of the construction and application of the CROA.

11.    Typicality is satisfied where the named plaintiff's claims are sufficiently similar to those of the absent Class Members to conclude that the representative will protect the interests of the class and that there are no antagonistic interests between the representative and the proposed class.  *See Coleman*, 141 F.R.D. at 522.  With respect to the core statutory safeguard claims at issue, this Court has previously found that there were no unusual or unique facts

or circumstances concerning Hillis's claims which made his claims atypical of the claims of Class Members. *Hillis*, 237 F.R.D. at 498. Like the Class Members, Hillis and Slack purchased credit-related Offerings on the internet by visiting Defendants' websites, www.equifax.com and www.myfico.com, respectively. Like the Class Members, neither Hillis nor Slack received those disclosures that the CROA requires of CROs and which would be required of Defendants if they were held to be CROs. Although the Court's August 18, 2006 Order had found that Hillis's CROA misrepresentation claims under 15 U.S.C. § 1679b(a)(3) were not typical of those of the Class, the Court's decision was based upon the fact that Hillis was unable to recall all of the alleged misrepresentations that formed the basis for these claims. *Hillis*, 237 F.R.D. at 503. On account thereof, the Court was concerned about the typicality of Hillis's misrepresentation claim and his adequacy to pursue that claim on behalf of others. During oral argument on Hillis's motion for reconsideration, the Court did not make any ruling, but expressed an inclination to reconsider that concern in the context of the adequacy issue. In addition, Ms. Slack also is in this case as a class representative, and there has been no challenge to her ability to serve as the class representative. Moreover, the relief sought in the CROA misrepresentation claims is duplicative of the relief sought in the CROA disclosure claims.

Accordingly, the Court finds that Hillis's and Slack's claims are typical of the claims of the Settlement Class.

12.     Adequacy of representation merges with commonality and typicality to guide the Court in determining whether maintenance of the action as a class action is economical and whether the interests of the absent Class Members will be fairly and adequately protected.  There should be no antagonism between the interests of the representative plaintiff and the Class Members, and counsel must be qualified to represent the class.  Based upon their representation of the class in this case and their successful representation of plaintiffs in similar litigation, Class Counsel have provided capable and adequate representation for the Settlement Class.  This Court previously found that Hillis was adequate to prosecute the CROA statutory claims, 237 F.R.D. at 503, and the relief sought in the CROA misrepresentation claims is duplicative of the relief sought in the CROA disclosure claims.  The Court overrules the one objection lodged on the grounds that Hillis is not an adequate class representative.  Moreover, in this context, where there will be no trial, the Court finds that Slack is adequate to represent the Settlement Class on her own.  Accordingly, the Court finds that Hillis and Slack are adequate class representatives, and their counsel are also adequate.

13.    "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the rule 23(a) prerequisites:  Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Amchem*, 521 U.S. at 615.  In the settlement context of this case, there are no disparate questions undermining class cohesion.[5]  The Class Members claim to have been harmed by a common course of conduct—Defendants' alleged violations of the CROA in their sales of the Offerings.  Plaintiffs allege that the Class Members all suffered harms in the same manner.  These allegations unite the Class, making it economical to settle the claims in one suit.  *See Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976).

14.    With respect to the superiority inquiry, courts seek to determine whether a single resolution of the claims of Class Members via settlement is

---

[5]    Again, that a settlement is before the Court means that potential predominance obstacles, which might be problematic in a contemplated trial, are not present at this juncture.  In *Amchem*, of course, the *settlement* and its structure created class conflict—the presently injured plaintiffs were effectively fighting the future claimants for the same "pot" of money.  No such competing interests are present among Class Members in this case.  All similarly situated Class Members get the same relief.

superior to individual litigation of the claims. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 523 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998). The Court finds that this class-wide settlement is a sensible means of adjudicating this controversy. *In re Prudential*, 962 F. Supp. at 522-23. As with the other requisite elements, the Court finds that the superiority requirement is satisfied in this case. Accordingly, the Court finds and concludes, for purposes of this settlement, the prerequisites to class action certification pursuant to Fed. R. Civ. P. 23(b)(3) have been satisfied.

15.     Accordingly, pursuant to Federal Rule of Civil Procedure 23(e), this Court finds that the applicable requirements of Rule 23 have been satisfied with respect to this Settlement and makes final its conditional certification of the Settlement Class, as defined on page 17 of this Judgment, Final Order and Decree (excluding those persons listed in Exhibit A of the Third Declaration of Keough), for settlement purposes only.

## C.     Final Approval of the Settlement

16.     Whether to approve a settlement in a class action lawsuit is a decision "left to the sound discretion of the trial court," and the court's decision will not be overturned "absent a clear showing of abuse of that discretion." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). When exercising its

discretion, the court is mindful of the public and judicial policies that strongly favor the settlement of class action lawsuits. *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *accord Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). "[I]t has been repeatedly recognized that settlements are 'highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits.'" *Bennett v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984) (quoting *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977)). Settlements in class action cases are also favored because they "conserve judicial resources by avoiding the expense of a complicated and protracted litigation process . . . ." *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000).

17.     Against the backdrop of these strong policy considerations, the Court must determine whether the Settlement is "fair, adequate and reasonable . . . ." *Bennett*, 737 F.2d 982, 986 (11th Cir. 1984); *see also* Fed. R. Civ. P. 23(e)(1)(C). When making that determination, the Court must consider the following factors:

- the possible existence of fraud or collusion;

- the stage of proceedings at which the settlement was achieved;

- the likelihood of Plaintiffs' success at trial;

- the range of possible recoveries and the point within that range at which the settlement is fair, reasonable, and adequate;

- the complexity, expense, and likely duration of litigation;

- the substance and amount of any opposition; and

- the opinions of class representatives and Class Counsel.

*In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d at 1333; *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993); *Bennett*, 737 F.2d at 986; *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 667-68 (M.D. Ala. 1988).

18.     This Court hereby grants final approval of the Settlement and finds that it is fair, reasonable and adequate, and in the best interests of the Class as a whole. There is no fraud or collusion in connection with the Settlement. The *Hillis* and *Slack* cases were aggressively, and often contentiously, litigated.

19.     The objections which have been filed have been considered by the Court and are overruled. The proposed Settlement is the product of arm's-length, serious, informed and non-collusive negotiations between experienced and knowledgeable counsel who have actively prosecuted and defended this litigation for more than two years. As the Court indicated on the record at the Final Fairness Hearing, the Court finds that the objections fail to contemplate or

address the Court's August 18, 2006 Order concerning class certification and partial summary judgment. As the Court explained to those Objectors who attended the Fairness Hearing, these rulings significantly limited the ability of the Plaintiffs to recover on behalf of themselves or the proposed Class.

20.    The Court finds that the in-kind benefits offered to the Class pursuant to the Settlement Agreement have significant value, particularly in light of the compromised viability of those claims given the Court's August 18 Order. Any settlement typically offers far less than a full recovery. Indeed, settlements, by their nature, do not yield one hundred percent recovery for plaintiffs. *See, e.g., Isby v. Bayh,* 75 F.3d 1191, 1200 (7th Cir. 1996) ("the 'essence of settlement is compromise.' *Armstrong,* 616 F.2d at 315. A settlement will not be rejected solely because it does not provide a complete victory to the plaintiffs"); *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago,* 834 F.2d 677, 682-83 (7th Cir. 1987) (holding settlement of $11.5 million out of an estimated $750 million to $1.5 billion generous after considering risks of litigation and costs of trial); *Equal Employment Opportunity Comm'n v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir. 1985) ("the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial").

26

21.    The Court finds that this is not a "coupon" settlement. A coupon
settlement implies that Class Members will receive a coupon that will entitle
Class Members to a discount on some future purchase. *See, e.g., New York v.
Nintendo of Am., Inc.*, 775 F. Supp. 676, 679 (S.D.N.Y. 1991) (class received
coupons for $5 off the future purchase of Nintendo video game cartridges).
Here, Settlement Class Members are not required to spend any money in order to
avail themselves of the in-kind relief. The in-kind relief is a free Offering that
does not require any expenditure by Settlement Class Members. There are no
strings attached to the receipt of this in-kind relief.

22.    In addition, the injunctive relief that Defendants have agreed to for
purposes of the Settlement directly address the issues raised by the Plaintiffs in
their Complaints. As such, the injunctive relief also has significant value for the
Settlement Class.

23.    The limitations prescribed by the injunctive relief provisions are
comprehensive, applying not simply to a few website pages, but to all of
Defendants' Offerings and "Associated Literature" (including marketing and
advertising). (*See* Settlement Agreement, ¶¶ 16, 62(i) (iii)). Moreover, the
injunctive relief prohibits Defendants from using certain phrases relating to a

consumer's credit score, even though no court has found that the use of these phrases constitutes a violation of the CROA.

24.    Because liability as a CRO under the CROA turns in part on the representations made, the restrictions on the use of certain terms goes to the heart of the Complaints by targeting the very representations that Plaintiffs in the Litigation contended gave rise to Defendants' potential CROA liability. Second, the specific wording limitations chosen were the result of a negotiated settlement where Defendants' liability under the CROA was substantially in doubt. These limitations therefore reflect the compromise inherent in the settlement process.

25.    The agreed-upon limitations are based on actual terms identified in the Complaints. *See* Hillis Amd. Compl. ¶ 8 (*Hillis*, Rec. Doc. No. 25) ("tips on how to improve your score"); *id.* ¶ 11.N ("take action that will increase your FICO score over time"); *id.* ¶ 26 ("information about how You may improve Your score over time"); Slack Amd. Compl. ¶ 19 (*Slack*, Rec. Doc. No. 14) ("Suze's FICO School reveals surprising tricks of the trade that can improve your FICO score"); *id.* ¶ 24 ("personalized advice on how to improve your FICO score"). *See also* Slack Pl's. Mot. for Part. Summ. J. (*Slack*, Rec. Doc. No. 100) at 10 ("Similarly, FICO's publications on its own scores has a section entitled 'HOW CAN I RAISE

MY FICO SCORE?'"). Terms were also identified in documents produced by the Defendants during the litigation, and in Internet searches.

26.    By contrast, the objections raised to these provisions are speculative and, in many instances, incorrect. For example, one Objector argued that the Release was too broad in that it released claims under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a-1681x. That Objector eventually acknowledged that FCRA claims were excluded from the Settlement and Release. The objections bear no relation to the Complaints in these cases, and taken to their logical conclusion, the objections would restrict Defendants from making any representations concerning their Offerings at all. This outcome is obviously unacceptable to Defendants and would thwart any Settlement, but it is also harmful to the members of the public who benefit from the Offerings that Defendants provide. (*See Hillis*, Rec. Doc. No. 310, App. F) (Consumer Reports article concerning products sold on www.myfico.com). Indeed, even with respect to the so-called statutory buzzwords such as improving a consumer's "credit record," "credit history," or "credit rating," the Court held that these representations might be construed by the average consumer "to mean simply that Score Power will provide them with the information, including their credit score, so that they can take steps to improve their credit score in the future."

29

*Hillis*, 237 F.R.D. at 516. As a result of its interpretation of the statute, the Court denied summary judgment to Hillis.

27.    In addition to the effect of any final judgment entered in accordance with this Agreement, upon this Settlement becoming final, the Court decrees that Defendant Equifax Consumer Services, Inc. and its present, former and future officers, directors, employees, agents, attorneys, shareholders, predecessors, successors, subsidiaries, corporate affiliates, parents, representatives, insurers, vendors and assigns, or interest therein jointly and severally, and Defendant Fair Isaac Corporation and its present, former and future officers, directors, employees, agents, attorneys, shareholders, predecessors, successors, subsidiaries, corporate affiliates, parents, representatives, insurers, vendors and assigns, or interest therein jointly and severally and Contractual Associates[6]

---

[6]   "Contractual Associates" means any entity with which the Defendants have a contractual relationship whereby the entity (1) posts a link to a Defendant's website on its website and receives a commission (or other compensation) for driving traffic to the Defendant's Website; (2) advertises, promotes, markets, provides, and/or sells any Offering; or (3) offers a private label or co-branded version of any of the Defendants' Offerings; provided however, that Contractual Associate shall not include TransUnion LLC, Experian Information Solutions, Inc. and their corporate parents, affiliates and subsidiaries. Contractual Associates shall be considered Released Parties only if they (1) acknowledge receipt of the
[Footnote continued on next page]

(collectively "Released Parties"), shall be released and forever discharged from all claims, actions, demands, causes of action, suits, obligations, damages, rights or liabilities, of any nature and description whatsoever, known or unknown, present or future, concealed or hidden, liquidated or unliquidated, fixed or contingent, anticipated or unanticipated, whether in tort, contract, law, equity or otherwise, that have been, could have been or might in the future be asserted by Plaintiffs in the *Hillis* or *Slack* actions or the Settlement Class Members or any of their respective heirs, spouses, executors, administrators, partners, attorneys, predecessors, successors, assigns, agents and/or representatives, and/or anyone acting or purporting to act on their behalf, arising out of the marketing, sale, purchase, representations and advertisements concerning or use of the Offerings. Such Released Claims include, but are not limited to, all claimed or unclaimed compensatory damages, damages for emotional distress, damages for physical injury, damages for reputational injury, statutory damages, consequential

---

[Footnote continued from previous page]
terms of Injunctive Relief, in accordance with paragraph 66 of the Settlement Agreement, and (2) marketed, sold or made representations concerning any of the Offerings; provided however, that a Contractual Associate is a Released Party only with respect to claims arising from the marketing, sale, purchase, representations concerning, or use of the Offerings.

31

damages, incidental damages, punitive and exemplary damages, as well as all claims for equitable, declaratory or injunctive relief under any federal or state statute or common law or other theory that was alleged or could have been alleged in the *Hillis* or *Slack* actions with respect to the marketing, sale, purchase, representations concerning or use of the Offerings, including but not limited to any and all claims under the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679j, State CROA statutes, deceptive or unfair practices statutes, common law, or any other statute, regulation or other judicial interpretation. These Released Claims further include interest, costs and fees arising out of any of the claims asserted or that could have been asserted in the *Hillis* or *Slack* actions. Nothing in the Settlement Agreement or this Judgment, Final Order and Decree is intended to release any claim(s) under the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., and/or the Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108-159, 111 Stat. 1952.

28.    The Court decrees that no member of the Settlement Class (including his or her past, present or future agents, legal representatives, trustees, parents, estates, heirs, executors and administrators) may hereafter assert any claim, demand, action, suit or cause of action, whether class or

individual, against any Released Party based, in whole or in part, upon any released claim.

29.    The Court decrees that Plaintiffs and Settlement Class Members who have not excluded themselves from this litigation expressly waive the provisions of Section 1542 of the California Code of Civil Procedure (and all other like provisions of law) to the full extent that these provisions may be applicable to this release.  California Code of Civil Procedure Section 1542, provides:

> A general release does not extend to claims which the credit does not know or suspect to exist in his or her favor at the time of executing the releases, which if known by him or her must have materially affected his or her settlement with the debtor.

30.    By its terms, the Settlement releases all claims that Settlement Class Members have or may have, no matter how styled, "arising out of the marketing, sale, representations and advertisements concerning or use of the Offerings." (Settlement Agreement, ¶¶ 40, 73.)  The release does not purport to release any other claims that Settlement Class Members may have against the Released Parties, nor does it purport to encompass claims beyond those that were asserted in the Lawsuit.  Notwithstanding the assertion of some Objectors, the release in the instant case is not at all overbroad under this standard.  By definition, Settlement Class Members are releasing only those claims relating to their

purchase and use of the Offerings.  Accordingly, the Court finds that the Release is not overbroad, and the Court expressly overrules the objections that the Release is overbroad.

     31.    Without affecting the finality of this Judgment, Final Order and Decree, the parties, including the Defendants and the Settlement Class, have submitted to the exclusive and continuing jurisdiction of this Court, and this Court reserves exclusive and continuing jurisdiction over the Settlement Agreement for two years from the Effective Date[7] of the Settlement Agreement, including the administration and consummation of the Settlement.

     32.    For the period beginning 60 days after the Effective Date and ending not sooner than 2 years thereafter, the Defendants shall comply with the following:

     a.    The Defendants will not, in their Offerings and Associated Literature, use the following terms:  "improve," "enhance," "boost," "raise" and "increase" in the same phrase as "score" or "rating"; however, an exception will

---

[7]   The "Effective Date" of the Settlement Agreement is the date on which this Judgment becomes final, as defined therein.

be allowed when discussing hypothetical examples in the Score Simulator, such
as "These Actions May Improve My Score";

      b.    The Defendants will not, in their Offerings and Associated
Literature, use the phrases "credit repair," "credit rebuilding," "credit fix,"
"repair your credit," "fix your credit" or combinations of those words; provided
however, that the Defendants may use such terms in the disclaimer described in
subparagraph (e) below and may post links on their Websites to the FTC's or
similar state agencies' web sites.

      c.    The Defendants will not, in their Offerings and Associated
Literature, use the terms "advice," "tips," "suggestions" and "instructions" in the
same phrase as "improving," "enhancing," "boosting," "raising" and
"increasing" a credit score or credit rating;

      d.    The Defendants' Offerings and Associated Literature that
refer to the Score Simulator will contain an explanation regarding the general
nature of the simulated score associated with the Score Simulator, and will not
suggest that the simulated score is "always" (or its equivalent) predictive of one's
actual score;

      e.    The Defendants will maintain a disclaimer that Defendants
are not credit repair organizations, or similarly regulated organizations under

other applicable laws, and do not provide credit repair advice and will prominently display in said disclaimer in bold at the top of the Terms of Use displayed by Defendants during the purchase process on the Defendants' Websites;

      f.     Fair Isaac in Associated Literature that refers to the Personal Coaching modules in its FICO® Kit will make clear that any such modules will focus on issues such as debt relief, buying a car, etc., and not the improvement of an individual consumer's credit score;

      g.     Fair Isaac will delete the "Suze's FICO School" and "FICO Improvement Plan" modules from the FICO® Kit;

      h.     Fair Isaac will offer on its Website for free a module similar to that offered in the FICO® Kit to assist a consumer to write a letter to a credit bureau listing potential errors identified by the consumer in his or her credit report, and that Associated Literature related to this module will only list that feature as one of the several features of the FICO® Kit but will not emphasize that feature over any other feature or suggest that it has any independent value;

      i.     Equifax will maintain a link to www.annualcreditreport.com on the Equifax Consumer Website; and

   j. Fair Isaac will maintain a link to www.ftc.gov/credit on the home page of the Fair Isaac Consumer Website.

   To the extent that a webpage on a Defendant's Website does not comply with the Injunctive Relief defined above, such webpage shall not: (1) contain any marketing or advertisement of the Defendants' Offerings; or (2) contain any links to web pages that market, advertise or offer for sale Defendants' Offerings; provided however, that such a webpage may contain the "Navigation Bar" that is the same as and contained on all of Defendants' web pages, and such "Navigation Bar" may include an option that links to a webpage that describes, promote or offers for sale the Defendants' Offerings or similar products.

   33. The Court finds that, upon implementation of the Injunctive Relief set forth in paragraph 32, none of the Defendants will fall within the statutory definition of a "credit repair organization" contained in 15 U.S.C. § 1679a, a "credit services organization" contained in Cal. Civ. Code § 1789.12, or the equivalent term defined in a substantially similar manner contained in a State CROA statute.

   34. Nothing in this Judgment, Final Order and Decree or the Settlement Agreement shall prevent the Defendants from complying with the law as it may

exist now or in the future, or from making future changes to adjust their websites if consistent with applicable statutes, statutory amendments, exemptions, regulations or case law precedent. Furthermore, nothing in this Judgment, Final Order and Decree or the Settlement Agreement shall prevent Defendants from complying with their obligations under state and federal law.

35.    The Court recognizes that situations may arise in which provisions of this Judgment, Final Order and Decree and the Settlement Agreement may conflict with, or differ from, other laws, rules, regulations, statutes, agreements, and the like. In that regard, the Court finds as follows:

a.    *Other Agreements or Legal Requirements*: In the event that in the future, in conjunction with any other matter, lawsuit, regulatory matter, or similar event, Equifax or Fair Isaac (or any of their successors, if applicable) enters into any agreement, consent judgment, settlement, injunction, consent decree, or other binding document regarding the subject matter of the Injunctive Relief or any section herein, or is otherwise required by a court or state or governmental agency to do something or refrain from doing something regarding the subject matter of any section herein, or concerning or relating to the subject matter of the Litigation ("Other Agreement or Requirement"), then, after notice to and consultation with Class Counsel, Equifax and/or Fair Isaac

may petition the Court for relief from any provision of the Injunctive Relief or this Agreement. If the Court grants such relief, then the Settlement will be modified accordingly without the requirement of notice to the Settlement Class or additional consideration by the requesting party or any other Defendant.

      b.    *New Law or New Legal Interpretation*: In the event any federal or state law, rule, regulation, or a judicial, agency, or administrative interpretation including but not limited to formal policy statement or letter ruling is passed, adopted, communicated or rendered after the Effective Date of this Agreement concerning or relating to the Injunctive Relief or the subject matter of any provision of the Injunctive Relief or this Agreement, or concerning the subject matter of the Litigation (a "New Law or Interpretation"), then, after notice to and consultation with Class Counsel, Equifax and/or Fair Isaac may petition the Court for relief from any provision of the Injunctive Relief or this Agreement. If the Court grants such relief, then the Settlement will be modified accordingly without the requirement of notice to the Settlement Class or additional consideration by the requesting party or any other Defendant.

      c.    *Inconsistent Agreements, Law, or Legal Interpretation*: In the event any New Law or Interpretation, or Other Agreement or Requirement, imposes requirements that are inconsistent with any provision of this

Agreement, or Equifax and/or Fair Isaac directly or indirectly becomes bound by any agreement, consent judgment, settlement, or other binding document regarding the subject matter of any provision or section herein, or is otherwise required by a court or state or governmental agency to do something or refrain from doing something regarding the subject matter of any provision herein, or concerning or relating to the subject matter of the Injunctive Relief or the Litigation, then, in the good faith exercise of their discretion, Defendants may comply with such inconsistent requirement(s) or inconsistent agreement(s), and such actions will constitute compliance with this Agreement and shall not be deemed a breach thereof. Provided, however, that Defendants (either individually or jointly) shall timely provide written notice to Class Counsel and the Court of the inconsistent New Law or Interpretation, or Other Agreement or Injunction, with which either or both Defendants intend to comply, and if Class Counsel dispute the inconsistency, then Class Counsel may petition the Court for an order requiring Defendants to comply with the claimed inconsistent provision of this Agreement.

> d.     For purposes of this Judgment, Final Order and Decree and the Settlement Agreement, a requirement of a New Law or Interpretation, or Other Agreement or Requirement, shall be deemed to be inconsistent with a

provision or provisions of this Agreement if Equifax and/or Fair Isaac cannot comply with the New Law or Interpretation, or Other Agreement or Requirement, without violating a corresponding provision or provisions in this Agreement.

36.    The Settlement Agreement is expressly approved and incorporated herein by this reference, and has the full force and effect of an order of this Court. The Parties shall consummate the Settlement Agreement according to its terms.

37.    Under Federal Rule of Civil Procedure 54, the Court, in the interests of justice, there being no just reason for delay, expressly directs the Clerk of the Court to enter this Judgment, Final Order and Decree, and hereby decrees that upon entry it be deemed as a final judgment with respect to all claims by members of the class against Defendants Equifax Consumer Services, Inc. , Fair Isaac Corporation and myFICO Consumer Services, Inc. , in accordance with the terms of the Settlement Agreement.

38.    The Court directs the Clerk of the Court to maintain the record of those members of the Class who have timely excluded themselves from the Class for a period of five years and to provide a certified copy of such records to the Defendants, at their expense.

39.    As to each Defendant, the class actions are dismissed with prejudice and, except as provided herein, without costs.

40.    Federal Rule of Civil Procedure 23(e) mandates that a "class action shall not be dismissed or compromised without the approval of the court." *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1293 (11th Cir. 1999) (quoting Fed. R. Civ. P. 23(e)).  The trial court bears this responsibility and has broad discretion in determining the amount of a fee award in view of its "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."  *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983).

41.    The Court has considered other class action cases and the common-fund awards made therein.  *See, e.g., In re Thirteen Appeals Arising Out of the San Juan DuPont Plaza Fire Litig.,* 556 F.3d 295 (1st Cir. 1995); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297 (N.D. Ga. 1993); *Mashburn v. Nat'l Healthcare, Inc., supra,* 684 F. Supp. 679; *In re Combustion, Inc.,* 968 F. Supp. 1116, 1139 (W.D. La. 1997); *In re Infant Formula Antitrust Litig.,* MDL No. 878 (N.D. Fla. Sept. 7, 1993); *In re Saloman Bros. Treasury Litig.,* No. 91 Civ. 5471 (RPP) (S.D.N.Y. Aug. 5, 1994); *Basile v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 640 F. Supp. 697 (S.D. Ohio

1986). The award the Court approves is within the range of customary fees awarded for actions of this type and size.

42.    In addition to the result, the numerous factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir 1978), also remain relevant in evaluating, setting and reviewing percentage fee awards in common fund cases. *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991). The Court has reviewed all of these factors and concludes that the requested fee is reasonable on these bases as well.

43.    The stage of the proceedings and the quality of Class Counsel's representation also weigh in favor of the requested fee. This case was vigorously litigated for over two years. This Court's decision on Plaintiffs' motions for class certification and for summary judgment significantly impaired Plaintiffs' ability to go forward on a class-wide basis, and it created a significant hurdle to Plaintiff Hillis and any other Class Member's abilities to establish liability. As the Court indicated on the record at the fairness hearing, however, Class Counsel left no proverbial stone unturned, developing a complete record and articulating all available cogent and reasonable arguments in favor of the Class's position on the core liability and certification issues in the case. And, contrary to the Objectors' position that other courts could disagree with this Court's construction of the

CROA or as to the propriety of certification, the Services Agreements contain forum selection clauses that would have required the claims of Class Members to be brought in one forum. Thus, this Court's construction of the CROA would most likely be applicable in any individual case, absent a successful appeal to the Eleventh Circuit. The Settlement is a good result for the Class after development of a complete record, and it brings this difficult litigation to an end.

44.    Based on the Application of Class Counsel, the Court approves the requested fee of $4 million, inclusive of all expenses.

45.    Incentive awards to class representatives are an accepted element of class action cases. *See In re Domestic Air Transp. Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993) (granting incentive awards based on participation); *In re GNC S'holder Litig.*, 668 F. Supp. 450, 452 (W.D. Pa. 1987); *see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broadcasting Co.*, 76 F.R.D. 173 (S.D.N.Y. 1977). Both Hillis and Slack have been involved in the preparation and prosecution of this litigation since the fall of 2004. Each has been an active participant in the discovery process by providing information and documents to their counsel. Each has met with Plaintiffs' Counsel to review and provide documents and discuss the status of the litigation. Each was deposed. Hillis and Slack undertook the responsibility of being Class Representatives seriously, and each

44

diligently pursued his/her claims against Defendants on behalf of themselves and all other persons similarly situated. Each has fulfilled his/her duties as Class Representative, and the Court finds that each is entitled to an award of $7,500 for representing the Settlement Class.

46.    The Court hereby decrees that neither this Judgment, Final Order and Decree nor the Settlement Agreement shall constitute an admission by the Defendants of any liability or wrongdoing whatsoever.

IT IS SO ORDERED this 12th day of June, 2007.

_____
Timothy C. Batten, Sr.
United States District Judge